1    SAMUELSON LAW, TECHNOLOGY & PUBLIC
     POLICY CLINIC
2    JASON M. SCHULTZ (SBN 212600)
     JENNIFER A. LYNCH (SBN 240701)
3    DOMENIC IPPOLITO (*Application for Student
     Practice Pending*)
4    HARI O'CONNELL (*Application for Student Practice
     Pending*)
5    UC Berkeley Law School
     389 Simon Hall
6    Berkeley, CA  94720
     Telephone:  (510) 642-7515
7    Facsimile:  (510) 643-4625
     jlynch@law.berkeley.edu
8
     Attorneys for *Amicus Curiae*
9    Electronic Frontier Foundation

10

11                  UNITED STATES DISTRICT COURT

12                 NORTHERN DISTRICT OF CALIFORNIA

13                        SAN JOSE DIVISION

14

15   COUPONS, INC.,                    │  Case No. 5:07-CV-03457 HRL

16              Plaintiff,             │  BRIEF AMICUS CURIAE OF
        v.                             │  ELECTRONIC FRONTIER
17                                     │  FOUNDATION IN SUPPORT OF
     JOHN STOTTLEMIRE and DOES 1-10,   │  DEFENDANT'S MOTION TO
18                                     │  DISMISS
              Defendants.
19                                     │  Date:       April 22, 2008
                                       │  Time:       10:00 A.M.
20                                     │  Place:      Courtroom 2, 5th Floor
                                       │  Judge:      Hon. Howard R. Lloyd
21

22

23

24

25

26

27

28
                                          Case No. 5:07-CV-03457 HRL

# TABLE OF CONTENTS

I.      INTEREST OF AMICUS ................................................................. 1

II.     INTRODUCTION AND SUMMARY OF ARGUMENT .............................. 1

III.    ARGUMENT ............................................................................ 3

     A.    The First Cause of Action Should Be Dismissed Because Coupons Has Not Alleged Facts Supporting a Claim for Circumvention of an Access Control under Section 1201(a) ....................................................... 3

         1.    The DMCA Requires that a Technological Measure that Controls Reproduction Be Analyzed Under Section 1201(b), Not 1201(a) ............ 4

         2.    Plaintiff's Complaint Describes a Rights Control Not an Access Control ........................................................................................ 7

     B.    The First and Second Causes of Action Should Be Narrowed Because Mr. Stottlemire's First Amendment-protected Speech is not a Circumvention Tool ............................................................................................ 10

         1.    Neither § 1201(a) nor § 1201(b) Applies to Mr. Stottlemire's Pure Speech ........................................................................................ 10

         2.    Section 1201(c)(4) Expressly Precludes Application of the DMCA to Stottlemire's Pure Speech ........................................................ 11

     C.    The Fifth Cause of Action for Conversion and Trespass to Chattels Should Be Dismissed Because It Is Vague, Threatens Consumer Rights, and is Preempted by the Copyright Act ...................................................... 13

         1.    Coupons Has Failed to Specify the Personal Property Involved in its Claims .................................................................................. 13

         2.    There Is No Property in this Case That Would Properly Lead to a Conversion or Trespass Claim ...................................................... 14

             a.    Stottlemire, Not Coupons, Owns All Tangible Property in this Case, and Thus Coupons Cannot State a Claim for Either Conversion or Trespass Based on Tangible Property ....... 15

             b.    Claims Based on Coupons' Intangible Property Are Preempted by the Copyright Act ................................................. 16

IV.    CONCLUSION ......................................................................... 18

# **TABLE OF AUTHORITIES**

**Cases**

*321 Studios v. Metro Goldwyn Mayer Studios, Inc.*, 307 F.Supp.2d 1085 (N.D. Cal. 2004) ..................................................................................................... 6

*Bell Atlantic Corp. v. Twombly*, 127 S.Ct. 1955 (2007) ....................................... 13, 15

*Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569 (1994) ........................................ 6

*Dielsi v. Falk*, 916 F. Supp. 985 (C.D. Cal. 1996) .................................................. 16

*Dowling v. United States*, 473 U.S. 207 (1985) ..................................................... 15

*Eldred v. Ashcroft*, 537 U.S. 186 (2003) ................................................................. 6

*Firoozye v. Earthlink Network*, 153 F. Supp. 2d 1115 (N.D. Cal. 2001) ......... 14, 16, 17

*Hustler Magazine, Inc. v. Moral Majority, Inc.*, 606 F. Supp. 1526 (C.D. Cal. 1985), *aff'd*, 796 F.2d 1148 (9th Cir. 1986) ........................................................... 6

*Intel Corp. v. Hamidi,* 30 Cal. 4th 1342 (2003) ..................................................... 15

*Kasdan, Simons, McIntyre, Epstein & Martin v. World Savings & Loan Assoc.,* 317 F.3d 1064 (9th Cir. 2003) ............................................................................. 14

*Kremen v. Cohen*, 337 F.3d 1024 (9th Cir. 2003) .................................................. 14

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 387 F.3d 522 (6th Cir. 2004) ................................................................................................................ 8

*Sony Computer Entm't Am., Inc. v. Divineo, Inc.,* 457 F. Supp. 2d 957 (N.D. Cal. 2006) .............................................................................................................. 11

*Storage Tech. Corp. v. Custom Hardware Eng'g & Consulting, Inc.*, 421 F.3d 1307 (Fed. Cir. 2005) ......................................................................................... 6

*United States v. Elcom Ltd.,* 203 F. Supp. 2d 1111 (N.D. Cal. 2002) ................. 6, 8, 10

*Universal City Studios v. Corley*, 273 F.3d 447 (2d Cir. 2001) .......................... 8, 11, 12

*Universal City Studios v. Reimerdes*, 111 F. Supp. 2d 294 (S.D.N.Y. 2000) .......... 8, 11

*Vault Corp. v. Quaid Software, Ltd.*, 847 F.2d 255 (5th Cir. 1988) ........................... 4

**Statutes**

17 U.S.C. § 106 .......................................................................................... 5, 6, 7, 17

BRIEF AMICUS CURIAE OF ELECTRONIC FRONTIER FOUNDATION IN SUPPORT OF
DEFENDANT'S MOTION TO DISMISS

1    17 U.S.C. § 106(1) .................................................................... 5, 7

2    17 U.S.C. § 117 .......................................................................... 6

3    17 U.S.C. § 1201(a) ............................................................. passim

4    17 U.S.C. § 1201(a)(1)(A) ......................................................... 5

5    17 U.S.C. § 1201(a)(2) ............................................................... 5

6    17 U.S.C. § 1201(a)(3)(B) .......................................................... 5

7    17 U.S.C. § 1201(b) ............................................................. passim

8    17 U.S.C. § 1201(b)(1) ........................................................ 2, 4, 5, 7

9    17 U.S.C. § 1201(c)(4) ..................................................... 2, 10, 11, 12

10    17 U.S.C. § 121 .......................................................................... 6

11    17 U.S.C. § 301 ................................................................ 3, 16, 17

12    **Rules**

13    Federal Rule of Civil Procedure 8(a) ...................................... 13

14    **Other Authorities**

15    3 Nimmer on Copyright ....................................................... passim

16    H.R. Rep. No. 105-551(II), 1998 WL 414916 ........................ 8

17    *Judicial Council of California Civil Jury Instructions §§ 2100-01* ........... 14

18    Pamela Samuelson & Suzanne Scotchmer, *The Law and Economics of Reverse*

19    *Engineering*, 111 Yale L.J. 1575 (2002) ............................... 12

20    R. Anthony Reese, *Will Merging Access Controls and Rights Controls Undermine*

21    *the Structure of Anticircumvention Law?*, 18 Berkeley Tech L.J. 619, 623-24

22    (2003). ............................................................................. 4, 5, 7

23    S. Rep. No. 105-190, 1998 WL 239623 .............................. passim

24

25

26

27

28

## I.     INTEREST OF AMICUS

The Electronic Frontier Foundation ("EFF") is a nonprofit public interest organization dedicated to protecting civil liberties and free expression in the digital world. Founded in 1990, EFF represents the interests of Internet users in court cases and in the broader policy debates surrounding the application of law in the digital age and publishes a comprehensive archive of digital civil liberties information on its website at EFF.org.

In working to ensure that the public's traditional rights are preserved as we move into the digital era, EFF has participated as counsel or *amicus curiae* in many of the leading cases testing the anticircumvention provisions of the Digital Millennium Copyright Act ("DMCA").

The Samuelson Law, Technology & Public Policy Clinic at the U.C. Berkeley School of Law (Boalt Hall) ("Clinic") was the first clinic in the country to provide law students with the opportunity to represent the public interest in cases and matters on the cutting-edge of high technology law. Since January 2001, students participating in the Clinic have worked with leading lawyers in nonprofit organizations, government, private practice, and academia to represent clients on a broad range of legal matters including free speech, privacy, copyright, and open source software.

## II.    INTRODUCTION AND SUMMARY OF ARGUMENT

The causes of actions claimed in Coupons, Inc.'s ("Coupons") Second Amended Complaint ("SAC" or "Complaint") raise troubling questions of public policy. If allowed, they threaten the public interest in three ways: (1) they blur the Congressionally-delineated line between DMCA access controls and rights controls, (2) they improperly extend the DMCA to prohibit protected speech, and (3) they create a new theory of trespass to chattels and conversion that threatens to inject inconsistent state laws into an area explicitly reserved to the federal Copyright Act. EFF and the Clinic strongly urge this Court to reject these arguments and dismiss Claims One and Five from the SAC.

Coupons first threatens the public interest by blurring Congress's carefully crafted distinction between technological measures that guard against *access* to a work ("access

1  controls")—which are protected under § 1201(a) of the DMCA—and technological measures
2  that secure *exclusive rights* protected by the Copyright Act ("rights controls")—which are
3  protected under § 1201(b)(1) of the DMCA.[1] *See generally* Nimmer & Nimmer, 3 Nimmer on
4  Copyright § 12A.03[C] & [D] (hereinafter "Nimmer"). The distinction between access controls
5  and rights controls is not merely semantic; Congress specified very different restrictions on
6  circumvention for these two types of technological protection measures. Specifically, the
7  DMCA's section on rights controls applies only to the distribution of circumvention tools, and,
8  unlike the section on access controls, does not apply to individual acts of circumvention. This
9  distinction leaves room for individual fair uses, adaptations for the blind, library research, and
10 the other statutory exceptions to copyright.

11        Coupons alleges that Defendant John Stottlemire ("Stottlemire") created and
12 distributed a tool that modified Coupons' software and allowed users to print more coupons than
13 would otherwise be possible. (SAC ¶¶ 26-27.) Coupons then alleges that, based on these actions,
14 Stottlemire violated both the access-control and rights-control provisions of § 1201. (SAC ¶¶ 39-
15 44.) Yet, as Coupons' own Complaint makes clear, the security measure Stottlemire is alleged to
16 have circumvented only controlled *reproduction* of the coupons, not *access* to them, and thus can
17 only fall under § 1201(b)(1). Accordingly, Coupons' First Cause of Action should be dismissed.

18        Additionally, it appears that Coupons rests its DMCA claims at least partially on
19 writings Mr. Stottlemire posted on the Internet. (*See* SAC ¶¶ 24-25, 37.) As these writings appear
20 to be pure speech, such allegations directly implicate the First Amendment as well as ignore the
21 definition of a circumvention tool in both § 1201(a)(2) and § 1201(b). They also disregard the
22 explicit free speech exemption of § 1201(c)(4). Accordingly, any cause of action that predicates
23 liability on such speech should be dismissed.

24        Finally, Coupons' Fifth Cause of Action alleges that Stottlemire committed
25 trespass to chattels and conversion. These claims must also fail for three reasons. First, Coupons

26 _____

27 [1] Unless otherwise noted, all statutory citations are to Title 17 of the U.S. Code.

28

1     has failed to identify the property allegedly converted or trespassed upon and therefore misses

2     the most essential element of the claim. Second, if Coupons is claiming its trespass and

3     conversion claims are based on its interest in some tangible property, the claims fail because the

4     only tangible property identified in the Complaint belongs to Stottlemire. Third, and perhaps

5     most importantly, if Coupons is basing its claims on intangible property rights in its allegedly

6     copyrighted coupons or software, those claims are preempted by Section 301 of the Copyright

7     Act. Therefore, the Fifth Cause of Action should be dismissed.

8    **III. ARGUMENT**

9        **A.**     **The First Cause of Action Should Be Dismissed Because Coupons Has Not**
**Alleged Facts Supporting a Claim for Circumvention of an Access Control**
10           **under Section 1201(a)**

11        Section 1201 contains two separate types of technology prohibitions: (1)

12     prohibitions on technologies that circumvent measures that control access to a copyrighted work,

13     set forth in § 1201(a) (access controls), and (2) prohibitions on technologies that circumvent

14     measures that protect a statutory right of the copyright holder, set forth in § 1201(b) (rights

15     controls). *See* S. Rep. No. 105-190, 1998 WL 239623 at *12 (1998)[2] (stating that the sections

16     "are designed to protect two distinct rights and to target two distinct classes of devices.

17     Subsection 1201(a)(2) is designed to protect access to a copyrighted work. Section 1201(b) is

18     designed to protect the traditional copyright rights of the copyright owner."); 3 Nimmer

19     § 12A.03[C].

20        In the Complaint, Coupons alleges that Mr. Stottlemire violated both § 1201(a)

21     and § 1201(b) of the DMCA by creating and distributing software that removed limitations on

22     the number of times a coupon could be printed from the coupons.com website. (SAC ¶¶ 26-27;

23     39-44 (First Cause of Action under 1201(a)); 45-48 (Second Cause of Action under 1201(b)).)

24     As the Complaint itself makes clear, however, the "security features" allegedly bypassed only

25     controlled the number of copies of each coupon a user could print. Because reproduction is not

26      ————————————————

27     [2] The complete legislative history of the DMCA can be found at
      <http://www.hrrc.org/index.php?id=20&subid=3>.

28

BRIEF AMICUS CURIAE OF ELECTRONIC FRONTIER FOUNDATION IN SUPPORT OF
DEFENDANT'S MOTION TO DISMISS

an issue of *access,* but rather an exclusive right of a copyright owner, the only proper cause of action available to Coupons would be under § 1201(b)(1) for manufacture or distribution of a device that circumvents a rights control. Accordingly, the First Cause of Action under § 1201(a) should be dismissed.

> **1.    The DMCA Requires that a Technological Measure that Controls Reproduction Be Analyzed Under Section 1201(b), Not 1201(a)**

Section 1201 created a new form of protection for copyrighted works. Prior to the enactment of the DMCA, a user of copyrighted material was not prohibited from circumventing any technological protection measure that was included with that work. *See Vault Corp. v. Quaid Software, Ltd*., 847 F.2d 255, 267 (5th Cir. 1988) (holding, prior to the enactment of the DMCA, that the maker of a software program that defeated copy-protection measures on floppy disks was not liable for contributory copyright infringement); *see also* S. Rep. No. 105-190, 1998 WL 239623 at *12 (1998) ("The prohibition in 1201(a)(1) is necessary because prior to this Act, the conduct of circumvention was never before made unlawful."). In enacting § 1201, Congress sought to give copyright owners greater legal recourse in protecting their intellectual property while preserving the public's long recognized right to engage in certain non-infringing uses of that property such as fair use. *See* R. Anthony Reese, *Will Merging Access Controls and Rights Controls Undermine the Structure of Anticircumvention Law?*, 18 Berkeley Tech L.J. 619, 623-24 (2003).

In order to achieve this dual goal, § 1201 of the DMCA divides security features into two distinct groups and governs them through two separate subsections: § 1201(a) and § 1201(b). *See* 3 Nimmer § 12A.03 [C] ("Although the two provisions 'are worded similarly and employ similar tests, they are designed to protect two distinct rights and to target two distinct classes of devices.'") (citation omitted).

Subsection (a) applies to any "technological measure that effectively controls *access*" to a copyrighted work. § 1201(a)(1)(A) (emphasis added). Such a measure effectively controls access to the work "if the measure in the ordinary process of its operation, requires the application of information or a process or a treatment, with the authority of the copyright owner,

1    to gain access to the work." § 1201(a)(3)(B). For access-control measures, the statute bars both

2    the individual act of circumvention, § 1201(a)(1)(A), and the distribution, manufacture and

3    dissemination of circumvention tools, § 1201(a)(2)(A)-(C).

4          Subsection (b), on the other hand, applies only to a "technological measure that

5    effectively protects a *right* of a copyright owner under this title." § 1201(b)(1)(A) (emphasis

6    added). *See* 3 Nimmer § 12A.03 [C] ("[t]he difference [between sections (a) and (b)] can be

7    compared to breaking into another's domain, as opposed to being permitted entry—but then

8    proceeding to violate the host's 'house rules.'"). The rights, or "house rules," referenced by

9    § 1201(b) are the exclusive rights granted by § 106 of the Copyright Act, including the right to

10    reproduce the work in § 106(1). Unlike subsection (a), subsection (b) prohibits only the

11    manufacture and distribution of a circumvention tool; it "does not, by itself, prohibit the

12    circumvention of effective technological copyright protection measures." S. Rep. No. 105-190, at

13    *29 (1998); *see also Reese*, 18 Berkeley Tech L.J. at 653 ("The main difference in the regulation

14    of access and rights controls . . . is that the statute bans only acts that circumvent access-control

15    measures. Circumvention devices, on the other hand, are equally prohibited, regardless of which

16    type of control measure they circumvent.").

17          The chart below summarizes the differences between § 1201(a) and § 1201(b).

| | *Act of Circumvention* | *Distribution/Manufacture of Circumvention Tool* |
|---|---|---|
| ***Access-Control Technology*** | Prohibited by § 1201(a)(1) | Prohibited by § 1201(a)(2) |
| ***Rights-Control Technology*** | Not prohibited | Prohibited by § 1201(b)(1) |

24          The distinction between these two prohibitions represents an important statutory

25    and policy choice made by Congress when it passed the DMCA in 1998. In forbidding the act of

26    circumvention for access-controls but not for rights-controls, Congress "anticipated that most

27    acts of circumventing a technological copyright protection measure [(rights control)] will occur

28    in the course of conduct which itself implicates the copyright owners['] rights under title 17." S.

Rep. No. 105-190, at *29 (1998). In other words, no ban on acts of circumvention was needed

for rights controls because traditional copyright law principles already provided sufficient

protections for copyright owners.

Further, Congress did "not intend[] in any way to enlarge or diminish those

rights." *Id.* Traditional copyright law provides both rights for copyright holders, *see* § 106, and

exceptions to those rights that benefit the public, *see* §§ 107-22. These exceptions include the

fair use exception defined in § 107,[3] the exception for distributing copies in a format readable by

the blind in § 121, and the exception for creating a backup copy of computer software in § 117.

A ban on the *act* of circumventing rights controls would have potentially limited the

effectiveness of these exceptions.[4] In order to avoid this result, § 1201(b) does not prohibit acts

of circumvention that enable copying. *See United States v. Elcom Ltd.,* 203 F. Supp. 2d 1111,

1120-21 (N.D. Cal. 2002) ("Congress did not prohibit the act of circumvention [under § 1201(b)]

because it sought to preserve the fair use rights of persons who had lawfully acquired a work.").

Practically, this means that if a user gains lawful access to a copyrighted work, copying that

---

[3] The Supreme Court has emphasized that fair use serves to harmonize the restrictions of copyright law with the First Amendment. *See Eldred v. Ashcroft,* 537 U.S. 186, 219-20 (2003) (explaining that fair use is one of copyright law's "built-in First Amendment accommodations"). Without the fair use doctrine, many socially-valuable forms of speech would be prohibited by copyright law. *See, e.g. Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569 (1994) (holding a musical parody of the song "Pretty Woman" was protected under the fair use doctrine); *MasterCard Int'l Inc. v. Nader 2000 Primary Comm., Inc.*, 70 U.S.P.Q.2d 1046 (S.D.N.Y. 2004) (finding a political ad that parodied Mastercard's ad campaign was fair use); *Hustler Magazine, Inc. v. Moral Majority, Inc.*, 606 F. Supp. 1526, 1536 (C.D. Cal. 1985), *aff'd,* 796 F.2d 1148 (9th Cir. 1986) (holding that Jerry Falwell's use of Hustler's copyrighted cartoon attacking him to raise donations from his followers qualified as fair use in part because it was a portion of a broader dialogue and thus served the public interest in free expression).

[4] For example, in cases involving the ban on circumvention of access controls, courts are still debating whether traditional copyright exceptions provide a defense. *See Storage Tech. Corp. v. Custom Hardware Eng'g & Consulting, Inc.*, 421 F.3d 1307, 1318-19 (Fed. Cir. 2005) (holding that a copyright holder must show a nexus to infringement in order to succeed in a claim under the DMCA and that statutorily exempted actions did not create such a nexus); *but see 321 Studios v. Metro Goldwyn Mayer Studios, Inc.*, 307 F.Supp.2d 1085, 1101-02 (N.D. Cal. 2004) (holding that the bar on circumvention of access controls in the context of DVDs did not impermissibly burden fair use because the public could find ways to fairly use the material without circumventing the access control).

BRIEF AMICUS CURIAE OF ELECTRONIC FRONTIER FOUNDATION IN SUPPORT OF
DEFENDANT'S MOTION TO DISMISS

1  qualifies as fair use under § 107 does not give rise to liability even if a technological control that

2  restricts copying was circumvented in the process. *See Reese*, 18 Berkeley Tech. L.J. at 623

3  ("[A] person who circumvents a rights-control measure does not commit any violation of § 1201,

4  and . . . is subject only to liability for copyright infringement[.]"). Therefore, for individual acts

5  of circumvention involving rights controls, the traditional balance between the public and

6  copyright holders is maintained.

7          The anti-distribution provision of § 1201(b) does not defeat Congress's intention

8  to leave the traditional copyright exceptions intact. This ban applies only to tools that (1) are

9  primarily designed for circumventing a rights control, or (2) have only limited commercial

10  purpose other than circumventing a rights control, or (3) are marketed for the purpose of

11  circumventing a rights control. § 1201(b)(1)(A)-(C). Therefore, it is possible not only to

12  circumvent a rights control without falling afoul of § 1201(b), but also to distribute a tool that

13  facilitates such circumvention as long as that tool does not fall into one of the above categories.

14  *Id*. This reinforces the fact that Congress did not intend § 1201 to effectively eliminate the

15  traditional copyright exceptions for works protected with a rights-control technology. *See also* S.

16  Rep. No. 105-190, at *12, *29 (1998) (stating that 1201(b) was intended to "enforce[] the

17  longstanding prohibitions on infringements" and that the "provision is designed to protect

18  copyright owners, and simultaneously allow the development of technology.").

19          Therefore, in order to help preserve the public's traditional rights under copyright

20  law as Congress intended, it is important that the distinction between §§ 1201(a) and (b) not be

21  blurred.

22          **2.      Plaintiff's Complaint Describes a Rights Control Not an Access**
                       **Control**
23

24          Coupons' First Cause of Action attempts to blur the line between access controls

25  and rights controls by alleging a violation of § 1201(a) even though Coupons' security measures,

26  as alleged in the Complaint, are solely intended to prevent users from printing additional

27  unauthorized copies of their coupons. Copying, or reproduction, is clearly specified as one of the

28  exclusive rights reserved to a copyright holder. § 106(1). Therefore, as noted above,

1    circumvention of a measure that controls reproduction but not access should be analyzed under

2    § 1201(b).

3         Coupons' security features cannot qualify as an access control because the

4    coupons at issue are fully accessible to any user the first time they are printed. While the DMCA

5    does not explicitly define what constitutes an access control, courts interpreting the statute have

6    made clear that a security measure cannot qualify as an effective access control when the work it

7    purports to protect is otherwise accessible. For example, in *Lexmark Int'l, Inc. v. Static Control*

8    *Components, Inc.*, 387 F.3d 522 (6th Cir. 2004), the court found that a security feature that had

9    to be bypassed in order to activate software embedded within a printer was not an effective

10   access control because a user who had bought the printer already had access to the software

11   inside the printer by simply opening it up physically. *Id.* at 547 ("[J]ust as one would not say that

12   a lock on any door of a house 'controls access' to the house after its purchaser receives the key to

13   the lock, it does not make sense to say that this provision of the DMCA applies to otherwise-

14   readily-accessible copyrighted works."). Similarly, in *Elcom,* where the defendant distributed a

15   tool that removed the technological protection measures embedded in electronic books that

16   controlled whether a book could be copied or distributed, the court analyzed the case under

17   § 1201(b) as a rights-control case. 203 F. Supp. 2d at 1122. Users with or without a

18   circumvention tool were able to view the book, so the tool was only needed to make

19   unauthorized copies, not to access the material in the first place. *Id.* at 1118.

20        To qualify as an access control, a technological protection measure must control

21   *complete* access to a work, making circumvention necessary to gain any access to the work at all.

22   For example, DVD encryption was found to be an effective access control because it prevented

23   any viewing of the underlying movie. *Universal City Studios v. Reimerdes*, 111 F. Supp. 2d 294,

24   317-18 (S.D.N.Y. 2000), *aff'd sub nom., Universal City Studios v. Corley,* 273 F.3d 429 (2d Cir.

25   2001). This view is supported by the legislative history of the DMCA in which Congress posited

26   that "measures that can be deemed to 'effectively control access to a work' would be those based

27   on encryption, scrambling, authentication, or some other measure which requires the use of a

28   'key' provided by a copyright owner to gain access to a work. " H.R. Rep. No. 105-551(II), 1998

1 WL 414916 at *39. The Senate Report additionally specifies that the ban on circumvention of an

2 access control "does not apply to the subsequent actions of a person once he or she has obtained

3 authorized access to a copy of a work protected under title 17, even if such actions involve

4 circumvention of other types of technological protection measures." S. Rep. No. 105-190, 1998

5 WL 239623 at *28.

6        As described in the Complaint, Coupons' security measures do not meet the

7 definition of an access control. Rather, since Coupons' admitted purpose is to limit a user's

8 ability to reproduce the allegedly copyrighted coupons, (SAC ¶ 16), this case presents a clear

9 example of a rights-control technology and should be analyzed under § 1201(b). For example,

10 the Complaint specifies that "Plaintiff offers a number of security products to its clients to

11 prevent unauthorized *copying* of its coupons, including proprietary technology that limits the

12 number of times a user can print a coupon." (SAC ¶ 13 (emphasis added).) Additionally it states

13 that the software "contains built-in security measures to prevent consumers from printing more

14 than the authorized number of *copies* of the coupons." (*Id.* ¶ 16 (emphasis added).) Finally, the

15 Complaint maintains that "Plaintiff's *anti-copying restrictions* are critical to the integrity and

16 desirability of Plaintiff's technology. Plaintiff's ability to control *electronic reproduction* of

17 unique coupons is crucial to Plaintiff's commercial success." (*Id.* ¶ 17 (emphasis added).)

18        To understand why this technology, as described, cannot qualify as an access

19 control, imagine two different users of the software: the first has installed Coupons' software but

20 has not modified it, the second has installed Coupons' software and then modified it with

21 Stottlemire's alleged circumvention tool. Both users can access a coupon. Additionally, both can

22 print it at least once (probably twice). (*See* SAC ¶ 30.) The difference between them appears only

23 when the users try to print more than two copies of the coupon; the first user with the unmodified

24 software cannot, while the second user with the modified software can. Therefore, the

25 circumvention tool only changes the number of times that a user can reproduce a coupon. (*See*

26 SAC ¶ 26 ("Defendants created and used software that purported to remove Plaintiff's security

27 features, for the purpose of printing more coupons than Plaintiff's security features allow").) It

28 does not control initial access; the user without the circumvention tool can access the coupon as

1    easily as the user with it. In this way, Coupons' security measure mirrors those analyzed in

2    *Lexmark* and *Elcom*; it cannot be an effective access control because any user of the system is

3    provided unrestricted access to at least one copy of the copyrighted work. *See Lexmark*, 387 F.3d

4    at 547; *Elcom*, 203 F. Supp. 2d at 1118; S. Rep. No. 105-190, at *28.

5           The Court should follow the examples of *Lexmark* and *Elcom* by analyzing the

6    circumvention tool only under § 1201(b) and dismissing Coupons' First Cause of Action under

7    § 1201(a).

8    **B.     The First and Second Causes of Action Should Be Narrowed Because Mr.
             Stottlemire's First Amendment-protected Speech is not a Circumvention
9            Tool**

10          In addition to blurring the line between access and rights controls, Coupons'

11   Complaint attempts to expand the scope of anticircumvention liability to encompass comments

12   Mr. Stottlemire posted on several online forums. (SAC ¶ 24, 37.) Coupons alleges that in these

13   comments Mr. Stottlemire described a method for removing its security features. (SAC ¶ 24.) It

14   is important to distinguish between these written comments and the software tool Mr. Stottlemire

15   is also alleged to have posted online (*see* SAC ¶¶ 26-27) and to narrow the First and Second

16   Causes of Action to exclude any claims based on Mr. Stottlemire's protected speech.

17          **1.      Neither § 1201(a) nor § 1201(b) Applies to Mr. Stottlemire's Pure
                      Speech**
18

19          Sections 1201(a)(2) and 1201(b)(1) both specify that "[n]o person shall

20   manufacture, import, offer to the public, provide, or otherwise traffic in any technology, product,

21   service, device, component, or part thereof." §§ 1201(a)(2), 1201(b)(1). Under any ordinary

22   reading of the words listed, Mr. Stottlemire's written instructions do not qualify as a

23   circumvention tool. Moreover, as will be discussed in the next section, even if one of the

24   categories could be stretched to include Stottlemire's writings, Congress has explicitly precluded

25   such an interpretation in § 1201(c)(4).

26          Coupons alleges that Stottlemire's online comments are one of the bases for its

27   First and Second Causes of Action; Coupons refers to Stottlemire's informative comments as

28   "circumvention methods," (SAC ¶ 24, 37), and then alleges that providing a "method" is a

violation of the DMCA. (SAC ¶ 41, 46.) "Method" is a word notably absent from the definition

of a circumvention tool in sections 1201(a) and (b). Moreover, cases interpreting the DMCA

show that plain text speech such as Stottlemire's was never intended to be covered by the phrase

"technology, product, service, device, component, or part thereof" in the statute. For example,

courts have found that trafficking in computer software that decrypted DVDs qualified under the

"technology" prong of 1201(a)(2), *Reimerdes*, 111 F. Supp. 2d at 317 (S.D.N.Y. 2000), and that

distributing computer hardware that modified a video game system so as to avoid technological

protection measures qualified under the "device" prong, *Sony Computer Entertainment America,*

*Inc. v. Divineo, Inc.,* 457 F. Supp. 2d 957, 965 (N.D. Cal. 2006). However, no court has extended

any of these terms to encompass written instructions. In alleging that Stottlemire's written

descriptions of circumvention "methods" fall within the DMCA, Coupons is asking the Court to

ignore the statutory definition of a circumvention tool.

Therefore, because the plain meaning of the statute excludes Stottlemire's online

comments, the First and Second Causes of Action should be narrowed to eliminate any reliance

on those comments.

## 2. Section 1201(c)(4) Expressly Precludes Application of the DMCA to Stottlemire's Pure Speech

Even if the meaning of "technology, product, service, device, component, or part

thereof" within sections 1201(a) and (b) could be stretched to encompass Mr. Stottlemire's

speech, his comments are nonetheless expressly protected by § 1201(c)(4). This section states,

"Nothing in this section shall enlarge or diminish any rights of free speech . . . for activities using

consumer electronics, telecommunications, or computing products." § 1201(c)(4).

Mr. Stottlemire's online comments describing his alleged circumvention method

constitute protected speech. *See Universal City Studios v. Corley*, 273 F.3d at 447 ("Thus, for

example, courts have subjected to First Amendment scrutiny restrictions on the dissemination of

technical scientific information, and scientific research, and attempts to regulate the publication

of instructions.") (citations omitted). The closest any court has come to applying the DMCA to a

form of speech was in *Universal City Studios v. Corley.* There, however, the court held that the

DMCA's anticircumvention provisions applied to executable computer code—a form of speech that could be regulated because it also functionally performed the act of circumvention. *Id.* at 451. Further, the court held that Internet hyperlinks connecting users of defendant's web page directly to the unlawful computer program could be prohibited, again because the program at issue directly performed the circumvention act. *Id.* at 457. The court reasoned that computer code (and direct hyperlinks to it) were entitled to less protection than pure speech because computer code had both functional and expressive elements and could yield a "functional result without any human comprehension of its content, human decision-making, [or] human action." *Id.* at 451. This instantaneous functionality distinguished code from other types of instructions such as "a blueprint or a recipe" which the court classified as "entirely speech." *Id.*

Mr. Stottlemire's comments, however, are precisely like a recipe or a blueprint. His descriptions of circumvention "methods" "cannot yield any functional result without human comprehension of its content, human decision-making, and human action." *See Corley*, 273 F.3d at 451. Users cannot merely convert his descriptions into a functional device or tool with one mouse click, as they could with the computer program in *Corley*. Instead, users must individually follow each of the instructions as they would with a recipe. Accordingly, the comments lack the degree of instant functionality that the court found decisive in *Corley*, and instead are "entirely speech." *See id.* Therefore, a holding by this Court that Stottlemire's comments violated either § 1201(a)(2) or § 1201(b) would conflict with the explicit guidance provided by Congress in § 1201(c)(4) instructing that § 1201 should not diminish the right to free speech.

In addition to § 1201's statutory language and associated caselaw, there are sound policy reasons to draw a bright line between circumvention tools and speech. Extending the anticircumvention provisions to pure speech could stifle scientific research and technological innovation. *See, e.g.,* Pamela Samuelson & Suzanne Scotchmer*, The Law and Economics of Reverse Engineering*, 111 Yale L.J. 1575, 1646-47 (2002). Already, some researchers have been forced to contend with DMCA threats when attempting to publish scientific research papers. *Id.* at 1647. In one incident, Princeton computer science professor Edward Felten accepted a challenge from the Recording Industry Association of America ("RIAA") to find flaws in their

1   audio recording protection measures. When the RIAA learned that he planned to publish his

2   results, it threatened to sue for violation of the DMCA. *Id.* at 1647 n.333. The threat was

3   eventually dropped, but not before Felten spent significant resources on the legal battle, and the

4   colorable threat of legal liability has had a chilling effect on other researchers. *Id.* Permitting

5   Coupons to proceed on its § 1201 claims against Stottlemire's pure speech would only

6   exacerbate the legal uncertainty that has plagued researchers in the computer security field.

7           For these reasons, the First and Second Causes of Action should be narrowed to

8   eliminate any reliance on Stottlemire's comments.

9   **C.      The Fifth Cause of Action for Conversion and Trespass to Chattels Should
            Be Dismissed Because It Is Vague, Threatens Consumer Rights, and is**
10          **Preempted by the Copyright Act**

11          Coupons Fifth Cause of Action, alleging conversion and trespass to chattels, fails

12  on at least three grounds. First, the claim does not describe its central element—what property

13  Stottlemire is accused of converting or trespassing upon. Second, all of the tangible property

14  identified in the complaint belongs to Stottlemire. Finally, Coupons' claim cannot be based upon

15  any of its intangible property interests, as any such claim is preempted by federal copyright law.

16          **1.      Coupons Has Failed to Specify the Personal Property Involved in its
                    Claims**
17

18          Coupons asserts that Stottlemire has committed conversion and trespass to

19  chattels, but has not alleged what item of its property Stottlemire has interfered with. Under

20  Federal Rule of Civil Procedure 8(a) and *Bell Atlantic Corp. v. Twombly*, 127 S.Ct. 1955 (2007),

21  a complaint must show that the pleader is entitled to relief and must "give the defendant adequate

22  notice of what the claim is and the grounds upon which it rests." Fed. R. Civ. P. 8(a)(2);

23  *Twombly*, 127 S.Ct. at 1964. A bare assertion that a claim exists and that some set of facts may

24  be discovered that entitles the plaintiff to relief is not sufficient. *Twombly,* 127 S. Ct. at 1965.

25  Coupons has failed to specify what item of its property it believes has been interfered with and

26  has failed to allege any facts that would constitute either a trespass to chattels or a conversion

27  claim against Stottlemire.

28          The requirement to specifically call out the item of property interfered with is not

superficial or ancillary. Ownership of the personal property involved in a conversion or trespass to chattels claim is an essential element of the claim. *See Kasdan, Simons, McIntyre, Epstein & Martin v. World Savings & Loan Assoc.*, 317 F.3d 1064, 1069 (9th Cir. 2003) (noting that the elements of conversion include "(1) the plaintiff's ownership or right to possession of the property").[5] Nonetheless, Coupons has failed to specify the property in which it is asserting an ownership interest. The essence of the Complaint is that after Stottlemire installed Coupons' software on his computer, he circumvented security features that were part of that installed software and then printed "unauthorized" copies of coupons. (SAC ¶¶ 15-16, 26.) However, Coupons has not stated whether it thinks its software, the security features contained in that software, the "unauthorized" copies of coupons, or something else entirely constituted the relevant personal property. By failing to specify the property involved in this claim and its ownership of that property, Coupons has failed to give Stottlemire adequate notice of the grounds upon which the claims rest, and therefore the claims should be dismissed.

### 2. There Is No Property in this Case That Would Properly Lead to a Conversion or Trespass Claim

Moreover, there appears to be no set of facts that would support a trespass or conversion claim. Conversion and trespass may be based on either tangible or intangible property. *See, e.g., Kremen v. Cohen*, 337 F.3d 1024 (9th Cir. 2003) (holding that misappropriation of the intangible domain name "sex.com" was properly handled as a conversion claim); but *cf.* Nimmer § 1.01 [B](1)(i-j) (noting that the torts of conversion and trespass relate to "interference with *tangible* rather than *intangible* property." (emphasis added)). In this case, however, all the relevant tangible property is owned by Stottlemire. And, as explained below, Coupons' claims for conversion or trespass based on its *intangible* property are preempted by federal copyright law. *See Firoozye v. Earthlink Network*, 153 F. Supp. 2d 1115,

---

[5] The other elements of the claims are: the defendant either interfered with plaintiff's use or possession of the property (conversion), or damaged the property (trespass); without plaintiff's consent; causing harm to the plaintiff; and said harm was substantially due to the conduct of the defendant. *Judicial Council of California Civil Jury Instructions §§ 2100-01.*

1130 (N.D. Cal. 2001) (conversion claims based on intangible copyrights are preempted by federal law).

### a. Stottlemire, Not Coupons, Owns All Tangible Property in this Case, and Thus Coupons Cannot State a Claim for Either Conversion or Trespass Based on Tangible Property

As to tangible property, Coupons has not alleged ownership of any of the tangible property that could possibly have been involved in either a conversion or trespass claim. There are only four items of tangible property mentioned in the complaint: printers for printing coupons, the paper on which the coupons are printed, the personal computer that activates the printing process, and Coupons' server that sends the coupon data to the personal computer for printing. (SAC ¶ 15.) However, as alleged, the computer, the printer, and the paper at issue all belong to Stottlemire, not Coupons. (*See id.* (alleging that client software was running on "the consumer's personal computer" and the coupon was sent directly to "the consumer's printer").)[6]

As to Coupons' computer servers, there is no allegation that Stottlemire ever interfered with them. Instead, quite the opposite is true: Coupons notes that, rather than Stottlemire meddling with its servers, it is *Coupons* that sends files from its server to *Stottlemire's* computer. (SAC ¶ 15.)[7]

_____

[6] Any claim by Coupons that it has acquired a tangible property interest in Stottlemire's computer or paper as a result of the incorporation of its intellectual property (for example, by Stottlemire installing Coupons' software on his computer) should be rejected as absurd. Intellectual property and tangible media are legally separate. *See, e.g.*, *Dowling v. United States*, 473 U.S. 207, 217 (1985) (finding that while distributing bootleg Elvis Presley records may constitute copyright infringement, the copyrights are distinct from the physical records themselves). To hold otherwise would mean that any software company, such as Microsoft, would own large portions of every computer and electronic device running its software; moreover, record labels would have a property interest in every consumer's iPod; and television studios would own part of every viewer's TiVo digital video recorder. This is not the law.

[7] Even if an impairment of Coupons' servers were alleged, the standard for impairment is non-trivial. *See Intel Corp. v. Hamidi,* 30 Cal. 4th 1342, 1356 (2003) (sending tens of thousands of emails over a period of 21 months did not put such a strain on Intel's email server that a trespass action was appropriate). Under *Twombly*, Coupons would need to allege not merely unauthorized use of its servers, but would need to point to facts suggesting so much unauthorized use that the functioning of the servers was impaired.

Case No. 5:07-CV-03457 HRL

**b. Claims Based on Coupons' Intangible Property Are Preempted by the Copyright Act**

Because all tangible property that could form the basis of a conversion or trespass claim belongs to Stottlemire, only Coupons' intangible property rights remain as a possible source for these claims. However, as shown below, to the extent those claims are based on Coupons' alleged copyright in its software or coupons, those claims are preempted by federal law.

Section 301 of the Copyright Act explicitly preempts state and common-law claims arising within the general scope of copyright where the rights asserted are equivalent to those granted by the Copyright Act. § 301; *see also Dielsi v. Falk*, 916 F. Supp. 985, 991-92 (C.D. Cal. 1996) (holding that fraud and unfair competition are not preempted because they are not equivalent to the rights granted by copyright, but that conversion claims are). The Ninth Circuit uses a two-part test to determine whether state-law claims are preempted by the Copyright Act. *See Laws v. Sony Music Entertainment, Inc.*, 448 F.3d 1134, 1137-38 (9th Cir. 2006) (applying the test in a right of publicity case); *Del Madera Properties v. Rhodes and Gardner, Inc.*, 820 F.2d 973, 976-77 (9th Cir. 1987) (applying the test in an unfair competition case). First, the court must determine whether the subject matter involved in the claim falls within the general scope of the subject matter of the Copyright Act. *Laws v. Sony,* 448 F.3d at 1137. Second, the court analyzes whether the rights asserted are equivalent to those protected by the Copyright Act. *Id.* at 1137-38. If the claims meet both parts of this test, they are preempted by the Copyright Act. Here, Coupons' claims for conversion and trespass to chattels meet both parts of this test, and are preempted.

Judge Breyer's ruling for this Court in *Firoozye v. Earthlink Network*, 153 F. Supp. 2d 1115 (N.D. Cal. 2001), is particularly instructive. Plaintiff Firoozye was a software developer who claimed the defendant converted his property by copying and distributing his software to its customers without a license. *Id.* at 1118-19. The Court held first that the software (and computer programs in general) fell within the subject matter of copyright. *Id.* at 1125. The Court then held that, because the plaintiff failed to allege the defendants converted a specific physical or tangible piece of his property (instead the plaintiff alleged that "defendants

1    wrongfully reproduced [his software] without his permission"), the conversion claim failed to

2    add an "extra element beyond unauthorized copying" and was therefore preempted by the

3    Copyright Act. *Id.* at 1130.

4         This case is on all fours with *Firoozye*. First, Coupons has not alleged that the

5    property converted or trespassed upon is anything other than the intangible ownership rights in

6    either its coupons or software, both of which are subject matter covered by the Copyright Act.

7    (*See* SAC ¶ 12 ("coupons are works subject to copyright protection").) Second, Coupons has not

8    alleged violation of any rights other than those protected by § 106. Coupons alleges unauthorized

9    copying and distribution of coupons and unauthorized modification to an installed copy of the

10    coupon-printing software. (SAC ¶¶ 23, 26.) The Copyright Act provides the exclusive remedy

11    for copying and distribution under § 106(1), (3), and for creating modified (or derivative) works

12    under § 106(2). *See* §§ 106, 301(a). Thus because Coupons' intangible property rights are within

13    the subject matter of federal copyright law and because Coupons has failed to allege any

14    additional elements beyond those covered by § 106, its conversion and trespass claims are

15    preempted by § 301(a) and should be dismissed.

16    //

17    //

18    //

19    //

20    //

21    //

22    //

23    //

24    //

25    //

26    //

27    //

28    //

1  **IV.  CONCLUSION**

2        For the foregoing reasons, the First and Fifth causes of action should be

3  dismissed, and the Second cause of action narrowed.

4

5

   DATED:  March 25, 2008                    By: _____ */s/ Jennifer A. Lynch*_____
6
                                                     Jennifer A. Lynch
7                                            Samuelson Law, Technology & Public Policy
                                             Clinic at U.C. Berkeley Law School
8                                            Attorney for Amicus Curiae
                                             Electronic Frontier Foundation
9                                            *(Supervising Attorney)*

10

11                                           By: _____ */s/ Domenic Ippolito*_____

12                                                  DOMENIC IPPOLITO
                                             Intern, Samuelson Clinic
13                                           *(Application for Student Practice Pending)*

14

15                                           By: _____ */s/ Hari O'Connell*_____

16                                                  HARI O'CONNELL
                                             Intern, Samuelson Clinic
17                                           *(Application for Student Practice Pending)*

18

19

20

21

22

23

24

25

26

27

28