# EXHIBIT D

## TO THE APPENDIX OF NON-FEDERAL AND UNPUBLISHED AUTHORITIES CITED IN COUPON'S OPPOSITION TO STOTTLEMIRE'S MOTION TO DISMISS



Caution
As of: Apr 03, 2008

**KOREA SUPPLY COMPANY, Plaintiff and Appellant, v. LOCKHEED MARTIN CORPORATION et al., Defendants and Respondents.**

**No. S100136.**

**SUPREME COURT OF CALIFORNIA**

29 Cal. 4th 1134; 63 P.3d 937; 131 Cal. Rptr. 2d 29; 2003 Cal. LEXIS 1301; 2003 Cal. Daily Op. Service 1825; 2003 Daily Journal DAR 2291

**March 3, 2003, Decided
March 3, 2003, Filed**

**PRIOR HISTORY:** Superior Court of Los Angeles County, No. BC 209893. Brett C. Klein Judge.
Korea Supply Co. v. Lockheed Martin Corp., 90 Cal. App. 4th 902, 109 Cal. Rptr. 2d 417, 2001 Cal. App. LEXIS 550 (2d Dist. 2001).

**DISPOSITION:** We reverse the judgment of the Court of Appeal with respect to its holding that plaintiff has stated a cause of action under the unfair competition law and we affirm the judgment of the Court of Appeal with respect to its determination that plaintiff has stated a cause of action for the tort of interference with prospective economic advantage. The present case is remanded to the Court of Appeal for proceedings consistent with this opinion.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** The Court of Appeal of California, Second Appellate District, Division Four, Los Angeles County (California), held that plaintiff losing bidder stated a cause of action against defendants, winning bidder and its agent, under the unfair competition law and that the losing bidder stated a cause of action for the tort of interference with prospective economic advantage. The winning bidder and the agent appealed.

**OVERVIEW:** The Republic of Korea wished to purchase military equipment known as synthetic aperture radar systems and solicited competing bids from manufacturers. The losing bidder represented one manufacturer in the negotiations for the contract and stood to receive a commission of over $ 30 million, if the manufacturer's bid was accepted. Ultimately, the contract was awarded to the winning bidder. Subsequently, it was revealed that the winning bidder offered bribes and sexual favors to key Korean officials. The losing bidder filed an action asserting claims under California's unfair competition law (UCL), Cal. Bus. & Prof. Code § 17200 et seq., and the tort of interference with prospective economic advantage. The supreme court found that the losing bidder's request for disgorgement was not a remedy permitted under the UCL and that the losing bidder did not state a cause of action under the UCL. However, the losing bidder's complaint clearly alleged that the winning bidder and its agent engaged in unlawful behavior in order to secure the contract. Thus, the losing bidder sufficiently stated a cause of action for the tort of interference with prospective economic advantage.

**OUTCOME:** The supreme court reversed the appellate court's judgment with respect to its holding that the losing bidder stated a cause of action under the UCL and affirmed the appellate court's judgment with respect to its determination that the losing bidder stated a cause of action for the tort of interference with prospective economic advantage. The case was remanded to the appellate court for further proceedings.

**CORE TERMS:** economic advantage, intentional interference, disgorgement, antitrust, restitution, unfair, indirect, interfere, independently, expectancy, intent requirement, contractual, remote, wrongful acts, specific

intent, derivative, remoteness, tortious, tort of interference, tort of intentional, economic relationship, unfair competition law, customer, proximate cause, wrongfulness, italics, dictum, unfair business practice, existing contract, antitrust violation

## LexisNexis(R) Headnotes

*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Defects of Form*
*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Demurrers*
*Civil Procedure > Appeals > Standards of Review > General Overview*
[HN1]Where a case comes to the supreme court after the sustaining of a general demurrer, the supreme accepts as true all the material allegations of the complaint.

*Antitrust & Trade Law > Trade Practices & Unfair Competition > General Overview*
[HN2]The unfair competition law (UCL), Cal. Bus. & Prof. Code § 17200 et seq., prohibits unfair competition, including unlawful, unfair, and fraudulent business acts. The UCL covers a wide range of conduct. It embraces anything that can properly be called a business practice and that at the same time is forbidden by law.

*Antitrust & Trade Law > Trade Practices & Unfair Competition > General Overview*
*Civil Procedure > Justiciability > Standing > General Overview*
*Trademark Law > Federal Unfair Competition Law > Lanham Act > Standing*
[HN3]Standing to sue under the unfair competition law, Cal. Bus. & Prof. Code § 17200 et seq., is expansive as well. Unfair competition actions can be brought by a public prosecutor or by any person acting for the interests of itself, its members or the general public. Cal. Bus. & Prof. Code § 17204.

*Antitrust & Trade Law > Trade Practices & Unfair Competition > General Overview*
*Trademark Law > Federal Unfair Competition Law > False Advertising > General Overview*
[HN4]See Cal. Bus. & Prof. Code § 17200.

*Criminal Law & Procedure > Criminal Offenses > Crimes Against Persons > Bribery > Public Officials > Elements*

*Criminal Law & Procedure > Criminal Offenses > Miscellaneous Offenses > Abuse of Public Office > Illegal Gratuities > Elements*
*Securities Law > Additional Offerings & the Securities Exchange Act of 1934 > Issuer Recordkeeping & Reporting > Foreign Corrupt Practices Act*
[HN5] Cal. Bus. & Prof. Code § 17200 borrows violations from other laws by making them independently actionable as unfair competitive practices. In addition, under § 17200, a practice may be deemed unfair even if not specifically proscribed by some other law.

*Antitrust & Trade Law > Trade Practices & Unfair Competition > General Overview*
*Civil Procedure > Remedies > Damages > General Overview*
*Torts > Transportation Torts > General Overview*
[HN6]While the scope of conduct covered by the unfair competition law (UCL), Cal. Bus. & Prof. Code § 17200 et seq., is broad, its remedies are limited. A UCL action is equitable in nature; damages cannot be recovered. Civil penalties may be assessed in public unfair competition actions, but the law contains no criminal provisions. Cal. Bus. & Prof. Code § 17206. Under the UCL, prevailing plaintiffs are generally limited to injunctive relief and restitution.

*Antitrust & Trade Law > Trade Practices & Unfair Competition > General Overview*
*Civil Procedure > Remedies > Injunctions > General Overview*
*Criminal Law & Procedure > Sentencing > Restitution*
[HN7]Through the unfair competition law, Cal. Bus. & Prof. Code § 17200 et seq., a plaintiff may obtain restitution and/or injunctive relief against unfair or unlawful practices.

*Antitrust & Trade Law > Trade Practices & Unfair Competition > General Overview*
*Civil Procedure > Remedies > General Overview*
[HN8]An order for restitution is one compelling an unfair competition law, Cal. Bus. & Prof. Code § 17200 et seq., defendant to return money obtained through an unfair business practice to those persons in interest from whom the property was taken, that is, to persons who had an ownership interest in the property or those claiming through that person. The object of restitution is to restore the status quo by returning to the plaintiff funds in which he or she has an ownership interest.

*Antitrust & Trade Law > Trade Practices & Unfair Competition > General Overview*
*Civil Procedure > Remedies > General Overview*
[HN9]While restitution is an available remedy under the unfair competition law, Cal. Bus. & Prof. Code § 17200 et seq., disgorgement of money obtained through an unfair business practice is an available remedy in a representative action only to the extent that it constitutes restitution.

*Antitrust & Trade Law > Trade Practices & Unfair Competition > General Overview*
[HN10]See Cal. Bus. & Prof. Code § 17203.

*Governments > Legislation > Interpretation*
[HN11]The fundamental objective of statutory construction is to ascertain the legislature's intent and to give effect to the purpose of the statute. Cal. Code Civ. Proc. § 1859. If the language of the statute is unambiguous, the plain meaning governs.

*Antitrust & Trade Law > Trade Practices & Unfair Competition > General Overview*
*Civil Procedure > Remedies > General Overview*
[HN12]Under Cal. Bus. & Prof. Code § 17203, the statutory authorization to make orders necessary to restore money to any person in interest is clear. An order for restitution, then, is authorized by the clear language of the statute. In fact, restitution is the only monetary remedy expressly authorized by § 17203.

*Governments > Legislation > Interpretation*
[HN13]If the statutory language is ambiguous, an appellate court may look to the history and background of the statute. In ascertaining the legislature's intent, an appellate court attempts to construe the statute to preserve its constitutional validity, as the appellate court presumes that the legislature intends to respect constitutional limits.

*Civil Procedure > Remedies > Damages > Punitive Damages*
*Governments > Legislation > Interpretation*
*Torts > Transportation Torts > General Overview*
[HN14]The language of Cal. Bus. & Prof. Code § 17203 is clear that the equitable powers of a court are to be used to prevent practices that constitute unfair competition and to restore to any person in interest any money or property acquired through unfair practices. While the "prevent" prong of § 17203 suggests that the legislature

considered deterrence of unfair practices to be an important goal, the fact that attorney fees and damages, including punitive damages, are not available under the unfair competition law, Cal. Bus. & Prof. Code § 17200 et seq., is clear evidence that deterrence by means of monetary penalties is not the act's sole objective. A court cannot, under the equitable powers of Cal. Bus. & Prof. Code § 17203, award whatever form of monetary relief it believes might deter unfair practices. The fact that the restore prong of § 17203 is the only reference to monetary penalties in that section indicates that the legislature intended to limit the available monetary remedies under the act.

*Antitrust & Trade Law > Trade Practices & Unfair Competition > General Overview*
*Civil Procedure > Remedies > General Overview*
*Criminal Law & Procedure > Sentencing > Restitution*
[HN15]Under the unfair competition law, Cal. Bus. & Prof. Code § 17200 et seq., an individual may recover profits unfairly obtained to the extent that those profits represent monies given to a defendant or benefits in which a plaintiff has an ownership interest.

*Antitrust & Trade Law > Trade Practices & Unfair Competition > General Overview*
*Civil Procedure > Remedies > General Overview*
[HN16]Nonrestitutionary disgorgement of profits is not an available remedy in an individual action under the unfair competition law, Cal. Bus. & Prof. Code § 17200 et seq.

*Antitrust & Trade Law > Trade Practices & Unfair Competition > General Overview*
*Civil Procedure > Remedies > General Overview*
[HN17]The concept of restoration or restitution, as used in the unfair competition law, Cal. Bus. & Prof. Code § 17200 et seq., is not limited only to the return of money or property that was once in the possession of that person. Instead, restitution is broad enough to allow a plaintiff to recover money or property in which he or she has a vested interest.

*Estate, Gift & Trust Law > Trusts > Constructive Trusts*
*Real Property Law > Trusts > General Overview*
[HN18]To create a constructive trust, there must be a res, an identifiable kind of property or entitlement in defendant's hands. A constructive trust requires money or property identified as belonging in good conscience to a plaintiff which can clearly be traced to particular funds or property in the defendant's possession.

*Antitrust & Trade Law > Trade Practices & Unfair Competition > General Overview*
*Civil Procedure > Remedies > Damages > General Overview*
*Torts > Business Torts > Unfair Business Practices > Remedies*
[HN19]An action under the unfair competition law (UCL), Cal. Bus. & Prof. Code § 17200 et seq., is not an all-purpose substitute for a tort or contract action. Instead, the UCL provides an equitable means through which both public prosecutors and private individuals can bring suit to prevent unfair business practices and restore money or property to victims of these practices. Because of the objective to provide a streamlined procedure for the prevention of ongoing or threatened acts of unfair competition, the remedies provided are limited. While any member of the public can bring suit under the act to enjoin a business from engaging in unfair competition, it is well established that individuals may not recover damages.

*Civil Procedure > Remedies > Damages > General Overview*
*Criminal Law & Procedure > Sentencing > Restitution*
[HN20]Compensation for a lost business opportunity is a measure of damages and not restitution to alleged victims.

*Criminal Law & Procedure > Criminal Offenses > Miscellaneous Offenses > Abuse of Public Office > Illegal Gratuities > Elements*
*Torts > Business Torts > Commercial Interference > Prospective Advantage > Elements*
*Torts > Business Torts > Unfair Business Practices > Elements*
[HN21]To state a claim under the unfair competition law, Cal. Bus. & Prof. Code § 17200 et seq., one need not plead and prove the element of a tort. Instead, one need only show that members of the public are likely to be deceived.

*Governments > Legislation > Effect & Operation > General Overview*
*Torts > Business Torts > Commercial Interference > Prospective Advantage > Elements*
[HN22]The tort of intentional interference with prospective economic advantage does not contain a requirement that a plaintiff plead and prove that the defendant acted with the specific intent, purpose, or design to interfere with the plaintiff's prospective advantage. Instead, it is sufficient for the plaintiff to plead that the defendant knew that the interference is certain or substantially certain to occur as a result of his action.

*Torts > Business Torts > Commercial Interference > Prospective Advantage > Elements*
[HN23]The elements for a claim for intentional interference with prospective economic advantage are: (1) an economic relationship between the plaintiff and some third party, with the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3) intentional acts on the part of the defendant designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic harm to the plaintiff proximately caused by the acts of the defendant.

*Torts > Business Torts > Commercial Interference > Prospective Advantage > Elements*
*Torts > Business Torts > Commercial Interference > Prospective Advantage > Remedies*
[HN24]A plaintiff seeking to recover damages for interference with prospective economic advantage must plead and prove as part of its case-in-chief that the defendant's conduct was wrongful by some legal measure other than the fact of interference itself.

*Governments > Legislation > Effect & Operation > General Overview*
*Torts > Business Torts > Commercial Interference > Prospective Advantage > Elements*
[HN25]Specific intent is not a required element of the tort of interference with prospective economic advantage. While a plaintiff may satisfy the intent requirement by pleading specific intent, i.e., that the defendant desired to interfere with the plaintiff's prospective economic advantage, a plaintiff may alternately plead that the defendant knew that the interference was certain or substantially certain to occur as a result of its action.

*Torts > Business Torts > Commercial Interference > Prospective Advantage > Elements*
[HN26]A plaintiff that chooses to bring a claim for interference with prospective economic advantage has a more rigorous pleading burden since it must show that the defendant's conduct was independently wrongful.

*Torts > Business Torts > Commercial Interference > Prospective Advantage > Elements*
[HN27]While intentionally interfering with an existing contract is a wrong in and of itself, interfering with a

plaintiff's prospective economic advantage is not. To establish a claim for interference with prospective economic advantage, therefore, a plaintiff must plead that the defendant engaged in an independently wrongful act. An act is not independently wrongful merely because defendant acted with an improper motive. The law usually takes care to draw lines of legal liability in a way that maximizes areas of competition free of legal penalties. The tort of intentional interference with prospective economic advantage is not intended to punish individuals or commercial entities for their choice of commercial relationships or their pursuit of commercial objectives, unless their interference amounts to independently actionable conduct. Thus, an act is independently wrongful if it is unlawful, that is if it is proscribed by some constitutional, statutory, regulatory, common law, or other determinable legal standard.

*Governments > Legislation > Effect & Operation > General Overview*
*Torts > Business Torts > Commercial Interference > Prospective Advantage > Elements*
[HN28]In a claim for intentional interference with prospective economic advantage, it is the independent wrongfulness requirement that makes defendants' interference with plaintiff's business expectancy a tortious act. Because the act of interference with prospective economic advantage is not tortious in and of itself, the requirement of pleading that a defendant has engaged in an act that was independently wrongful distinguishes lawful competitive behavior from tortious interference. Such a requirement sensibly redresses the balance between providing a remedy for predatory economic behavior and keeping legitimate business competition outside litigative bounds.

*Criminal Law & Procedure > Scienter > General Intent*
*Torts > Business Torts > Commercial Interference > Prospective Advantage > Elements*
[HN29]In a claim for intentional interference with prospective economic advantage, California has required plaintiffs to show that a defendant has engaged in an independently, or inherently, wrongful act. Under that requirement, a defendant's motive or purpose is relevant only to the extent that it renders the defendant's conduct unlawful.

*Contracts Law > Third Parties > General Overview*
*Torts > Business Torts > Commercial Interference > Contracts > General Overview*
*Torts > Business Torts > Commercial Interference > Prospective Advantage > General Overview*
[HN30]In a claim for intentional interference with prospective economic advantage, a defendant's wrongful actions need not be directed towards a plaintiff seeking to recover for this tort. The interfering party is liable to the interfered-with party when the independently tortious means the interfering party uses are independently tortious only as to a third party. Even under these circumstances, the interfered-with party remains an intended (or at least known) victim of the interfering party - albeit one that is indirect rather than direct. In fact, the most numerous of the tortious interference cases are those in which the disruption is caused by an act directed not at the plaintiff, but at a third person.

*Contracts Law > Third Parties > General Overview*
*Torts > Business Torts > Commercial Interference > Prospective Advantage > General Overview*
[HN31]In a claim for intentional interference with prospective economic advantage, a plaintiff that wishes to state a cause of action for the tort must allege the existence of an economic relationship with some third party that contains the probability of future economic benefit to the plaintiff. The tort protects the expectation that the relationship eventually will yield the desired benefit, not necessarily the more speculative expectation that a potentially beneficial relationship will arise.

*Torts > Business Torts > Commercial Interference > Prospective Advantage > General Overview*
[HN32]In a claim for intentional interference with prospective economic advantage, a defendant must have knowledge of the plaintiff's economic relationship.

*Criminal Law & Procedure > Criminal Offenses > Crimes Against Persons > Bribery > Public Officials > Elements*
*Securities Law > Additional Offerings & the Securities Exchange Act of 1934 > Issuer Recordkeeping & Reporting > Foreign Corrupt Practices Act*
*Torts > Business Torts > Commercial Interference > Prospective Advantage > General Overview*
[HN33]In a claim for intentional interference with prospective economic advantage, a defendant must have engaged in intentionally wrongful acts designed to disrupt a plaintiff's relationship. That requires a plaintiff to plead (1) that the defendant engaged in an independently wrongful act, and (2) that the defendant acted either with the desire to interfere or the knowledge that interference was certain or substantially certain to occur as a result of its action.

*Governments > Legislation > Effect & Operation > General Overview*
*Torts > Business Torts > Commercial Interference > Prospective Advantage > Elements*

[HN34]In a claim for intentional interference with prospective economic advantage, if the interference is not certain or substantially certain to occur as a result of the defendant's acts, then a plaintiff will not be able to state a claim for intentional interference with prospective economic advantage. However, if a defendant knows that its wrongful acts are substantially certain to injure the plaintiff's business expectancy, the defendant can be held liable, regardless of the motivation behind its actions. Liability will not be imposed for unforeseeable harm, since the plaintiff must prove that the defendant knew that the consequences were substantially certain to occur.

*Torts > Business Torts > Commercial Interference > Prospective Advantage > Elements*

[HN35]In a claim for intentional interference with prospective economic advantage, only plaintiffs that can demonstrate actual disruption of their economic relationship will be able to state a claim for that tort.

*Torts > Business Torts > Commercial Interference > Prospective Advantage > Elements*

[HN36]In a claim for intentional interference with prospective economic advantage, a plaintiff must establish proximate causation. Specifically, that element requires a plaintiff to show that the economic harm it suffered was proximately caused by the acts of the defendant.

*Torts > Business Torts > Commercial Interference > Prospective Advantage > General Overview*

[HN37]An actor engaging in unlawful conduct with the knowledge that its actions are certain or substantially certain to interfere with a party's business expectancy should be held accountable. Liability for such actions, which are independently wrongful, should not turn on the subjective intent of the defendant.

## SUMMARY:

## CALIFORNIA OFFICIAL REPORTS SUMMARY

A business representing manufacturers of military equipment brought an action asserting claims under the unfair competition law (UCL) (Bus. & Prof. Code, § 17200 et seq.) and the tort of interference with prospective economic advantage. Plaintiff alleged that defendants illegally induced a foreign government to award a contract of sale to a company other than the one represented by plaintiff. The trial court sustained defendants' demur-

rer without leave to amend, finding that plaintiffs complaint did not state facts sufficient to constitute a cause of action under California law, and entered a judgment of dismissal. (Superior Court of Los Angeles County, No. BC209893, Brett C. Lkein, Judge.) The Court of Appeal, Second Dist., Div. Four, No. B136410, reversed the trial courts judgment in full.

The Supreme Court reversed the judgment of the Court of Appeal with respect to its holding that plaintiff stated a cause of action under the unfair competition law, affirmed the judgment of the Court of Appeal with respect to its determination that plaintiff stated a cause of action for the tort of interference with prospective economic advantage, and remanded to the Court of Appeal for further proceedings. As to plaintiff's claim under the unfair competition law, the court held that disgorgement of profits that was not restitutionary in nature was not an available remedy. Restitution is the only monetary remedy expressly authorized by Bus. & Prof. Code, § 17203. Nothing in the legislative history indicates that the Legislature intended to authorize a court to order a defendant to disgorge all profits to a plaintiff who does not have an ownership interest in those profits. The court further held that to state a claim for interference with prospective economic advantage, plaintiff was not required to plead that defendants acted with the specific intent, or purpose, of interfering with plaintiffs prospective economic advantage. It was sufficient for plaintiff to plead that defendants knew that the interference was certain or substantially certain to occur as a result of their action. Moreover, plaintiff satisfied the requirement of pleading that defendants engaged in an act that was independently wrongful, alleging that defendants engaged in bribery and offered sexual favors to key officials of the foreign government in order to obtain the contract from that government. (Opinion by Moreno, J., with Kennard, Acting C.J., Baxter and Werdegar, JJ., and Rubin, J., * concurring. Concurring opinion by Kennard, Acting C.J. (see p. 1166). Concurring opinion by Werdegar, J. (see p. 1167). Concurring and dissenting opinion by Chin , J., with Brown, J., concurring (see p. 1168)

* Associate Justice of the Court of Appeal, Second Appellate District, Division Eight, assigned by the Acting Chief Justice pursuant to article VI, section 6 of the California Constitution.

## HEADNOTES

## CALIFORNIA OFFICIAL REPORTS HEADNOTES
Classified to California Digest of Official Reports

(1) Appellate Review §128--Scope of Review--Function of Appellate Court--Rulings on Demurrers.

--When a case is reviewed by the appellate court after the sustaining of a general demurrer, the appellate court accepts as true all the material allegations of the complaint.

**(2a) (2b) Unfair Competition §4--Unfair Competition Law--Scope--Conduct and Remedies.** --The unfair competition law ( Bus. & Prof. Code, § 17200 et seq.) covers a wide range of conduct. It embraces anything that can properly be called a business practice and that at the same time is forbidden by law. Bus. & Prof. Code, § 17200, borrows violations from other laws by making them independently actionable as unfair competitive practices. In addition, under Bus. & Prof. Code, § 17200, a practice may be deemed unfair even if not specifically proscribed by some other law. While the scope of conduct covered by competition law action is equitable in nature; damages cannot be recovered. Civil penalties may be assessed in public unfair competition actions, but the law contains no criminal provision ( Bus. & Prof. Code, § 17206). Under the unfair competition law, prevailing plaintiffs are generally limited to injunctive relief and restitution.

**(3a) (3b) (3c) (3d) (3e) (3f) (3g) (3h) Unfair Competition § 10--Actions--Remedies--Disgorgement of Nonrestututionary Profits--Propriety.** --In an action under the unfair competition law (UCL) ( Bus. & Prof. Code, § 17200 et seq.) by a business representing manufacturers of military equipment, in which plaintiff alleged that defendants illegally induced a foreign government to award a contract of sale to a company other than the one represented by plaintiff, disgorgement of profits that was not restitutionary in nature was not an available remedy. Restitution is the only monetary remedy expressly authorized by Bus. & Prof. Code, § 17203. Nothing in the legislative history indicated that the Legislature intended to authorize a court to order a defendant to disgorge all profits to a plaintiff who does not have an ownership interest in those profits. Although plaintiff described its requested remedy as restitution, that term did not accurately describe the relief sought, since plaintiff had neither an ownership interest nor a vested interest in the money it sought to recover. At most, plaintiff had a expectancy in the receipt of a commission. Since the recovery requested could not be traced to any particular funds in possession of one of the defendants, it was not the proper subject of a constructive trust. The nonrestitutionary disgorgement remedy sought by plaintiff closely resembled a claim for damages, which is not permitted under the UCL. Allowing such a remedy would have enabled plaintiff to obtain tort damages without proving the elements of liability under its traditional tort claim for intentional interference with prospective economic advantage, and would have exposed defendants to multiple suits and the risk of duplicative liability without the

traditional limitations on standing, thereby raising due process concerns.

[See 11 Witkin, Summary of Cal. Law (9th ed. 1990) Equity, § 934.]

**(4a) (4b) Statutes § 30--Construction--Language--Plain Meaning Rule--Aids--Legislative Intent.** --The fundamental objective of statutory construction is to ascertain the Legislature's intent and to give effect to the purpose of the statute ( Code Civ. Proc., § 1859). If the language of the statute is unambiguous, the plain meaning governs. If the statutory language is ambiguous, the court may look to the history and background of the statute. In ascertaining the Legislature's intent, the court attempts to construe the statute to preserve its constitutional validity, presuming that the Legislature intends to respect constitutional limits.

**(5a) (5b) Unfair Competition § 10--Actions--Remedies--Restitution--What Constitutes--Purpose.** --In an unfair competition law case ( Bus. & Prof. Code, § 17200 et seq.), an order for restitution is one compelling the defendant to return money obtained through an unfair business practice to those persons in interest from whom the property was taken, that is, to persons who had an ownership interest in the property or those claiming through that person. The object of restitution is to restore the status quo by returning to the plaintiff funds in which he or she has an ownership interest. The concept of restoration or restitution, as used in the unfair competition law, it is not limited only to the return of money or property that was once in the possession of that person. Instead, restitution is broad enough to allow a plaintiff to recover money or property in which he or she has a vested interest.

**(6) Trust § 27--Constructive Trusts--Requisites.** --To create a constructive trust, there must be a res, an identifiable kind of property or entitlement in defendant's hands. A constructive trust requires money or property identified as belonging in good conscience to the plaintiff that can clearly be traced to particular funds or property in the defendant's possession.

**(7) Unfair Competition § 10--Actions--Remedies--Damages.** --An action under the unfair competition law (UCL) ( Bus. & Prof. Code, § 17200 et seq.) is not an all-purpose substitute for a tort or contract action. Instead, the UCL provides an equitable means through which both public prosecutors and private individuals can bring suit to prevent unfair business practices and restore money or property to victims or these practices. The overarching legislative concern was to provide a streamlined procedure for the prevention of ongoing or threatened acts of unfair competition. Because of this objec-

tive, the remedies provided are limited. While any member of the public can bring suit under the UCL to enjoin a business from engaging in unfair competition, it is well established that individuals may not recover damages.

**(8a) (8b) (8c) (8d) Interference § 7--Interference with Prospective Economic Advantage--Actions--Pleading Requirements--Intent--Act of Independent Wrongfulness.** --In an action for interference with prospective economic advantage by a business representing manufacturers of military equipment, in which plaintiff alleged that defendants illegally induced a foreign government to award a contract of sale to a company other than the one represented by plaintiff, plaintiff was not required to plead that defendants acted with the specific intent, or purpose, of interfering with plaintiff's prospective economic advantage. It was sufficient for plaintiff to plead that defendants knew that the interference was certain or substantially certain to occur as a result of their action. Moreover, plaintiff satisfied the requirement of pleading that defendants engaged in an act that was independently wrongful, alleging that defendants engaged in bribery and offered sexual favors to key officials of the foreign government in order to obtain the contract from that government. Since independent wrongfulness is a required element of the tort, and additional showing of specific intent to interfere is not necessary. The substantial certainty test, coupled with the independent wrongfulness requirement, sufficiently limits the tort. Only defendants who have engaged in an unlawful act can be held liable for this tort, while the five elements of the tort, all of which were met by plaintiff in this case, serve to limit the number of potential plaintiffs that can state a cause of action.

**(9) Interference § 6--Interference with Prospective Economic Advantage--Elements.** --The elements of the tort of intentional interference with prospective economic advantage are as follows: (1) an economic relationship between the plaintiff and some third party, with the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3) intentional wrongful acts on the defendant's part designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic harm to the plaintiff proximately caused by the defendant's acts.

**(10a) (10b) Interference § 2--Interference with Contract Relationship--Compared to Interference with Prospective Economic Advantage.** --Although the intent requirement is the same for the torts of intentional interference with contract and intentional interference with prospective economic advantage, these torts remain distinct. Courts should firmly distinguish the two kinds of business contexts, bringing a greater solicitude to

those relationships that have ripened into agreements, while recognizing that relationships short of that subsist in a zone where the rewards and risks of competition are dominant. However, although the two torts are distinct, some plaintiffs may be able to state causes of action for both torts. The tort of interference with contract is merely a species of the broader tort of interference with prospective economic advantage. Moreover, the existence of a contract does not mean that a plaintiff's claim must be brought exclusively as one for interference with contract. However, a plaintiff that chooses to bring a claim for interference with prospective economic advantage has a more rigorous pleading burden since it must show that the defendant's conduct was independently wrongful. An act is not independently wrongful merely because the defendant acted with an improper motive. An act is independently wrongful if it is unlawful, that is, if it is proscribed by some constitutional statutory, regulatory, or common law, or some other determinable legal standard. (Disapproving to the extent inconsistent: *PMC, Inc. v. Saban Entertainment, Inc.* (1996) 45 Cal. App. 4th 579 [52 Cal. Rptr. 2d 877].)

**COUNSEL:** Blecher & Collins, Steven J. Cannata, David W. Kesselman and Maxwell M. Blecher for Plaintiff and Appellant.

O'Melveny & Myers, Marc F. Feinstein, Marc S. Williams, Robert E. Willett and James W. Colbert III for Defendants and Respondents Lockheed Martin Corporation and Lockheed Martin Tactical Systems, Inc.

Law Offices of Jiyoung Kym and Jiyoung Kym for Defendant and Respondent Linda Kim.

Fred J. Hiestand for the Civil Justice Association of California as Amicus Curiae on behalf of Defendants and Respondents.

Robie & Matthai, Pamela E. Dunn and Daniel J. Koes for United Services Automobile Association as Amicus Curiae on behalf of Defendants and Respondents.

Gibson, Dunn & Crutcher, Gail E. Lees, Mark A. Perry and G. Charles Nierlich for Aetna Health of California, Inc., Cingular Wireless LLC and AT&T Wireless Services, Inc., as Amici Curiae on behalf of Defendants and Respondents.

Skadden, Arps, Slate, Meagher & Flom, Raoul D. Kennedy, Sheryl C. Medeiros and Benjamin R. Ostapuk for Citibank (South Dakota), N.A., as Amicus Curiae on behalf of Defendants and Respondents.

Heller Ehrman White & McAuliffe, Vanessa Wells and Andrew C. Byrnes for State Farm Mutual Automobile Insurance Company as Amicus Curiae on behalf of Defendants and Respondents.

Horvitz & Levy, David M. Axelrad, Lisa Perrochet and Loren H. Kraus for Truck Insurance Exchange and Mid-Century Insurance Company as Amici Curiae on behalf of Defendants and Respondents Lockheed Martin Corporation and Lockheed Martin Tactical Systems, Inc.

Horvitz & Levy, Mitchell C. Tilner and William N. Hancock for Quality King Distributors, Inc., as Amici Curiae on behalf of Defendants and Respondents Lockheed Martin Corporation and Lockheed Martin Tactical Systems, Inc.

Morrison & Foerster, Robert S. Stern, John Sobieski and John W. (Jack) Alden, Jr., for Bank One Corporation as Amicus Curiae on behalf of Defendants and Respondents Lockheed Martin Corporation and Lockheed Martin Tactical Systems, Inc.

Arnold & Porter, James F. Speyer, Ronald C. Redcay; Kirkland & Ellis and Alexander F. Mackinnon for California Manufacturers and Technology Association and BP Oil Supply Company as Amici Curiae on behalf of Defendants and Respondents Lockheed Martin Corporation and Lockheed Martin Tactical Systems, Inc.

Crosby, Heafey, Roach & May, James C. Martin, Christina J. Imre, Michael K. Brown; Daniel J. Popeo and Richard A. Samp for Washington Legal Foundation and National Association of Independent Insurers as Amici Curiae on behalf of Defendants and Respondents Lockheed Martin Corporation and Lockheed Martin Tactical Systems, Inc.

**JUDGES:** (Opinion by Moreno, J., with Kennard, Acting C. J., Baxter and Werdegar, JJ., and Rubin, J., * concurring. Concurring opinion by Kennard, Acting C. J. (see p. 1166). Concurring opinion by Werdegar, J. (see p. 1167). Concurring and dissenting opinion by Chin, J., with Brown, J., concurring (see p. 1168).)

> \* Associate Justice of the Court of Appeal, Second Appellate District, Division Eight, assigned by the Acting Chief Justice pursuant to article VI, section 6 of the California Constitution.

**OPINION BY:** MORENO

**OPINION**

[**941] **MORENO,** [*1140] **J.**

[***34] This case addresses what claims and remedies may be pursued by a plaintiff who alleges a lost business opportunity due to the unfair practices of a competitor. The Republic of Korea wished to purchase military equipment known as synthetic aperture radar (SAR) systems and solicited competing bids from manufacturers, including Loral Corporation (Loral) and MacDonald, Dettwiler, and Associates Ltd. (MacDonald Dettwiler). Plaintiff Korea Supply Company (KSC) represented MacDonald Dettwiler in the negotiations for the contract and stood to receive a commission of over $ 30 million if MacDonald Dettwiler's bid was accepted. Ultimately, the contract was awarded to Loral (now Lockheed Martin Tactical Systems, Inc.). KSC contends that even though MacDonald Dettwiler's bid was lower and its equipment superior, it was not awarded the contract because Loral and its agent had offered bribes and sexual favors to key Korean officials. KSC instituted the present action asserting claims under both California's unfair competition law ( Bus. & Prof. Code, § 17200 et seq.) and the tort of interference with prospective economic advantage.

[***35] We granted review to decide two issues. First, we address whether disgorgement of profits allegedly obtained by means of an unfair business practice is an authorized remedy under the UCL where these profits are neither money taken from a plaintiff nor funds in which the plaintiff has an ownership interest. We conclude that disgorgement of such profits is not an authorized remedy in an individual action under the UCL. Accordingly, we reverse the judgment of the Court of Appeal on this issue.

Second, we address whether, to state a claim for interference with prospective economic advantage, a plaintiff must allege that the defendant [*1141] specifically intended to interfere with the plaintiff's prospective economic advantage. We conclude that a plaintiff need not plead that the defendant acted with the specific intent to interfere with the plaintiff's business expectancy in order to state a claim for this tort. We affirm the judgment of the Court of Appeal on this issue.

I.

**(1)** [HN1]"Because '[t]his case comes to us after the sustaining of a general demurrer . . ., we accept as true all the material allegations of the complaint.' " ( Charles J. Vacanti, M.D., Inc. v. State Comp. Ins. Fund (2001) 24 Cal.4th 800, 807 [102 Cal. Rptr. 2d 562, 14 P.3d 234], quoting Shoemaker v. Myers (1990) 52 Cal.3d 1, 7 [276 Cal. Rptr. 303, 801 P.2d 1054].)

Plaintiff KSC is a corporation engaged in the business of representing manufacturers of military equipment in transactions with the Republic of Korea. In the mid-

1990's, the Republic of Korea solicited bids for a SAR system for use by its military. KSC represented MacDonald Dettwiler, a Canadian company, in its bid to obtain the contract award. KSC expected a commission of 15 [**942] percent of the contract price, or over $ 30 million, if MacDonald Dettwiler were awarded the contract.

In June 1996, the Korean Ministry of Defense announced that Loral, [1] an American competitor of the Canadian company MacDonald Dettwiler, was awarded the contract, despite the fact that MacDonald Dettwiler's bid was about $ 50 million lower and that the project management office of the Korean Defense Intelligence Command had determined that MacDonald Dettwiler's equipment was far superior to Loral's system. The Ministry of Defense explained that the decision to award Loral the contract was based on a suggestion that the United States government would not be favorably disposed to share intelligence information with the Republic of Korea if the latter selected a Canadian supplier.

1 In 1996, Loral changed its name to Lockheed Martin Tactical Systems, Inc., and became a subsidiary of Lockheed Martin Corporation, both of which are defendants in the present case. These defendants will collectively be referred to as Lockheed Martin, unless otherwise indicated.

Beginning in October 1998, major news publications in the Republic of Korea revealed that an internal investigation had established that the SAR contract was awarded to Loral as a result of bribes and sexual favors, rather than pressure from the United States government. Loral's agent for the procurement of the SAR contract, defendant Linda Kim, had bribed two [*1142] Korean military officers. In addition, Ms. Kim had extended bribes and sexual favors to the Minister of National Defense, the ultimate decision maker with respect to the award of the SAR contract. Ms. Kim reportedly received approximately $ 10 million in commission from Loral, an [***36] amount that exceeded the maximum established by the Foreign Corrupt Practices Act (15 U.S.C. § 78dd-2) and foreign military sales policies and regulations. As a result of the internal investigation by the Republic of Korea, several persons were imprisoned, including high-ranking Korean military officers. Ms. Kim herself was indicted in absentia; she avoided imprisonment because she resides in the United States and refuses to travel to the Republic of Korea.

Upon learning of these alleged reasons for the award of the SAR contract to Loral, KSC commenced the present action on May 5, 1999. In its first amended complaint, KSC alleged that defendants [2] "conspired, knowingly and intentionally to induce and did knowingly and intentionally induce the Republic of Korea, through its authorized agencies, to award the SAR contract to Loral instead of MacDonald Dettwiler by employing wrongful means including bribes and sexual favors." As a direct and proximate result of defendants' actions, the Republic of Korea awarded the contract to Loral; but for the bribes and sexual favors, this contract would have been awarded to MacDonald Dettwiler. "In securing the contract by wrongful means, Loral acted with full knowledge of the commission relationship between plaintiff and MacDonald Dettwiler and knowing that its interference with the award of the contract . . . would cause plaintiff severe loss." "Defendant Lockheed Martin has been the beneficiary of the illegal Loral-Kim conduct and to that extent has been unjustly enriched."

2 Lockheed Martin Corporation, Lockheed Martin Tactical Systems, Inc., and Linda Kim were named as defendants in the present action.

The first amended complaint asserts three causes of action: (1) conspiracy to interfere with prospective economic advantage, (2) intentional interference with prospective economic advantage, and (3) unfair competition pursuant to Business and Professions Code section 17200. [3] For its unfair competition claim, KSC sought disgorgement to it of the profits realized by Lockheed Martin on the sale of the SAR to Korea. For its tort claims, KSC sought damages for the loss of its expected compensation from MacDonald Dettwiler.

3 As in _Kraus v. Trinity Management Services, Inc._ (2000) 23 Cal.4th 116, 121 [96 Cal. Rptr. 2d 485, 999 P.2d 718] (_Kraus_), we refer to Business and Professions Code section 17200 et seq., the unfair competition law, as the UCL, and the claim as one for unfair competition.

Lockheed Martin, joined by Ms. Kim, generally demurred to all counts. The trial court sustained the demurrer without leave [**943] to amend, finding that [*1143] plaintiff's complaint did not state facts sufficient to constitute a cause of action under California law. Judgment was entered dismissing the action on September 7, 1999. After the trial court subsequently denied KSC's motion for reconsideration, KSC filed its notice of appeal. The Court of Appeal reversed the trial court's judgment in full, finding that plaintiff had sufficiently stated causes of action for unfair competition and for intentional interference with prospective economic advantage.

Lockheed Martin sought review in this court of two bases of the Court of Appeal's decision: first, its holding that disgorgement of profits is an available remedy under the UCL even where the disgorgement sought does not represent restitution of money or property in which plaintiff has an ownership interest; and second, its hold-

ing that the tort of intentional interference with prospective economic advantage does not require plaintiff to plead that [***37] defendant acted with the specific intent to interfere with plaintiff's business expectancy. We granted review on both issues.

II.

We first address plaintiff's unfair competition claim. Business and Professions Code section 17200 et seq. [4] [HN2]prohibits unfair competition, including unlawful, unfair, and fraudulent business acts. **(2a)** The UCL covers a wide range of conduct. It embraces " ' " 'anything that can properly be called a business practice and that at the same time is forbidden by law.' " ' [Citations.]" ( *Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.* (1999) 20 Cal.4th 163, 180 [83 Cal. Rptr. 2d 548, 973 P.2d 527] (*Cel-Tech*).) [HN3]Standing to sue under the UCL is expansive as well. Unfair competition actions can be brought by a public prosecutor or "by any person acting for the interests of itself, its members or the general public." (§ 17204.)

> 4 Business and Professions Code section 17200 states: [HN4]"As used in this chapter, unfair competition shall mean and include any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by Chapter 1 (commencing with Section 17500) of Part 3 of Division 7 of the Business and Professions Code." All subsequent statutory citations are to the Business and Professions Code, unless otherwise noted.

Section 17200 [HN5]"borrows" violations from other laws by making them independently actionable as unfair competitive practices. ( *Cel-Tech, supra,* 20 Cal.4th at p. 180.) In addition, under section 17200, "a practice may be deemed unfair even if not specifically proscribed by some other law." (*Cel-Tech,* at p. 180.) **(3a)** In the present case, KSC's third cause of action, for unfair competition, "borrowed" from the federal Foreign Corrupt Practices Act, which prohibits, among other things, bribing a foreign government official for the purpose of influencing any act or decision in his or [*1144] her official capacity and in violation of a lawful duty, or for the purpose of inducing the use of official influence to obtain or retain business. (See 15 U.S.C. § 78dd-2(a)(1)(A), (B).) The Court of Appeal determined that a claim under the UCL may be predicated on a violation of this act. [5]

> 5 The parties did not challenge this ruling and so we accept, without deciding, that a claim under the UCL may be predicted on a violation of the Foreign Corrupt Practices Act.

**(2b)** [HN6]While the scope of conduct covered by the UCL is broad, its remedies are limited. ( *Cel-Tech, supra,* 20 Cal.4th at p. 180.) A UCL action is equitable in nature; damages cannot be recovered. ( *Bank of the West v. Superior Court* (1992) 2 Cal.4th 1254, 1266 [10 Cal. Rptr. 2d 538, 833 P.2d 545] (*Bank of the West*).) Civil penalties may be assessed in public unfair competition actions, but the law contains no criminal provisions. (§ 17206.) We have stated that under the UCL, "[p]revailing plaintiffs are generally limited to injunctive relief and restitution." ( *Cel-Tech, supra,* 20 Cal.4th at p. 179.) **(3b)** The question raised by this case is whether disgorgement of profits that is not restitutionary in nature is an available remedy for an individual private plaintiff under the UCL.

A.

[**944] The Court of Appeal in this case held that plaintiff can recover disgorgement of profits earned by defendants as a result of their allegedly unfair practices, even where the money sought to be disgorged was not taken from plaintiff and plaintiff did not have an ownership interest in the [***38] money. This holding was based on language taken from our recent decision in *Kraus, supra,* 23 Cal.4th 116. As we explain, the Court of Appeal's reliance on this language was mistaken.

In *Kraus*, we held that disgorgement of unfairly obtained profits into a fluid recovery fund is not an available remedy in a representative action brought under the UCL. (*Kraus, supra,* 23 Cal. 4th at p. 137.) We began by describing the remedies that are clearly available to a plaintiff under the UCL: [HN7]"Through the UCL a plaintiff may obtain restitution and/or injunctive relief against unfair or unlawful practices." (*Kraus,* at p. 126.) We then differentiated between the terms "restitution" and "disgorgement" in order to show why a plaintiff in a representative action under the UCL could recover restitution but could not obtain disgorgement of profits into a fluid recovery fund.

[HN8]We defined an order for "restitution" as one "compelling a UCL defendant to return money obtained through an unfair business practice to those persons in interest from whom the property was taken, that is, to persons [*1145] who had an ownership interest in the property or those claiming through that person." ( *Kraus, supra,* 23 Cal.4th at pp. 126-127.) We then clarified that "disgorgement" is a broader remedy than restitution. We stated that an order for disgorgement "may include a restitutionary element, but is not so limited." ( *Id.* at p. 127.) We further explained that an order for disgorgement "may compel a defendant to surrender all money obtained through an unfair business practice even though not all is to be restored to the persons from whom it was obtained or those claiming under those persons. It has

also been used to refer to surrender of all profits earned as a result of an unfair business practice regardless of whether those profits represent money taken directly from persons who were victims of the unfair practice." (*Ibid.*) Relying on this distinction between restitution and disgorgement, we held in *Kraus* that although restitution was an available remedy in UCL actions, a plaintiff in a representative action under the UCL could not recover disgorgement in the broader, nonrestitutionary sense, into a fluid recovery fund. (*Kraus*, at p. 137.)

The Court of Appeal in the present case misread our opinion in *Kraus*. Noting that plaintiff in this case seeks disgorgement of profits unjustly earned by defendants, the Court of Appeal quoted our statement in *Kraus* that " '[a]n order that a defendant disgorge money obtained through an unfair business practice may include a restitutionary element, but is not so limited. . . . [S]uch orders may compel a defendant to surrender all money obtained through an unfair business practice even though not all is to be restored to the persons from whom it was obtained or those claiming under those persons. It has also been used to refer to surrender of all profits earned as a result of an unfair business practice *regardless of whether those profits represent money taken directly from persons who were victims of the unfair practice.*' " (Quoting *Kraus, supra,* 23 Cal.4th at p. 127, italics added.) Relying on this language, the Court of Appeal concluded that plaintiff adequately stated a claim under the UCL.

As Lockheed Martin and several amici curiae point out, however, this passage from *Kraus*, cited by the Court of Appeal as authorization for disgorgement under the UCL, merely *defined* the term [***39] "disgorgement" in order to demonstrate that it was broader in scope than "restitution." In the above cited quotation, this court was not approving of disgorgement as a remedy under the UCL. To the contrary, we held in *Kraus* that [HN9]while restitution was an available remedy under the UCL, disgorgement of money obtained through an unfair business practice is an available remedy in a representative action [**945] only to the extent that it constitutes restitution. We reaffirm this holding here in the context of an individual action under the UCL. We therefore reverse the judgment of the Court of Appeal on this issue.

[*1146] B.

We begin our analysis with the statutory authorization for relief under the UCL, found in section 17203: [HN10]"Any person who engages, has engaged, or proposes to engage in unfair competition may be enjoined in any court of competent jurisdiction. The court may make such orders or judgments, including the appointment of a receiver, as may be necessary to prevent the use or employment by any person of any practice which consti-

tutes unfair competition, as defined in this chapter, or as may be necessary to restore to any person in interest any money or property, real or personal, which may have been acquired by means of such unfair competition."

(4a) [HN11]The fundamental objective of statutory construction is to ascertain the Legislature's intent and to give effect to the purpose of the statute. ( Code Civ. Proc., § 1859.) If the language of the statute is unambiguous, the plain meaning governs. ( *Day v. City of Fontana* (2001) 25 Cal.4th 268, 272 [105 Cal. Rptr. 2d 457, 19 P.3d 1196].) (3c) [HN12]Under section 17203, "[t]he statutory authorization . . . to make orders necessary to restore money to any person in interest is clear." ( *Kraus, supra,* 23 Cal.4th at p. 129.) An order for restitution, then, is authorized by the clear language of the statute. In fact, "restitution is the only monetary remedy expressly authorized by section 17203." (*Ibid.*)

While a remedy of nonrestitutionary disgorgement of profits is not expressly authorized by the statute, KSC argues that the equitable language in section 17203 is sufficiently broad to allow courts to award this monetary remedy for an unfair competition claim. KSC contends that under the UCL a court may, in its discretion, order Lockheed Martin to surrender its profits to KSC because KSC allegedly has been wronged by Lockheed Martin's unfair conduct.

Here, since the remedy of nonrestitutionary disgorgement is not expressly authorized by the statute, we determine whether the Legislature intended to authorize such a remedy under section 17203. (4b) [HN13]If the statutory language is ambiguous, we may look to the history and background of the statute. (*Kraus, supra,* 23 Cal. 4th at p. 129.) In ascertaining the Legislature's intent, we attempt to construe the statute to preserve its constitutional validity, as we presume that the Legislature intends to respect constitutional limits. (See *ibid.*)

(3d) We described the legislative history of the UCL in *Kraus*. ( *Kraus, supra,* 23 Cal.4th at pp. 129-130.) As amended in 1933, the predecessor to the current law provided express authority to enjoin unfair competition. (Civ. [*1147] Code, former § 3369, as amended by Stats. 1933, ch. 953, § 1, p. 2482.) While no specific provision empowered courts to order monetary remedies, in *People v. Superior Court (Jayhill)* (1973) 9 Cal.3d 283, 286 [107 Cal. Rptr. 192, 507 P.2d 1400], we held that trial courts retained their inherent equitable power to [***40] order restitution under the UCL. Three years after *Jayhill Corp.*, express authority to order restitution was added to Civil Code section 3369, the predecessor to section 17203. (Stats. 1976, ch. 1005, § 1, p. 2378.) As we have previously said, this revision of the act was intended to *codify*, not change, the remedies available to a trial court under the UCL. ( *Kraus, supra,* at p. 132 [with

the 1976 amendments, "the Legislature confirmed, but did not increase, the powers of the court in a UCL action"]; see also Assem. Com. on Judiciary, Analysis of Assem. Bill No. 1763 (1972 Reg. Sess.) May 1, 1972 [congruent amendments to false advertising law were intended to affirm equity power already existing in courts]; Sen. Com. on Judiciary, Analysis of Assem. Bill No. 1763 (1972 Reg. Sess.) [same].)

While express authority to order restitution was added to the UCL, courts were not given similar authorization to order nonrestitutionary disgorgement. Further, plaintiff has not pointed to anything in the legislative [**946] history that suggests that the Legislature intended to provide such a remedy in an individual action. Plaintiff contends that this court's interpretation of the UCL and commentary by leading academic authorities establish that a court's equitable power under the UCL is broad. Notably absent from this argument, however, is any showing from the language or history of section 17203 that the Legislature intended to authorize a disgorgement remedy that was not restitutionary in nature. Instead, KSC merely asserts, without pointing to any particular statutory language or legislative history, that a court's equitable powers under section 17203 are broad enough to encompass its requested remedy.

We have previously found that the Legislature did not intend section 17203 to provide courts with *unlimited* equitable powers. In *Kraus*, we rejected the argument, revived by plaintiff in this case, that the general grant of equitable authority in section 17203 implicitly permitted a disgorgement remedy--in that case, into a fluid recovery fund in a representative action. We found that since there was nothing in the express language of the statute or its legislative history indicating that the Legislature intended to provide such a remedy, the remedy was not available. ( *Kraus, supra,* 23 Cal.4th at p. 132.) Here, again, we find nothing to indicate that the Legislature intended to authorize a court to order a defendant to disgorge all profits to a plaintiff who does not have an ownership interest in those profits.

In fact, [HN14]the language of section 17203 is clear that the equitable powers of a court are to be used to "prevent" practices that constitute unfair competition and to "restore to any person in interest" any money or property [*1148] acquired through unfair practices. (§ 17203.) While the "prevent" prong of section 17203 suggests that the Legislature considered deterrence of unfair practices to be an important goal, the fact that attorney fees and damages, including punitive damages, are not available under the UCL is clear evidence that deterrence by means of monetary penalties is not the act's sole objective. A court cannot, under the equitable powers of section 17203, award whatever form of monetary relief it believes might deter unfair practices. The fact that the

"restore" prong of section 17203 is the only reference to monetary penalties in this section indicates that the Legislature intended to limit the available monetary remedies under the act. [6]

> 6 Our discussion in this case is limited to individual private actions brought under the UCL. In public actions, civil penalties may be collected from a defendant. (§ 17206.) Further, in *Kraus* we noted that the Legislature "has authorized disgorgement into a fluid recovery fund in class actions." ( *Kraus, supra,* 23 Cal.4th at p. 137.) These issues are not before us, and therefore we need not address them further.

[***41] Our previous cases discussing the UCL indicate our understanding that the Legislature did not intend to authorize courts to order monetary remedies other than restitution in an individual action. This court has never approved of nonrestitutionary disgorgement of profits as a remedy under the UCL. While prior cases discussing the UCL may have characterized some of the relief available as "disgorgement," we were referring to the restitutionary form of disgorgement, and not to the nonrestitutionary type sought here by plaintiff. ( *Cortez v. Purolator Air Filtration Products Co.* (2000) 23 Cal.4th 163, 176 [96 Cal. Rptr. 2d 518, 999 P.2d 706] (*Cortez*) [holding that because section 17203 authorizes an order compelling a defendant to pay back wages as a restitutionary remedy, we "need not consider whether the order might be proper under the UCL on a disgorgement of benefit theory"]; *ABC International Traders, Inc. v. Matsushita Electric Corp.* (1997) 14 Cal.4th 1247, 1271 [61 Cal. Rptr. 2d 112, 931 P.2d 290] [stating that "the defendant's victims may be entitled to restitution" under section 17203]; *Fletcher v. Security Pacific National Bank* (1979) 23 Cal.3d 442, 452 [153 Cal. Rptr. 28, 591 P.2d 51] (*Fletcher*) [trial court may order restitution under the UCL for bank customers challenging a bank's computation of per annum interest on the basis of a 360-day year]; *People v. Superior Court (Jayhill), supra,* 9 Cal.3d at p. 286 [court may order a defendant to pay restitution to victims who have been defrauded [**947] as a result of an unfair business practice].) The present case merely confirms what we have previously held: [HN15]Under the UCL, an individual may recover profits unfairly obtained to the extent that these profits represent monies given to the defendant or benefits in which the plaintiff has an ownership interest.

## C.

In an attempt to fit its claim within the statutory authorization for relief, and as an implicit acknowledgement that [HN16]nonrestitutionary disgorgement is [*1149] not an available remedy in an individual action

under the UCL, plaintiff describes its requested remedy as "restitution." This term does not accurately describe the relief sought by plaintiff. **(5a)** As defined in *Kraus*, an order for restitution is one "compelling a UCL defendant to return money obtained through an unfair business practice to those persons in interest from whom the property was taken, that is, to persons who had an ownership interest in the property or those claiming through that person." ( *Kraus, supra,* 23 Cal.4th at pp. 126-127.) The object of restitution is to restore the status quo by returning to the plaintiff funds in which he or she has an ownership interest.

**(3e)** The remedy sought by plaintiff in this case is not restitutionary because plaintiff does not have an ownership interest in the money it seeks to recover from defendants. First, it is clear that plaintiff is not seeking the return of money or property that was once in its possession. KSC has not given any money to Lockheed Martin; instead, it was from the Republic of Korea that Lockheed Martin received its profits. Any award that plaintiff would recover from defendants would not be restitutionary as it would not replace any money or [***42] property that defendants took directly from plaintiff.

Further, the relief sought by plaintiff is not restitutionary under an alternative theory because plaintiff has no vested interest in the money it seeks to recover. **(5b)** We have stated that [HN17]"[t]he concept of restoration or restitution, as used in the UCL, is not limited only to the return of money or property that was once in the possession of that person." ( *Cortez, supra,* 23 Cal.4th at p. 178.) Instead, restitution is broad enough to allow a plaintiff to recover money or property in which he or she has a vested interest. In *Cortez,* we determined that "earned wages that are due and payable pursuant to section 200 et seq. of the Labor Code are as much the property of the employee who has given his or her labor to the employer in exchange for that property as is property a person surrenders through an unfair business practice." (*Ibid.*) Therefore, we concluded that such wages could be recovered as restitution under the UCL. We reached this result because "equity regards that which ought to have been done as done [citation], and thus recognizes equitable conversion." ( *Cortez, supra,* at p. 178.)

**(3f)** While the plaintiffs in *Cortez* had a vested interest in their earned but unpaid wages, KSC itself acknowledges that, at most, it had an "expectancy" in the receipt of a commission. KSC's expected commission is merely a contingent interest since KSC only expected payment if MacDonald Dettwiler was awarded the SAR contract. (See *United States v. Rodrigues* (9th Cir. 2000) 229 F.3d 842, 846 [finding that under the federal Victim and Witness Protection Act of 1982, restitution was not

available for a contingent loss in [*1150] which the company had only an expectancy interest; restitution could only be recovered for the loss of a vested interest].) Such an attenuated expectancy cannot, as KSC contends, be likened to "property" converted by Lockheed Martin that can now be the subject of a constructive trust. **(6)** [HN18]To create a constructive trust, there must be a res, an "identifiable kind of property or entitlement in defendant's hands." (1 Dobbs, Law of Remedies (1993) § 4.1(2), pp. 589-590.) As the United States Supreme Court recently said, a constructive trust requires "money or property identified as belonging in good conscience to the plaintiff [which can] clearly be traced to particular funds or property in the defendant's possession." ( *Great-West Life & Annuity Insurance Co. v. Knudson* (2002) 534 U.S. 204 , 213 [151 L. Ed. 2d 635, 122 S. Ct. 708].) **(3g)** The recovery requested in this case cannot be traced to any particular [**948] funds in Lockheed Martin's possession and therefore is not the proper subject of a constructive trust.

KSC's expectancy in this case is further attenuated since KSC never anticipated payment directly from Lockheed Martin. Instead, it expected the Republic of Korea to pay MacDonald Dettwiler, which would then pay a commission to KSC. In contrast, in *Cortez,* the defendant was the employer from which the plaintiffs expected payment. ( *Cortez, supra,* 23 Cal.4th at p. 169.) Therefore, the order for restitution served to restore to the plaintiffs funds that were directly owed to them by the defendant. Unlike *Cortez,* then, the monetary relief requested by KSC does not represent a quantifiable sum owed by defendants to plaintiff. Instead, it is a contingent expectancy of payment from a third party. For these reasons, we find that plaintiff's claim is properly characterized as a claim for nonrestitutionary disgorgement of profits.

### D.

**(7)** We reaffirm that [HN19]an action under the UCL "is not an all-purpose substitute [***43] for a tort or contract action." ( *Cortez, supra,* 23 Cal.4th at p. 173.) Instead, the act provides an equitable means through which both public prosecutors and private individuals can bring suit to prevent unfair business practices and restore money or property to victims of these practices. As we have said, the "overarching legislative concern [was] to provide a streamlined procedure for the prevention of ongoing or threatened acts of unfair competition." ( *Id.* at pp. 173-174.) Because of this objective, the remedies provided are limited. While any member of the public can bring suit under the act to enjoin a business from engaging in unfair competition, it is well established that individuals may not recover damages. ( *Bank of the West, supra,* 2 Cal.4th at p. 1266.))

**(3h)** The nonrestitutionary disgorgement remedy sought by plaintiff closely resembles a claim for damages, something that is not permitted under [*1151] the UCL. As one court has noted: [HN20]"Compensation for a lost business opportunity is a measure of damages and not restitution to the alleged victims." ( *MAI Systems Corp. v. UIPS* (N.D.Cal. 1994) 856 F. Supp. 538, 542.) Plaintiff suggests that its disgorgement remedy need not include *all* of the profits unfairly obtained by Lockheed Martin; instead, its recovery might be limited to the amount it allegedly would have obtained as a commission had McDonald Dettwiler been awarded the contract. This proposed recovery would be in exactly the same amount that plaintiff is seeking to recover as damages for its traditional tort claim of interference with prospective economic advantage. The only difference between what plaintiff seeks to recover as "disgorgement" and the damages it seeks under its traditional tort claim is that plaintiff would not recover its full expected commission under a "disgorgement" remedy if, for some reason, the profits obtained by Lockheed Martin did not equal the amount of plaintiff's expected commission.

Allowing the plaintiff in this case to recover nonrestitutionary disgorgement under the UCL would enable it to obtain tort damages while bypassing the burden of proving the elements of liability under its traditional tort claim for intentional interference with prospective economic advantage. As we have stated, any member of the public can bring suit under the UCL. In addition, [HN21]"to state a claim under the act one need not plead and prove the element of a tort. Instead, one need only show that 'members of the public are likely to be deceived. ' [Citation.]" ( *Bank of the West, supra,* 2 Cal.4th at p. 1267; see also *Fletcher, supra,* 23 Cal.3d at p. 453 [individual plaintiff's knowledge of the unfair practice not needed in order to recover restitution].) Given the UCL's liberal standing requirements and relaxed liability standards, were we to allow nonrestitutionary disgorgement in an individual action under the UCL, plaintiffs would have an incentive to recast claims under traditional tort theories as UCL violations. They could recover from a competitor without having to meet the more rigorous pleading requirements of a negligence action, [**949] or a breach of contract suit. The result could be that the UCL would be used as an all-purpose substitute for a tort or contract action, something the Legislature never intended.

In addition, it is possible that due process concerns would arise if an individual business competitor could recover disgorgement of profits under the UCL. While restitution is limited to restoring money or property to direct victims of an unfair practice, a potentially unlimited number of individual plaintiffs could recover [***44] nonrestitutionary disgorgement. Allowing such a remedy would expose defendants to multiple suits and the risk of duplicative liability without the traditional limitations on standing. (See *Stop Youth Addiction v. Lucky Stores, Inc.* (1998) 17 Cal.4th 553, 582 [71 Cal. Rptr. 2d 731, 950 P.2d 1086] (conc. opn. of Baxter, J.) [disgorgement of [*1152] profits to a party that has not paid money to the defendant and was not a party to the litigation "raises substantial due process issues implicating the rights of both the defendant and the absent parties"].) The disgorgement remedy requested in this case would not require that the disgorged money or property have come from the prospective plaintiff in the first instance. Nor is there any limit on the number of times the remedy could be sought or any limit on the monetary relief available. There is a risk of unfairness not only to defendants but also to direct victims of the unfair practice. If Lockheed Martin were forced to disgorge its profits to KSC, there might be little left for the Republic of Korea to recover, even though it is the party ostensibly entitled to restitutionary relief.

Plaintiff suggests ways of alleviating these due process concerns, proposing several "options to prevent abuse," including that this remedy be "limited to instances where the defendant has engaged in egregious practices." None of plaintiff's proposals, however, alleviate the possibility that defendants would be subjected to duplicate liability. Further, none of plaintiff's proposed "options to prevent abuse" are contemplated by the legislative scheme.

E.

We conclude, therefore, that allowing plaintiff to recover monetary relief under the UCL in this case would be at odds with the language and history of the statute, our previous decisions construing the UCL, and public policy. We hold that nonrestitutionary disgorgement of profits is not an available remedy in an individual action under the UCL. We note that the UCL remains a meaningful consumer protection tool. The breadth of standing under this act allows any consumer to combat unfair competition by seeking an injunction against unfair business practices. Actual direct victims of unfair competition may obtain restitution as well. The present decision merely reaffirms the balance struck in this state's unfair competition law between broad liability and limited relief.

In addition, we note that our decision does not foreclose all relief to plaintiff. While plaintiff may not recover monetary relief under the limited remedies provided by the UCL, plaintiff may pursue a cause of action under traditional tort law. In fact, as we conclude below, plaintiff in this case can state a claim for the tort of intentional interference with prospective economic advantage. While the pleading and proof requirements under this

tort are more rigorous than under the UCL, if plaintiff succeeds in meeting its burden of proof, it may recover damages for the injuries it claims to have suffered as a result of unfair competition.

[*1153] III.

(8a) Lockheed Martin argues that KSC fails to state a claim for intentional interference with prospective economic advantage because it has not shown that Lockheed Martin acted with the specific intent to disrupt KSC's business relationship. KSC counters that a plaintiff need only show that the defendant acted with the knowledge that its wrongful acts were substantially certain to disrupt plaintiff's business expectancy. We conclude that [HN22]the tort of intentional interference with [***45] prospective economic advantage does not require a plaintiff to plead that the defendant acted with the specific intent, or purpose, of disrupting the plaintiff's prospective [**950] economic advantage. Instead, to satisfy the intent requirement for this tort, it is sufficient to plead that the defendant knew that the interference was certain or substantially certain to occur as a result of its action.

A.

(9) We first articulated the elements of the tort of intentional interference with prospective economic advantage in _Buckaloo v. Johnson_ (1975) 14 Cal.3d 815, 827 [122 Cal. Rptr. 745, 537 P.2d 865] (_Buckaloo_). [HN23]These elements are usually stated as follows: " '(1) an economic relationship between the plaintiff and some third party, with the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3) intentional acts on the part of the defendant designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic harm to the plaintiff proximately caused by the acts of the defendant.' [Citations.]" ( _Westside Center Associates v. Safeway Stores 23, Inc._ (1996) 42 Cal.App.4th 507, 521-522 [49 Cal. Rptr. 2d 793].)

We most recently considered this tort in _Della Penna v. Toyota Motor Sales, U.S.A., Inc._ (1995) 11 Cal.4th 376 [45 Cal. Rptr. 2d 436, 902 P.2d 740] (_Della Penna_), where we held that [HN24]a plaintiff seeking to recover damages for interference with prospective economic advantage must plead and prove as part of its case-in-chief that the defendant's conduct was "wrongful by some legal measure other than the fact of interference itself." ( _Id._ at p. 393.) In _Della Penna_, we did not address the elements of the tort as we had formulated them in _Buckaloo_, other than noting that "[t]o the extent that language in _Buckaloo_ . . . addressing the pleading and proof requirements in the economic relations tort is inconsistent with the formulation we adopt in this case, it is disapproved." ( _Della Penna, supra_, 11 Cal.4th at p. 393, fn. 5.)

Since our opinion in _Della Penna_, lower courts considering this tort have continued to apply the elements we articulated in _Buckaloo_, with the added [*1154] understanding that a plaintiff must plead that the defendant engaged in an act that is wrongful apart from the interference itself. (See, e.g., _Limandri v. Judkins_ (1997) 52 Cal.App.4th 326, 339 [60 Cal. Rptr. 2d 539]; _Arntz Contracting Co. v. St. Paul Fire and Marine Insurance Company_ (1996) 47 Cal.App.4th 464, 475 [54 Cal. Rptr. 2d 888]; _Westside Center Associates v. Safeway Stores 23, Inc., supra_, 42 Cal.App.4th at pp. 521-522.) The Court of Appeal in the present case, however, in considering whether a plaintiff must plead specific intent, determined that after _Della Penna_, "it is no longer appropriate to apply the elements formulated in _Buckaloo_ in all actions for interference with prospective advantage."

We disagree with the Court of Appeal's conclusion that the elements we first articulated in _Buckaloo, supra_, 14 Cal.3d 815, do not still apply to this tort. In _Della Penna_, we did not abandon these elements. Instead, we specifically stated that "[w]e do not in this case . . . go beyond approving the requirement of a showing of wrongfulness as part of the plaintiff's case." (_Della Penna, supra_, 11 Cal. 4th at p. 378.) In fact, we explicitly approved the trial court's modified version of the standard jury instruction on intentional interference with prospective economic advantage, BAJI No. [***46] 7.82. The instruction at issue articulated the traditional elements of the tort, but changed the third element to provide that the defendant " 'intentionally engaged in [wrongful] acts or conduct designed to interfere with or disrupt' the relationship." ( _Della Penna,_ 11 Cal.4th at p. 380, fn. 1, italics and brackets added.) Rather than overrule the established elements of this tort, _Della Penna_ merely clarified the plaintiff's burden as to the third element, stating that to meet this element, a plaintiff must plead and prove that the defendant's acts are wrongful apart from the interference itself. ( _Id._ 11 Cal.4th at p. 393.) Thus, as the majority of the Courts of Appeal have understood, after _Della Penna_ the elements of the tort of interference with prospective economic advantage remain the same, except that the third element also requires a plaintiff to plead intentional _wrongful_ [**951] acts on the part of the defendant designed to disrupt the relationship.

B.

(8b) Having clarified the required elements, we now consider the intent requirement of this tort. The question is whether a plaintiff must plead and prove that the defendant engaged in wrongful acts _with the specific intent_ of interfering with the plaintiff's business expectancy. We conclude that [HN25]specific intent is not a required element of the tort of interference with prospective economic advantage. While a plaintiff may satisfy

the intent requirement by pleading specific intent, i.e., that the defendant desired to interfere with the plaintiff's prospective economic advantage, a plaintiff may alternately plead that the defendant knew that the interference was certain or substantially certain to occur as a result of its action.

[*1155] Lockheed Martin argues that specific intent is an established element of this tort. It contends that to satisfy the tort's third element--intentional wrongful acts designed to disrupt the plaintiff's relationship with its benefactor--a plaintiff must allege that the defendant purposely sought the disruption. It asserts that the inclusion of the word "designed" in the typical formulation of the third element is evidence that a plaintiff is required to plead specific intent. We disagree. The elements of the tort of interference with prospective economic advantage do not require a plaintiff to allege that the defendant acted with the specific intent, or purpose, of disrupting the plaintiff's prospective economic advantage.

Contrary to Lockheed Martin's assertion, the inclusion of the word "designed" in the third element of the tort does not necessarily mean that this tort contains a specific intent requirement. Our analysis of the intent requirement for the tort of intentional interference with contract in *Quelimane Company, Inc. v. Stewart Title Guaranty Company* (1998) 19 Cal.4th 26 [77 Cal. Rptr. 2d 709, 960 P.2d 513] (*Quelimane*) is instructive. [7] In *Quelimane*, we [***47] articulated the elements of this tort, stating that the third element requires a plaintiff to plead the " 'defendant's intentional acts designed to induce a breach or disruption of the contractual relationship.' " (*Id.* at p. 55.) Notwithstanding the presence of the word "designed," we found that this tort did not require a plaintiff to plead that the defendant acted with the specific intent to interfere. (*Id.* at p. 65.)

7 The concurring and dissenting opinion argues that we should rely on *Seaman's Direct Buying Service, Inc. v. Standard Oil Co.* (1984) 36 Cal.3d 752 [206 Cal. Rptr. 354, 686 P.2d 1158], overruled on other grounds in *Freeman & Mills, Inc. v. Belcher Oil Co.* (1995) 11 Cal.4th 85, 88 [44 Cal. Rptr. 2d 420, 900 P.2d 669], rather than on *Quelimane, supra,* 19 Cal.4th 26. Both cases discuss the intent requirement for the tort of interference with contract. Yet the *Quelimane* court did not consider the earlier per curiam decision in *Seaman's.* As we noted in *Della Penna,* the *Seaman's* court "rel[ied] on the *first* Restatement . . . without reviewing or even mentioning intervening revaluations of the tort by the Restatement Second, other state high courts and our own Court of Appeal." ( *Della Penna, supra,* 11 Cal.4th at p. 389.) Further, we expressly disap-

proved of our language in *Seaman's* to the extent that it was inconsistent with *Della Penna.* (*Della Penna,* at p. 393, fn. 5.) Thus, we find in *Quelimane,* which relies on *Della Penna* and the Restatement Second of Torts, a better representation than *Seaman's* of the current state of the law.

In determining that intentional interference with contract does not contain a specific intent requirement, we relied on the Restatement Second of Torts. ( *Quelimane, supra,* 19 Cal.4th at p. 56.) The Restatement, section 766, comment j, makes clear that the tort of intentional interference with contract applies not only when a defendant acts with the purpose or desire to interfere but that "[i]t applies also to intentional interference . . . in which the actor does not act for the purpose of interfering with the contract or desire it but knows that the interference is certain or substantially certain to occur as a [*1156] result of his action. The rule applies, in other words, to an interference that is incidental to the actor's independent purpose and desire but known to him to be a necessary consequence of his action." ( Rest.2d Torts, § 766, com. j, p. 12.)

[**952] We similarly look to the Restatement to determine whether the tort at issue in the present case, intentional interference with prospective economic advantage, contains a specific intent requirement. Restatement Second of Torts section 766B, entitled Intentional Interference with Prospective Contractual Relation, [8] explains in comment d: "The intent required for this Section is that defined in § 8A. The interference with the other's prospective contractual relation is intentional if the actor desires to bring it about or if he knows that the interference is certain or substantially certain to occur as a result of his action. (See § 766, Comment j)." ( Rest.2d Torts, § 766B, com. d, p. 22.)

8 This section states: "One who intentionally and improperly interferes with another's prospective contractual relation (except a contract to marry) is subject to liability to the other for pecuniary harm resulting from loss of the benefits of the relation, whether the interference consists of [P] (a) inducing or otherwise causing a third person not to enter into or continue the prospective relation or [P] (b) preventing the other from acquiring or continuing the prospective relation." ( Rest.2d Torts, § 766B, p. 20.)

In explaining the intent requirement for intentional interference with prospective economic advantage, the Restatement Second of Torts specifically refers to the intent requirement for the tort of intentional interference with contract, as defined in section 766, comment j. We relied on this section of the Restatement in *Quelimane* to conclude that this tort contained no specific intent re-

quirement. ( *Quelimane, supra,* 19 Cal.4th at p. 56.) In addition, the Restatement refers to the definition of intent in section 8A, which states: "The word 'intent' is used throughout the Restatement [Second] of [Torts] to denote that the actor desires to cause consequences of his act, or that he believes that the consequences are substantially certain to derive from it." ( Rest.2d Torts, § 8A.) Comment [***48] b to this section clarifies that "[i]ntent is not, however, limited to consequences which are desired. If the actor knows that the consequences are certain, or substantially certain, to result from his act, and it goes ahead, he is treated by the law as if he had in fact desired to produce the result." ( Rest.2d Torts, § 8A, com. b, p. 15.)

Based on our reading of the Restatement and our discussion in *Quelimane* of the intent requirement, we reject Lockheed Martin's argument that the tort of intentional interference with prospective economic advantage contains a requirement that a plaintiff plead and prove that the defendant acted with the specific intent, purpose, or design to interfere with the plaintiff's prospective advantage. Instead, we agree with the Restatement that it is sufficient for the [*1157] plaintiff to plead that the defendant "[knew] that the interference is certain or substantially certain to occur as a result of his action." ( Rest.2d Torts, § 766B, com. d, p. 22.)[9]

> [9] We consider only whether, to state a claim for this tort, a plaintiff need allege that the defendant acted with a specific intent to interfere with the plaintiff's business expectancy. A defendant's intent, as defined in section 8A of the Restatement Second of Torts, is still a triable issue of fact. (See *Quelimane, supra,* 19 Cal.4th at p. 57.)

## C.

**(10a)** We caution that although we find the intent requirement to be the same for the torts of intentional interference with contract and intentional interference with prospective economic advantage, these torts remain distinct. We reiterate our statement in *Della Penna* that "[o]ur courts should . . . firmly distinguish the two kinds of business contexts, bringing a greater solicitude to those relationships that have ripened into agreements, while recognizing that relationships short of that subsist in a zone where the rewards and risks of competition are dominant." ( *Della Penna, supra,* 11 Cal.4th at p. 392.)

We note initially that even though these two torts are distinct, some plaintiffs may be able to state causes of action for both torts. As we stated in *Buckaloo,* "the tort of interference with contract is merely a species of the broader tort of interference with prospective economic advantage." ( *Buckaloo, supra,* 14 Cal.3d at p. 823.) **(8c)** In the present case, KSC's claim was appropriately stated

as one for [**953] interference with prospective economic advantage. KSC did not allege in its complaint that it had a contractual agreement with MacDonald Dettwiler. KSC merely alleged that it had an economic expectancy in that it was acting as MacDonald Dettwiler's broker and expected a commission if the contract was awarded to MacDonald Dettwiler. KSC nowhere pleads that this expectancy amounted to an enforceable contract.

**(10b)** Moreover, the existence of a contract does not mean that a plaintiff's claim must be brought exclusively as one for interference with contract. In *Buckaloo,* we concluded that the tort of interference with prospective economic advantage "is considerably more inclusive than actions based on contract or interference with contract, and is thus not dependent on the existence of a valid contract." ( *Buckaloo, supra,* 14 Cal.3d at pp 826-827; see id. at p. 823, fn. 6 [" 'the basic tort of interference with economic relations can be established by showing, *inter alia,* an interference with an [*1158] existing contract or a contract which is [***49] certain to be consummated' "].)[10] Thus, a plaintiff who believes that he or she has a contract but who recognizes that the trier of fact might conclude otherwise might bring claims for both torts so that in the event of a finding of no contract, the plaintiff might prevail on a claim for interference with prospective economic advantage. In the present case, even if KSC could have alleged a contractual relationship with MacDonald Dettwiler, its claim was properly brought as one for interference with prospective economic advantage. As we explain below, however, [HN26]a plaintiff that chooses to bring a claim for interference with prospective economic advantage has a more rigorous pleading burden since it must show that the defendant's conduct was independently wrongful.

> [10] The concurring and dissenting opinion contends that the *Buckaloo* court made other statements indicating that the two torts were mutually exclusive. But it is apparent that each of the statements it quotes in support of this contention, when read in context, are merely made in furtherance of *Buckaloo*'s central thesis: that the existence of a contract is not *necessary* to maintain an action for intentional interference with prospective economic advantage.

As we have made clear in both *Della Penna* and *Quelimane,* the distinction between these two torts is found in the independent wrongfulness requirement of the tort of interference with prospective economic advantage. We stated in *Quelimane:* "Because interference with an existing contract receives greater solicitude than does interference with prospective economic advantage [citation], it is not necessary that the defendant's conduct

be wrongful apart from the interference with the contract itself. [Citation.] [P] . . . Intentionally inducing or causing a breach of an existing contract is . . . a wrong in and of itself. Because this formal economic relationship does not exist and damages are speculative when remedies are sought for interference in what is only prospective economic advantage, *Della Penna* concluded that some wrongfulness apart from the impact of the defendant's conduct on that prospect should be required." ( *Quelimane, supra,* 19 Cal.4th at pp. 55-56.)

Thus, [HN27]while intentionally interfering with an existing contract is "a wrong in and of itself" ( *Quelimane, supra,* 19 Cal.4th at p. 56), intentionally interfering with a plaintiff's prospective economic advantage is not. To establish a claim for interference with prospective economic advantage, therefore, a plaintiff must plead that the defendant engaged in an independently wrongful act. (See *Della Penna, supra,* 11 Cal.4th at p. 393.) An act is not independently wrongful merely because defendant acted with an improper motive. As we said in *Della Penna,* "the law usually takes care to draw lines of legal liability in a way that maximizes areas of competition free of legal penalties." ( *Della Penna, supra,* 11 Cal.4th at p. 392.) The tort of intentional interference with prospective economic advantage is not intended to punish individuals or commercial entities for their choice of [*1159] commercial relationships or their pursuit of commercial objectives, unless their interference amounts to independently actionable conduct. ( [**954] *Marin Tug & Barge, Inc.* (9th Cir. 2001) 271 F.3d 825, 832.) We conclude, therefore, that an act is independently wrongful if it is unlawful, that is, if it is proscribed by some constitutional, statutory, regulatory, common law, or other determinable legal standard. [11] [***50] (See *Marin Tug & Barge, Inc., supra,* at p. 835; see also *Della Penna, supra,* 11 Cal.4th at 408 (conc. opn. of Mosk, J.) ["It follows that the tort may be satisfied by intentional interference with prospective economic advantage *by independently tortious means*"].)

> 11  We need not in this case further define which sources of law can be relied on to determine whether a defendant has engaged in an independently wrongful act, other than to say that such an act must be wrongful by some legal measure, rather than merely a product of an improper, but lawful, purpose or motive. To the extent that the lower courts have determined otherwise, these decisions are disapproved. (See, e.g., *PMC, Inc. v. Saban Entertainment, Inc.* (1996) 45 Cal.App.4th 579, 603 [52 Cal. Rptr. 2d 877] [stating that liability may arise from either improper motive or improper means].)

(**8d**) Here, KSC has clearly satisfied the independent wrongfulness requirement. In its complaint, KSC alleged that defendant Kim, as an agent for Loral, engaged in bribery and offered sexual favors to key Korean officials in order to obtain the contract from the Republic of Korea. Under the Foreign Corrupt Practices Act, it is unlawful to pay or offer money or anything of value to a foreign official for the purposes of influencing any act or decision of the foreign official, or to induce the foreign official to use his or her influence with a foreign government to affect or influence any act or decision of the government. (15 U.S.C. § 78dd-1(a)(1)(A), (B).) In addition, the complaint alleges that the commissions paid by Loral to Kim exceeded the maximum allowable amounts established by the Foreign Corrupt Practices Act. (15 U.S.C. § 78dd-2(a)(1)(A), (B).) The complaint thus clearly alleges that defendants engaged in unlawful behavior in order to secure the SAR contract. KSC has, therefore, sufficiently alleged that defendants' acts, in addition to interfering with KSC's business expectancy, were wrongful in and of themselves.

D.

[HN28]It is this independent wrongfulness requirement that makes defendants' interference with plaintiff's business expectancy a tortious act. Because we have determined that the act of interference with prospective economic advantage is not tortious in and of itself, the requirement of pleading that a defendant has engaged in an act that was independently wrongful distinguishes lawful competitive behavior from tortious interference. Such a requirement "sensibly redresses the balance between providing a remedy for [*1160] predatory economic behavior and keeping legitimate business competition outside litigative bounds." ( *Della Penna, supra,* 11 Cal.4th at p. 378.)

The independent wrongfulness requirement also differentiates California law from that of other states and the Restatement Second of Torts. Lockheed Martin's reliance on these authorities is unpersuasive since they require a plaintiff only to plead that the defendant's interference was improper, and not that the interference was independently unlawful. As we explain, California's independent wrongfulness requirement more narrowly defines actionable conduct under this tort.

According to the Restatement, there are two requirements for liability under this tort: The interference must be both intentional and improper. A defendant who "intentionally and improperly interferes with another's prospective contractual relation" is subject to liability. ( Rest.2d Torts, § 766B.) The intent requirement, as described above, is that the defendant either desires to bring about the interference or knows that the interference is certain or substantially certain to occur as a result

of its action. ( Rest.2d Torts, § 766B, com. d, p. 22.) In addition to this [***51] general intent, the second requirement is that "[t]he interference . . . must also be improper. The factors to be considered in determining whether an interference is improper are stated in § 767. One of them is the actor's motive and another is the interest sought to be advanced by him. Together these factors [**955] mean that the actor's purpose is of substantial significance. If he had no desire to effectuate the interference by his action but knew that it would be a mere incidental result of conduct he was engaging in for another purpose, the interference may be found to be not improper. Other factors come into play here, however, particularly the nature of the actor's conduct. *If the means used is innately wrongful, predatory in character, a purpose to produce the interference may not be necessary.* On the other hand, if the sole purpose of the actor is to vent his ill will, the interference may be improper although the means are less blameworthy." ( Rest.2d Torts, § 766B, com. d, pp. 22-23, italics added.)

Unlike California, the Restatement Second of Torts does not require a plaintiff to plead that a defendant engaged in an independently wrongful act in order to show "improper" interference. Instead, a general intent plus an actor's motive or purpose to interfere is enough to subject a defendant to liability under the Restatement. In the absence of an independent wrongfulness requirement, a purpose to interfere with the plaintiff's business expectancy suffices to distinguish actionable conduct from behavior that is merely competitive, and therefore privileged. The Restatement, however, recognizes that when the defendant's conduct is innately wrongful, a purpose to interfere may be unnecessary. The Restatement appreciates that the independent [*1161] wrongfulness of a defendant's acts may satisfy the "improper" requirement of the tort without the need to look behind the motive or purpose behind a defendant's acts.

Thus, while California does follow the Restatement's general intent requirement, California law adheres to a narrower interpretation of what conduct is improper under this tort. After *Della Penna, supra,* 11 Cal.4th 376, [HN29]California has required plaintiffs to show that a defendant has engaged in an independently, or inherently, wrongful act. Under this requirement, a defendant's motive or purpose is relevant only to the extent that it renders the defendant's conduct unlawful. We are therefore unconvinced by Lockheed Martin's reliance on the Restatement in this regard.

Lockheed Martin's citation to out-of-state decisions holding that a plaintiff must plead that the defendant acted with a specific intent or purpose to interfere with the plaintiff's economic relations is similarly unpersuasive. Like the Restatement Second of Torts, the cases cited by Lockheed Martin look to a defendant's motive or

purpose to distinguish tortious conduct from lawful behavior. (See, e.g., *Ethyl Corp. v. Balter* (Fla.Dist.Ct.App. 1980) 386 So. 2d 1220, 1223 [finding no interference because the defendant's purpose or motive was not directed at the plaintiff]; *Bank Computer Network Corp. v. Continental Illinois Nat'l Bank and Trust Co.* (1982) 110 Ill. App. 3d 492 [442 N.E.2d 586, 593, 66 Ill. Dec. 160] [same]; *K&K Management v. Lee* (1989) 316 Md. 137 [557 A.2d 965, 975] [same]; *Anderson v. The Regents of the Univ. of California* (1996) 203 Wis. 2d 469 [554 N.W.2d 509, 519] [same].) Unlike California, however, these states do not require a plaintiff to plead that the defendant has engaged in an independently wrongful act in order to state a claim for interference with prospective economic advantage. Instead of independent wrongfulness, a plaintiff is required [***52] to plead a purpose or motive to interfere in order to demonstrate that the defendant's interference was improper.

We additionally reject Lockheed Martin's reliance on *DeVoto v. Pacific Fidelity Life Insurance Co.* (9th Cir. 1980) 618 F.2d 1340 (*DeVoto*). In that case, the Ninth Circuit Court of Appeals attempted to anticipate whether California courts would require a plaintiff to plead that the defendant acted with a specific purpose or motive to interfere with the plaintiff's prospective economic advantage. ( *Id.* at p. 1347.) *DeVoto* was decided prior to our opinions in *Della Penna, supra,* 11 Cal.4th 376, and *Quelimane, supra,* 19 Cal.4th 26, and, as the Ninth Circuit noted, there was "a scarcity of pertinent authority on this issue." ( *DeVoto,* 618 F.2d at p. 1347.) We agree with the Court of Appeal in the present case that *DeVoto* "does not support the requirement of an allegation of purposeful intent directed specifically at the plaintiff in every [*1162] case." Instead, the *DeVoto* court states: "Where the [**956] *actor's conduct is not criminal or fraudulent, and absent some other aggravating circumstances,* it is necessary to identify those whom the actor had a specific motive or purpose to injure by his interference and to limit liability accordingly." ( *DeVoto, supra,* 618 F.2d at p. 1347, italics added.)

The *DeVoto* court, then, determined that a defendant's motive or purpose to interfere is a necessary element only when the defendant's conduct is not independently unlawful. After *Della Penna,* independent wrongfulness has been recognized as a required element of the tort. Therefore, an additional showing of specific intent to interfere is not necessary.

### E.

Lockheed Martin additionally argues that a specific intent requirement is necessary to prevent potential plaintiffs with injuries remotely caused by a defendant's acts from maintaining standing to sue for this tort. It contends that since KSC is an indirect victim of defendants' al-

leged acts of interference, KSC should only be able to state a claim if it can show that Lockheed Martin acted with the purpose of interfering with KSC's economic expectancy. We disagree. Were we to adopt a specific intent requirement, a plaintiff's standing would turn on the subjective intent of a defendant who has committed an independently wrongful act. Such a requirement would lead to absurd and unfair results. A defendant who engaged in an unlawful act knowing that it would harm the plaintiff's business interest could escape liability if the defendant acted with the purpose of furthering its own interest, rather than specifically harming the plaintiff's interest. Standing for this tort should not be made to turn on such a consideration.

As support for its argument, Lockheed Martin cites section 767 of the Restatement Second of Torts and argues that a defendant must act with the specific intent of interfering with a plaintiff's business expectancy when the plaintiff is not the direct victim of the interference. We note, however, that section 767 of the Restatement Second of Torts is entitled Factors in Determining Whether Interference is Improper. This section, then, refers to the element of the tort that defines when interference is improper, not to the element that defines the required intent. As stated above, California law does not follow the Restatement's definition of when interference is improper. Instead, California law defines "improper" more narrowly than the Restatement, allowing recovery only when the defendant's conduct is independently unlawful.

We further note that even the Restatement, with its broader definition of improper [***53] conduct, recognizes that an indirectly injured plaintiff may state a [*1163] claim under this tort without pleading that the defendant acted with the purpose to interfere with the plaintiff's business expectancy. Section 767, comment h, of the Restatement, discussing the proximity or remoteness of the defendant's conduct to the interference, supports our conclusion: "This remoteness [between the defendant's conduct and the plaintiff's injury] conduces toward a finding that the interference was not improper. The weight of this factor, however, may be controverted by . . . the factor of the actor's conduct *if that conduct was inherently unlawful or independently tortious.*" ( Rest.2d Torts, § 767, com. h, p. 36, italics added.) [12] If the defendant's improper conduct constitutes independently wrongful behavior, the fact that the plaintiff is an indirect victim does not preclude recovery.

12    Contrary to the assertion of the concurring and dissenting opinion, section 767 "applies to each form of the tort," and is therefore applicable to both interference with contract and interfer-

ence with prospective economic advantage. ( Rest.2d Torts, § 767, com. a, p. 27.)

Contrary to the arguments of Lockheed Martin and the concurring and dissenting opinion, [HN30]we find no sound reason for requiring that a defendant's wrongful actions must be directed towards the plaintiff seeking to recover for this tort. The interfering party is liable to the interfered-with party "when the independently tortious means the interfering party uses are independently tortious *only as to a third party.* Even under these circumstances, the interfered-with party remains an intended (or at least known) victim of the interfering party--albeit one that is [**957] indirect rather than direct." ( *Della Penna, supra,* 11 Cal.4th at p. 409 (conc. opn. of Mosk, J.) [citing Rest.2d Torts, § 767, com. c, pp. 29-30].) In fact, "[t]he most numerous of the tortious interference cases are those in which the disruption is caused by an act directed not at the plaintiff, but at a third person." (Perlman, *Interference with Contract and Other Economic Expectancies: A Clash of Tort and Contract Doctrine* (1982) 49 U.Chi.L.Rev. 61, 106.)

We do not share the concern of Lockheed Martin and the concurring and dissenting opinion that our ruling today will expose defendants to an unlimited number of potential plaintiffs. [13] The "substantial [***54] certainty" test used in the Restatement, coupled with the independent wrongfulness requirement of [*1164] *Della Penna,* sufficiently limits this tort. It is important to underscore that the independent wrongfulness requirement of this tort limits the class of potential *defendants;* only defendants who have engaged in an unlawful act can be held liable for this tort. In addition, as described below, each of the five elements of the tort of interference with prospective economic advantage serves to limit the number of potential plaintiffs that can state a cause of action for this tort. [14]

13    Further, we find federal cases discussing antitrust and RICO (Racketeer Influenced and Corrupt Organizations Act) law to be inapplicable to the question of whether a plaintiff may state a claim under the California common law tort of interference with prospective economic advantage. The federal antitrust cases cited by the concurring and dissenting opinion address the question of whether the plaintiffs in those cases could maintain standing under section 4 of the Clayton Act (15 U.S.C. § 15). ( *Associated General Contractors v. California State Council of Carpenters* (1983) 459 U.S. 519, 529 [74 L. Ed. 2d 723, 103 S. Ct. 897].) To answer this question, these courts engage, inter alia, in an analysis of the statutory language of the Clayton Act, as well as its relevant legislative history and objectives. (459 U.S.

at pp. 529-531, 538-540.) The question of whether a plaintiff has standing to bring a claim under a California common law tort is not subject to the same considerations and limitations that were raised in the Clayton Act and RICO cases. Adopting this federal case law would be a significant departure from our prior cases discussing this tort, especially *Buckaloo, supra,* 14 Cal.3d 815, and *Della Penna, supra,* 11 Cal.4th 376. Nevertheless, the concurring and dissenting opinion points to the Restatement, which states in section 768, comment f, that "there is therefore interplay between [antitrust] law and the law of tortious interference with prospective contractual relations." The concurring and dissenting opinion fails to include the remainder of this sentence, which continues: "[antitrust] law is so involved and is so primarily concerned with areas of public law *only tangentially related* to tort law that it must be regarded as *outside the scope* of the Restatement of Torts." ( *Rest.2d Torts, § 768, com. c,* p. 43, italics added.)

14   We address only plaintiff's allegations as pleaded in its complaint. We express no view as to whether plaintiff's proof will be sufficient to establish these elements at trial.

First, [HN31]a plaintiff that wishes to state a cause of action for this tort must allege the existence of an economic relationship with some third party that contains the probability of future economic benefit to the plaintiff. This tort therefore "protects the expectation that the relationship eventually will yield the desired benefit, not necessarily the more speculative expectation that a potentially beneficial relationship will arise." ( *Westside Center Associates v. Safeway Stores 23, Inc., supra,* 42 Cal.App.4th at p. 524.) Here, KSC had an agency relationship with MacDonald Dettwiler under which KSC's commission was fixed at 15 percent of the contract price. As alleged in the complaint, if MacDonald Dettwiler had been awarded the contract, KSC's commission would have exceeded $ 30 million. This business relationship and corresponding expectancy is sufficient to meet this first element. Only plaintiffs that can demonstrate an economic relationship with a probable future economic benefit will be able to state a cause of action for this tort.

Second, [HN32]a defendant must have knowledge of the plaintiff's economic relationship. KSC alleges that "Loral acted with full knowledge of the commission relationship between plaintiff and MacDonald Dettwiler." Again, this element serves to restrict the class of plaintiffs that can state a claim for this tort.

Third, [HN33]the defendant must have engaged in intentionally wrongful acts designed to disrupt the plaintiff's relationship. As discussed above, this requires a

plaintiff to [**958] plead (1) that the defendant engaged in an independently wrongful act, and (2) that the defendant acted either with the desire to [*1165] interfere or the knowledge that interference was certain or substantially certain to occur as a result of its action. Here, KSC alleges that defendants bribed and offered sexual favors to Korean officials, and paid excessive commissions, in violation of the Foreign Corrupt Practices Act. Further, KSC claims that Loral acted "knowing that its interference with the award of the contract on a competitive basis would cause plaintiff severe loss. "

This intent requirement is an appropriate limitation on both the potential number of plaintiffs that may bring a claim under this tort and the remoteness of these plaintiffs to a defendant's wrongful conduct. At the very least, a defendant must know that its action is substantially certain to interfere with the plaintiff's business expectancy. This interference becomes less certain as the time frame expands, the identity of potential victims becomes more vague, the causal sequence becomes more attenuated, and the assumption of easy preventability becomes less plausible. [HN34]If the interference is not certain or substantially certain to occur as a result of the defendant's acts, [***55] then a plaintiff will not be able to state a claim for intentional interference with prospective economic advantage. However, if a defendant knows that its wrongful acts are substantially certain to injure the plaintiff's business expectancy, the defendant can be held liable, regardless of the motivation behind its actions.

Liability will not be imposed for unforeseeable harm, since the plaintiff must prove that the defendant knew that the consequences were substantially certain to occur. For example,  if the president of MacDonald Dettwiler stood to receive a bonus if the company secured the SAR contract, it would be unlikely that Lockheed Martin would have known this with substantial certainty. Here, however, KSC has alleged that defendants had full knowledge of its commission relationship with MacDonald Dettwiler and that KSC would lose its commission if Lockheed Martin secured the contract through anticompetitive means.

Fourth, [HN35]only plaintiffs that can demonstrate actual disruption of their economic relationship will be able to state a claim for this tort. In this case, KSC sufficiently pleads actual disruption by alleging that it did not receive its expected commission, since MacDonald Dettwiler was not awarded the contract.

Fifth, [HN36]a plaintiff must establish proximate causation. Specifically, this element requires a plaintiff to show that the economic harm it suffered was proximately caused by the acts of the defendant. Here, KSC claims that MacDonald Dettwiler would have been awarded the contract but for Lockheed Martin's interfer-

ence. KSC specifically pleads that MacDonald [*1166] Dettwiler's product was superior and that its bid was significantly lower than the bid submitted by Lockheed Martin. KSC also alleges that its own loss of commission from MacDonald Dettwiler was directly caused by Lockheed Martin's tortious acts. We therefore conclude that KSC has satisfied the proximate cause element. In other cases, however, this proximate cause requirement will prevent a plaintiff from recovering for harm that is more remotely connected to a defendant's wrongful conduct.

### F.

[HN37]An actor engaging in unlawful conduct with the knowledge that its actions are certain or substantially certain to interfere with a party's business expectancy should be held accountable. Liability for such actions, which are independently wrongful, should not turn on the subjective intent of the defendant.

We conclude that the Court of Appeal correctly determined that to state a claim for intentional interference with prospective economic advantage, a plaintiff need not plead that the defendant acted with the specific intent to interfere with the plaintiff's business expectancy. [15] Further, we agree that [**959] plaintiff in this case has sufficiently pled that defendants acted with the required intent, that is, the knowledge that its actions were certain or substantially certain to interfere with plaintiff's business expectancy.

> 15    As noted above, however, we disagree with the Court of Appeal's determination that, after _Della Penna, supra,_ 11 Cal.4th 376, it is no longer appropriate for courts to apply elements of this tort that we first formulated in _Buckaloo, supra,_ 14 Cal.3d 815, with the addition of the independent wrongfulness requirement.

### IV.

We reverse the judgment of the Court of Appeal with respect to its holding that [***56] plaintiff has stated a cause of action under the unfair competition law and we affirm the judgment of the Court of Appeal with respect to its determination that plaintiff has stated a cause of action for the tort of interference with prospective economic advantage. The present case is remanded to the Court of Appeal for proceedings consistent with this opinion.

Kennard, Acting C. J., Baxter, J., Werdegar, J., and Rubin, J., [*] concurred.

---

[*]    Associate Justice of the Court of Appeal, Second Appellate District, Division Eight, assigned

by the Acting Chief Justice pursuant to article VI, section 6 of the California Constitution.

**CONCUR BY:** KENNARD; WERDEGAR; CHIN

### CONCUR

#### KENNARD, Acting C. J.

I concur in the majority opinion.

The majority holds that disgorgement of profits is not an available remedy under California's unfair competition law (UCL) ( [*1167] Bus. & Prof. Code, § 17200 et seq.) when the action is brought by an individual entity on its own behalf. This conclusion logically follows from this court's decision in _Kraus v. Trinity Management Services, Inc._ (2000) 23 Cal.4th 116 [96 Cal. Rptr. 2d 485, 999 P.2d 718] (_Kraus_). That case held that disgorgement of profits is not an available remedy in a representative action under the UCL when the case is not brought as a class action. _Kraus_ explained: "[T]he Legislature has not expressly authorized monetary relief other than restitution in UCL actions, but has authorized disgorgement into a fluid recovery fund in class actions. Although the Legislature is well aware of the distinction between class actions and representative actions, it has not done so for representative UCL actions." ( _Id._ at p. 137.) On this issue, I agreed with the majority in _Kraus._

I wrote separately in _Kraus,_ however, because I was troubled by dictum in that case suggesting " 'it may be appropriate . . . to condition payment of restitution to [nonparty] beneficiaries of a representative UCL action on execution of acknowledgement that the payment is in full settlement of claims against the defendant.' " (_Kraus, supra,_ 23 Cal. 4th at p. 142 (conc. opn. of Kennard, J.) quoting maj. opn., _id._ at pp. 138-139.) But here the issue of conditioning payment of restitution to nonparty beneficiaries in a representative UCL action is not implicated because this case involves an individual entity, the agent of unsuccessful bidders for a lucrative contract to supply military equipment to the Republic of Korea. Because plaintiff here paid no money to defendant successful bidder, I agree with the majority that plaintiff is not entitled to restitution. (Maj. opn., _ante,_ at p. 1149.)

#### WERDEGAR, J., Concurring.

I agree with the majority that a plaintiff, in order to state a claim for interference with prospective economic advantage, need not plead that a defendant acted with the specific intent to interfere with the plaintiff's business expectancy, and with the reasoning leading to that conclusion. (Maj. opn., _ante,_ at pp. 1141, 1153-1166.) Under compulsion of _Kraus v. Trinity Management Services, Inc._ (2000) 23 Cal.4th 116 [96 Cal. Rptr. 2d 485, 999

P.2d 718], from which I dissented, I further agree that nonrestitutionary disgorgement of profits is not an available remedy in an individual action under the unfair competition law, [***57] Business and Professions Code section 17200 et seq. (Maj. opn., *ante*, at p. 1152.) Accordingly, I concur in the judgment.

**DISSENT BY:** [*1168] CHIN

**DISSENT**

CHIN, J.. [**960] Concurring and Dissenting.

I agree with the majority's conclusion that disgorgement of profits is not a proper remedy where an individual private plaintiff alleges a violation of California's unfair competition law ( Bus. & Prof. Code, § 17200 et seq.) and the requested disgorgement would not be restitutionary in nature. However, I dissent from the majority's conclusion that recovery for intentional interference with prospective advantage is available to a plaintiff whose alleged injury only indirectly and remotely followed from the defendant's interference with the prospective economic advantage of a third party with whom the plaintiff had a contractual relationship. Here, plaintiff Korea Supply Company (KSC) alleges that it sustained such remote, indirect, and derivative injury as a result of the interference by defendants Lockheed Martin Tactical Systems, Inc., and Lockheed Martin Corporation (collectively Lockheed) with the prospective economic advantage of MacDonald, Dettwiler, and Associates Ltd. (MacDonald). Thus, in my view, KSC may not state a claim for intentional interference with prospective economic advantage.

I. KSC'S CLAIM FAILS FOR LACK OF A PROSPECTIVE ECONOMIC ADVANTAGE.

As a threshold matter, KSC has improperly brought its claim as one for intentional interference with prospective economic advantage, when it should have brought the claim, if at all, as one for interference with contract. The "first element" of a claim for intentional interference with prospective economic advantage is "an economic relationship between the plaintiff and some third person containing the probability of future economic benefit to the plaintiff." ( *Blank v. Kirwan* (1985) 39 Cal.3d 311, 330 [216 Cal. Rptr. 718, 703 P.2d 58].) Here, KSC had no existing or prospective economic relationship with the Republic of Korea, which is the only entity with which Lockheed had any dealings. As KSC alleged and as the majority explains (maj. opn., *ante*, at p. 1150), KSC expected to receive payment *from MacDonald*, not from the Republic of Korea. Thus, KSC's only economic relationship here was its existing *contractual* relationship with MacDonald, and KSC alleges that Lockheed's actions prevented KSC from realizing the benefits of that

existing contract. Given these allegations, KSC's claim is, in reality, a claim for interference with contract, not intentional interference with prospective economic advantage. As the Restatement Second of Torts (Restatement Second) explains, the latter claim "is concerned *only* with intentional interference with prospective contractual relations, *not yet reduced to contract*." (Rest.2d, § 766B, com. a, p. 20, italics added; see also *Shoemaker v. Myers* (1990) 52 Cal.3d 1, 24 [276 Cal. Rptr. 303, 801 P.2d 1054] [complaint identifying "no 'prospective economic advantage' other than continuation of [plaintiff's] employment relationship" [*1169] is, "in reality," claim for inducement of breach of contract]. ) Thus, as Lockheed argued in its demurrer, KSC's claim for prospective economic advantage fails at the threshold because the complaint fails to allege "a prospective economic relationship between [KSC] and a third person, and the disruption of that relationship."

In reaching a contrary conclusion, the majority errs factually in stating that KSC does "not allege" that it had a contractual [***58] agreement with MacDonald. (Maj. opn., *ante*, at p. 1157.) KSC's complaint alleges that KSC had a "commission relationship" with MacDonald providing for KSC to receive "fifteen percent (15) of the contract price," and that Lockheed's interference caused KSC to lose "its *agreed*" commission." (Italics added.) At oral argument before us, KSC cited these allegations in arguing that it had alleged a "contract between" itself and MacDonald. Similarly, at the hearing on Lockheed's demurrer, KSC argued that it could pursue the interference claim because it "had *a contract* with [MacDonald] affording [KSC] a 15 percent commission on the contract price if [MacDonald] won the contract." (Italics added.) In the Court of Appeal, KSC argued that it "was *contractually entitled* to receive fifteen percent (15) of the contract price" if MacDonald obtained the contract, that its economic interests were intertwined with MacDonald "given [its] *contractual* representation [**961] of MacDonald . . . and its *contractual* entitlement to a commission" if MacDonald obtained the contract, and that it could pursue the interference claim "by virtue of its commissionable *contractual interest*" in MacDonald's prospective contract. (Italics added.) Thus, the record demonstrates that the majority is simply wrong in asserting that KSC does not allege "an enforceable contract" with MacDonald. (Maj. opn., *ante*, at p. 1157.) Moreover, because this case comes to us after the sustaining of a demurrer, we must assume, based on these allegations, that KSC had a valid and enforceable commission contract with MacDonald.

The majority also errs in asserting that "the existence of a contract does not mean that a plaintiff's claim must be brought exclusively as one for interference with contract." (Maj. opn., *ante*, at p. 1157.) As support for its

assertion, the majority cites dictum in _Buckaloo v. Johnson_ (1975) 14 Cal.3d 815 [122 Cal. Rptr. 745, 537 P.2d 865] (_Buckaloo_). (Maj. opn., _ante_, at p. 1157.) In generally describing the historical development of the interference torts, _Buckaloo_ stated that "the tort of interference with contract is merely a species of the broader tort of interference with prospective economic advantage." (_Buckaloo, supra,_ 14 Cal. 3d at p. 823.) _Buckaloo_ also stated that the tort of intentional interference with prospective economic advantage "is considerably more inclusive than actions based on contract or interference with contract, and thus is not dependent on the existence of a [*1170] valid contract." (_Id._ at pp. 826-827.) _Buckaloo_ also seemingly endorsed a federal district court's view that " '[r]ather than characterizing' " interference with contract and intentional interference with prospective business relations " 'as separate torts, the more rational approach seems to be that the basic tort of interference with economic relations can be established by showing, _inter alia,_ an interference with an existing contract or a contract which is certain to be consummated . . . .' " (_Id._ at p. 823, fn. 6.) The majority's assertion rests exclusively on this dictum. (See maj. opn. , _ante,_ at p. 1157.)

For several reasons, _Buckaloo's_ dictum is insufficient to support the majority's conclusion. First, other statements in _Buckaloo_ contradict the majority's analysis. _Buckaloo_ explained that the tort of intentional interference with prospective advantage applies where "a prospective economic relationship has not attained the dignity of a legally enforceable [***59] agreement . . . ." (_Buckaloo, supra,_ 14 Cal. 3d at p. 827.) _Buckaloo_ also stressed that the "area of activity" this tort protects "is not a contractual relationship but an economic relationship with the potential to ripen into contract." (_Id._ at p. 830, fn. 7.) It is in this sense—the protection of _non_contractual relationships—that _Buckaloo_ stated that the tort of intentional interference with prospective advantage "is considerably more inclusive than" the tort of interference with contract. (_Id._ at pp. 826-827.) As the statements I have quoted make clear, _Buckaloo_ was not, as the majority incorrectly suggests, indicating that the tort of intentional interference with prospective economic advantage _also_ includes claims based on a valid and enforceable contract. Thus, several statements in _Buckaloo_ contradict the majority's view that a plaintiff may base a claim for intentional interference with prospective advantage on an interference with a valid and enforceable contract. [1]

> [1] The majority asserts that these statements were "merely made in furtherance of _Buckaloo's_ central thesis: that the existence of a contract is not _necessary_ to maintain an action for intentional interference with prospective economic advantage." (Maj. opn., _ante,_ at p. 1158, fn 10.)

What the majority fails to understand, and what the statements I have quoted establish, is that this thesis does not, as the majority incorrectly concludes, imply that an action for intentional interference with prospective economic advantage may be brought where there _is_ a valid contract.

Second, the majority's reliance on _Buckaloo's_ dictum is also incorrect because the federal decision _Buckaloo_ endorsed did not, [**962] as the majority erroneously suggests, state that a claim for interference with contract may be brought as one for intentional interference with prospective economic advantage. Rather, it suggested that these claims should be recognized not as " 'separate torts,' " but as alternative theories for establishing a single, broader tort called " 'interference with economic relations.' " (_Buckaloo, supra,_ 14 Cal. 3d at p. 823, fn. 6, quoting _Builders Corporation of America v. United States_ (N.D.Cal. 1957) 148 F. Supp. 482, 484, fn. 1, revd. on other [*1171] grounds (9th Cir. 1958) 259 F.2d 766.) Despite _Buckaloo's_ dictum, we have not recognized this broader tort. On the contrary, we have stressed the "need to draw and enforce a sharpened distinction between claims for the tortious disruption of an _existing_ contract and claims that a _prospective_ contractual or economic relationship has been interfered with by the defendant." (_Della Penna v. Toyota Motor Sales, U.S.A., Inc._ (1995) 11 Cal.4th 376, 392 [45 Cal. Rptr. 2d 436, 902 P.2d 740] (_Della Penna_).) Indeed, the majority purports to "reiterate" _Della Penna's_ statement that California courts should " 'firmly distinguish' " between these two separate torts. (Maj. opn., _ante,_ at p. 1157.) Unfortunately, the majority fails to follow this statement.

Finally, the other statement from _Buckaloo_ the majority cites—that " 'the tort of interference with contract is merely a species of the broader tort of interference with prospective economic advantage' " (maj. opn., _ante,_ at p. 1157)—is both imprecise and incorrect. _Buckaloo_ cited several authorities as establishing this proposition, but none of them stated that the tort of interference with contract is a species of the tort of intentional interference with prospective economic advantage. Rather, to the extent they spoke to this question, consistent with the federal decision discussed above, they characterized or [***60] analyzed interference with contract and intentional interference with prospective economic advantage as separate aspects of the broader "subject of interference with commercial or economic relations." (Prosser, Torts (4th ed. 1971) § 128, p. 915; see also 1 Harper & James, Torts (1956) § 6.5, p. 489 [interference with contract "is one of several segments of a large area of the law of tort in which damages may be recovered for unlawfully causing loss to the plaintiff in connection with his business relations"]; _id._ at §§ 6.7, 6.11, pp. 495, 510 [actions for interference with contract and interference with reason-

able economic expectations protect different rights and interests]; 4 Witkin, Summary of Cal. Law (8th ed. 1974) Torts, §§ 380- 391, pp. 2634-2643; Note, *Developments in the Law--Competitive Torts* (1964) 77 Harv. L.Rev. 888, 961 [stressing "the difference between the action for inducing breach of contract and the action for interference with prospective advantage"].) [2] Consistent with these authorities, in an extensive historical discussion, we have previously labeled "interference with contract" and "interference with prospective economic relations" as, generally, "the so-called 'interference torts,' " and characterized them as "two torts" that are "sibling[s]." (*Della Penna, supra,* 11 Cal. 4th at p. 381.) Thus, *Buckaloo's* dictum is erroneous and it fails to support the majority's assertion that KSC may properly base a claim for intentional interference with prospective economic advantage on allegations that Lockheed interfered with the existing contract between KSC and MacDonald.

> 2  *Buckaloo* also cited Bernhardt, California Real Estate Transactions (Cont.Ed.Bar 1974 supp.) section 5.81. (*Buckaloo, supra,* 14 Cal. 3d at p. 823.) That source did not address the issue or otherwise support *Buckaloo's* statement.

[*1172]  The discussion of this subject in the Restatement Second, on which the majority heavily relies, fully supports the conclusion that *Buckaloo's* dictum, and the majority's conclusion based on that dictum, are incorrect. Consistent with the authorities I have already discussed, the Restatement Second explains that interference with contract and "interference with prospective advantage" are separate "form[s]" of the broader subject of "intentional interference with business relations." (Rest.2d, § 766A, com. b, p. 18; see also *id.,* § 767, com. j, p. 37 [interference with contract and interference with prospective [**963] economic advantage are separate "forms of interference with business relations"].) The Restatement Second also explains that, as their names suggest, intentional interference with contract involves only interference with an "existing contract," whereas intentional interference with prospective economic advantage "is concerned *only* with intentional interference with prospective contractual relations *not yet reduced to contract."* (Rest.2d, § 766B, com. a, p. 20, italics added.) Thus, the Restatement Second supports the conclusion that because KSC alleges only a loss of benefits under its *existing* contract with MacDonald, and it had no *prospective* relationship with the Republic of Korea, its claim for intentional interference with prospective economic advantage fails at the threshold for lack of a prospective economic advantage with which Lockheed allegedly interfered. The majority's contrary conclusion improperly "blurs the analytical line between interference with an existing business contract and interference with commercial relations *less* than contractual," thus "invit[ing] both

uncertainty and unpredictability . . . ." (*Della Penna, supra,* 11 Cal. 4th at p. 392.)

[***61]  II. KSC'S ALLEGED INJURIES ARE TOO REMOTE TO WARRANT RECOVERY.

In its demurrer, Lockheed argued that "the economic relationship [it] allegedly disrupted was MacDonald's . . . effort to obtain the award of the . . . contract from" the Republic of Korea, and that KSC's alleged injury was merely "an indirect consequence of" this alleged disruption. This indirect injury, Lockheed continued, "does not give rise to a claim for intentional interference with prospective economic advantage because [KSC] cannot show that the injury resulted from the disruption of a prospective economic relationship to which [KSC] was a party." In sustaining the demurrer, the trial court agreed with Lockheed, finding that KSC's claim failed because it was "secondary and derivative and indirect and [KSC] has found no case from any U.S. state or federal jurisdiction giving cognizance to a comparable secondary or derivative or indirect claim."

The majority rejects this view and holds that "an indirectly injured plaintiff may state a claim" for intentional interference with prospective [*1173] economic advantage, and may do so "without pleading that the defendant acted with the purpose to interfere with the plaintiff's business expectancy." (Maj. opn., *ante,* at pp. 1162-1163.) The majority gives scant attention to this issue. It cites no decisions, from California or elsewhere, supporting either its analysis or its holding. The sole authority the majority cites is a portion of comment h to section 767 of the Restatement Second (comment h). The majority states: "Section 767, comment h, of the Restatement [Second], discussing the proximity or remoteness of the defendant's conduct to the interference, supports our conclusion: 'This remoteness [between the defendant's conduct and the plaintiff's injury] conduces toward a finding that the interference was not improper. The weight of this factor, however, may be controverted by . . . the factor of the actor's conduct *if that conduct was inherently unlawful or independently tortious.'* [Citation.] If the defendant's improper conduct constitutes independently wrongful behavior, the fact that the plaintiff is an indirect victim does [**964] not preclude recovery." (Maj. opn., *ante,* at p. 1163, fn. omitted.)

For several reasons, comment h is insufficient support for the majority's conclusion that KSC's status as "an indirect victim does not preclude recovery." (Maj. opn., *ante,* at p. 1163.) First, comment h does not, as the majority suggests, categorically state that a defendant's commission of an independently wrongful act *does* overcome remoteness between the defendant's conduct and the plaintiff's injury. Rather, in decidedly equivocal terms, comment h states that the significance of remote-

ness "*may be* controverted . . . *perhaps* by the factor of the actor's conduct if that conduct was inherently unlawful or independently tortious." ( Rest.2d Torts, § 767, com. h, p. 36, italics added.  ) Comment h's equivocal language does not support the majority's categorical holding that where a defendant's conduct is independently wrongful, "the fact that the plaintiff is an indirect victim does not preclude recovery." [3] (Maj. opn., *ante,* at p. 1163.)

> 3  Comment b of section 767 of the Restatement Second makes the same point. In discussing "the interplay between" a defendant's "motive" and "the nature of [his or her] conduct," it states, in equivocal terms, that "[i]f the conduct is independently wrongful . . . the desire to interfere with the other's contractual relations *may be less essential* to a holding that the interference is improper." (Rest.2d, § 767, com. on cl. b, p. 33, italics added.)

[***62] Second, comment h addresses proximity and remoteness in the context of an interference with an existing contract, not an interference with a merely prospective economic advantage. This fact is clear from the portion of comment h that immediately precedes the portion the majority quotes, which states: "If . . . A induces B to sell certain goods to him and thereby causes him not to perform his *contract* to supply the goods to C, this may also have the effect of preventing C from performing his *contractual obligations* to [*1174] supply them to D and E. C's failure to perform *his contracts* is a much more indirect and remote consequence of A's conduct than B's breach of his contract with C, even assuming that A was aware of all *contractual obligations* and the interference can be called intentional." (Rest.2d, § 767, com. h, p. 36, italics added.) This fact is significant because, as the Restatement Second elsewhere explains, the law affords "greater protection . . . to the interest in an existing contract than to the interest in acquiring prospective contractual relations," and section 767's "weighing process" therefore "does not necessarily reach the same result in regard to" these separate "forms of interference with business relations." (Rest.2d, § 767, com. j, p. 37; see also *id.,* com. a, p. 27 [weight of various factors "may vary considerably" with respect to different "forms of the tort"].) Thus, comment h's discussion of the interaction between independently wrongful means and remoteness in the context of an interference with an existing contract does not necessarily apply to the same extent with regard to an interference with a merely prospective economic advantage. By failing to distinguish between these torts, the majority, in the words of the Restatement Second, "produce[s] a blurring of the significance of the factors involved in determining liability." [4] (Rest.2d, ch. 37, Introductory Note, p. 5.)

> 4  As should be clear, I do not, as the majority states, "assert[]" that section 767 of the Restatement Second does not apply to intentional interference with prospective economic advantage. (Maj. opn., *ante,* at p. 1163, fn. 12.) What I do assert is that given the Restatement Second's caution that "the weight carried by" the various factors "may vary considerably" with respect to the different interference torts (Rest.2d, § 767, com. a, p. 27), the majority errs in simply assuming that comment h's discussion of remoteness in the context of interference with contract necessarily applies to the same extent to intentional interference with prospective economic advantage.

Third, and most important, the Restatement Second's sections and comments regarding interference with contract and intentional interference with prospective economic advantage do not even purport to address the fundamental question before us: whether Lockheed's alleged interference is the legal cause of the remote, indirect, and derivative injury KSC alleges. The relevant sections of the Restatement Second state rules for determining whether someone is "subject to liability." (Rest.2d, §§ 766, 766B.) Under the Restatement Second, "subject to liability" means only that "the actor's conduct is such as to make him liable for another's injury, *if,*" in *addition,* "the actor's conduct is *a legal cause*" of the injury. (Rest.2d, § 5, italics added.)' "Legal cause," according to the Restatement, means that "the causal sequence by which the actor's tortious conduct has resulted in an invasion of some legally protected interest of another is such that the law holds the actor responsible for such harm unless there is some defense to liability." (Rest.2d, § 9.) Regarding the relationship between these concepts, the Restatement Second explains: "To become liable . . . under the principles of the law of [*1175] Torts, an actor's conduct must not only be tortious in character but it must also be a legal [***63] cause of the invasion of another's interest. If the actor has engaged in conduct which is tortious in character, he thereby subjects himself to liability . . . . In order that the actor become liable to another, it is necessary, [**965] among other things, that his conduct be the legal cause of the invasion of the other's interest . . . ." (Rest.2d, § 9, com. a, p. 16.) "In order that a particular act or omission may be the legal cause of an invasion of another's interest, the act or omission must be a substantial factor in bringing about the harm, and there must be no principle or rule of law which restricts the actor's liability because of the manner in which the act or omission operates to bring about such invasion." (Rest.2d, § 9, com. b, p. 16.) Thus, a defendant "may be 'subject to liability' " within the meaning of the Restatement Second "but may escape" liability if his or her conduct is not "the legal cause of the

plaintiff's harm." (Rest.2d, § 5, com. b, p. 11.) Because the Restatement Second's sections on interference with contract and intentional interference with prospective economic advantage consider the circumstances only for determining whether a defendant is "subject to liability" (Rest.2d, §§ 766, 766B), they do not even purport to address the more fundamental question now before us: whether Lockheed's alleged interference is the legal cause of the remote, indirect, and derivative injury KSC alleges. Thus, the majority's reliance on the Restatement Second is both inadequate and unpersuasive.

Our prior decisions discuss similar concepts in tort law. As we have explained, "[p]roximate cause involves *two* elements. [Citation.] One is *cause in fact*. An act is a cause in fact if it is a necessary antecedent of an event. [Citation.] . . . [P] To simply say, however, that the defendant's conduct was a necessary antecedent of the injury does not resolve the question of whether the defendant should be liable. . . . '[T]he consequences of an act go forward to eternity, and the causes of an event go back to the dawn of human events, and beyond. But any attempt to impose responsibility upon such a basis would result in infinite liability for all wrongful acts, and would "set society on edge and fill the courts with endless litigation. " ' [Citation.] Therefore, the law must impose limitations on liability other than simple causality. These additional limitations are related not only to the degree of connection between the conduct and the injury, but also with public policy. [Citation.] As Justice Traynor observed, proximate cause 'is ordinarily concerned, not with the fact of causation, but with the various considerations of policy that limit an actor's responsibility for the consequences of his conduct.' [Citation.]" ( *PPG Industries, Inc. v. Transamerica Ins. Co.* (1999) 20 Cal.4th 310, 315-316 [84 Cal. Rptr. 2d 455, 975 P.2d 652] [holding that although the defendant was cause in fact of the plaintiff's damages, for policy reasons, it was not proximate cause].) In [*1176] short, proximate cause is " 'a policy-based legal filter on "but for" causation' " that courts apply " ' "to those more or less undefined considerations which limit liability even where the fact of causation is clearly established." ' [Citation.]" ( *Vons Companies, Inc. v. Seabest Foods, Inc.* (1996) 14 Cal.4th 434, 464 [58 Cal. Rptr. 2d 899, 926 P.2d 1085].) Moreover, to the extent proximate cause involves "limitations imposed upon liability as a matter of public policy, the issue is for the court" to decide as "a question of law." ( *Mosley v. Arden Farms Co.* (1945) 26 Cal.2d 213, 223 [157 P.2d 372] (conc. opn. of Traynor, J.).) Thus, the majority errs in concluding that KSC "has satisfied the proximate cause element" merely by *pleading* that its injury "was directly caused by" Lockheed's alleged interference. (Maj. opn., *ante*, at p. 1166.) [***64] This allegation does "not . . . render the complaint sufficient" because, as I later explain, "it affirmatively appears from other alle-gations that the act[s] made the basis of liability [are], as a matter of law, not the proximate cause of the injury complained of." ( *Katz v. Helbing* (1928) 205 Cal. 629, 633 [271 P. 1062].)

Regarding the more fundamental policy question of legal, or proximate, cause, the majority has little to say. The majority declares that there is "no sound reason for requiring that a defendant's wrongful actions must be directed towards the plaintiff." (Maj. opn., *ante*, at p. 1163.) To do so, the majority suggests, would exclude what a law review article describes as " 'the most numerous of the tortious interference cases' "--" 'those in which the disruption is caused by an act directed not at the plaintiff, but at a third [**966] person.' " (Maj. opn., *ante*, at p. 1163.)

This analysis simply attacks a straw man of the majority's own creation. Contrary to the majority's suggestion, no one asserts that we should allow recovery only where the defendant's wrongful act is "directed towards the plaintiff." (Maj. opn., *ante*, at p. 1163.) Rather, the issue here is whether to allow recovery where the wrongful act is not directed towards the plaintiff *or* towards anyone with whom the plaintiff had a prospective economic advantage. As I have previously explained, Lockheed directed no actions towards either KSC or Mac-Donald. It directed its actions only towards the Republic of Korea--with which KSC has no prospective economic relationship--and KSC's alleged injury is only a remote, indirect, and derivative consequence of those alleged acts towards the Republic of Korea. Moreover, contrary to the majority's suggestion, cases involving such derivative injury are not among those that the cited law review article described as being the "most numerous." (Perlman, *Interference with Contract and Other Economic Expectancies: A Clash of Tort and Contract Doctrine* (1982) 49 U.Chi. L.Rev. 61, 106.) According to the article, that category consists of cases in which the defendant's act of interference was directed towards a third person who [*1177] was "in a [r]elationship with the [p]laintiff." (*Ibid.*; see also *id.* at p. 99.) Again, this is not such a case, because Lockheed's alleged acts were not directed towards anyone having either an existing or prospective relationship with KSC. [5]

5 Nor does the passage the majority cites from the concurring opinion in *Della Penna* (maj. opn., *ante*, at p. 1163) address recovery where the defendant's alleged act of interference is not directed towards the plaintiff or towards anyone with whom the plaintiff has an existing or prospective economic relationship. (*Della Penna, supra*, 11 Cal. 4th at p. 409 (conc. opn. of Mosk, J.).)

The majority also summarily declares that because, under *Della Penna, supra*, 11 Cal.4th 376, a defendant's liability for intentional interference with prospective economic advantage requires commission of "an independently wrongful act," a plaintiff's standing to sue should not "turn on" the defendant's "subjective intent." (Maj. opn., *ante*, at p. 1162.) A contrary conclusion, the majority reasons, would produce "absurd and unfair results." (*Ibid.*) Again, the majority cites no case law supporting its analysis and conclusion. Moreover, the majority's reliance on *Della Penna*'s wrongful act requirement subverts and distorts the [***65] purpose of that requirement. In *Della Penna*, we required an independently wrongful act to *restrict* the scope of the tort. Contrary to this purpose, the majority here uses that requirement as justification for significantly *expanding* the tort's scope by allowing recovery for remote, indirect, and derivative injuries. Finally, the majority's conclusion that it would be unfair to preclude recovery for indirect and remote injury simply because the defendant lacked specific intent begs the more fundamental, threshold question of whether a plaintiff with remote, indirect, and derivative injury should be able to recover even if the defendant had specific intent.

Regarding this threshold policy question, and lacking governing California authority, we borrow the substantial body of case law from other courts—including the United States Supreme Court—that deals with analogous causes of action and holds that parties with remote, indirect, and derivative injuries may not recover. The high court has addressed this subject in the context of antitrust law. Consistent with the causation principles I have previously discussed, the high court has explained that although "[a]n antitrust violation may be expected to cause ripples of harm to flow through the Nation's economy," " 'there is a point beyond which the wrongdoer should not be held liable.' [Citation.]" ( *Blue Shield of Virginia v. McCready* (1982) 457 U.S. 465, 476-477 [73 L. Ed. 2d 149, 102 S. Ct. 2540] (*Blue Shield*).) Like "common-law" remedies, "the judicial remedy" for an antitrust violation "cannot encompass every conceivable harm that can be traced to alleged wrongdoing." ( [**967] *Associated General Contractors of California, Inc. v. California State Council of Carpenters* (1983) 459 U.S. 519, 535-536 [74 L. Ed. 2d 723, 103 S. Ct. 897] [*1178] ( *Associated General*.)) Thus, in an antitrust case, the "question of which persons have been injured by" the alleged antitrust violation "is analytically distinct from the question of which persons have sustained injuries too remote to give them standing to sue for damages . . . ." ( *Illinois Brick Co. v. Illinois* (1977) 431 U.S. 720, 728, fn. 7 [52 L. Ed. 2d 707, 97 S. Ct. 2061] (*Illinois Brick*); see also *Blue Shield, supra,* 457 U.S. at p. 476 [102 S. Ct. at pp. 2546-2547].)

The high court focused on these questions in *Associated General,* where several labor unions sought damages for an alleged antitrust violation by an employers association. The unions alleged that the employers association illegally "coerced certain third parties . . . to enter into business relationships with nonunion firms. This coercion, according to the [unions'] complaint, adversely affected the trade of certain unionized firms and thereby restrained the business activities of the unions." (*Associated General, supra,* 459 U.S. at pp. 520-521.) The court of appeals held that the unions "had standing to recover damages for the injury to their own business activities" because their injury was not only "a foreseeable consequence of the antitrust violation," but also "was specifically intended by the defendants." ( *Id.* at p. 525.) The high court disagreed and held that the unions could not maintain their antitrust action notwithstanding their "allegation of intent to harm." ( *Id.* at p. 545.)

Notably, in reaching its conclusion, the high court in *Associated General* expressly relied on common law principles, which are, of course, applicable in the case now before us. The court reasoned: "In 1890, notwithstanding general language in many state constitutions providing in substance that 'every wrong shall have a remedy,' a number of judge-made rules circumscribed the availability of damages recoveries in both tort and contract litigation—doctrines [***66] such as foreseeability and proximate cause, directness of injury, certainty of damages, and privity of contract. Although particular common-law limitations were not debated in Congress, the frequent references to common-law principles [in congressional debates on the antitrust laws] imply that Congress simply assumed that antitrust damages would be subject to constraints comparable to well-accepted common-law rules applied in comparable litigation." (*Associated General, supra,* 459 U.S. at pp. 532-533, fns. omitted.) The court noted that, based on this understanding of congressional intent, federal judges had "held as a matter of law that neither a creditor nor a stockholder of a corporation that was injured by a violation of the antitrust laws could recover" because a "plaintiff's injury as a stockholder [is] 'indirect, remote, and consequential.' [Citation.]" ( *Id.* at p. 533.) "This holding," the high [*1179] court continued, is "consistent with . . . '[t]he general tendency of the law, in regard to damages at least, . . . not to go beyond the first step.' [Citation.]" ( *Id.* at p. 534.) Thus, the court reasoned, "as was required in common-law damages litigation in 1890," the question of whether the plaintiff "may recover for the injury it allegedly suffered by reason of the defendants' coercion against certain third parties . . . requires . . . evaluat[ion of] the plaintiff's harm, the alleged wrongdoing by the defendants, and the relationship between them." ( *Id.* at p. 535, fn. omitted.)

In holding that the unions could not maintain their antitrust action, the high court in *Associated General* stressed, among other factors, the "indirectness of the [unions'] asserted injury." (*Associated General, supra,* 459 U.S. at p. 540.) Focusing on the "chain of causation" between the unions' injury and the alleged antitrust violation, the high court found "that any such injuries were only an indirect result of whatever harm may have been suffered by [the] construction contractors and subcontractors" that lost business due to the defendants' coercion. ( *Id.* at pp. 540-541.) "If either these firms, or the immediate victims of coercion by defendants, have been injured by an antitrust violation, their injuries would be direct and . . . they would have a right to maintain their own . . . actions against the defendants. . . . The existence of an identifiable class of persons whose self-interest would normally motivate them to" sue "diminishes the justification for allowing [**968] . . . more remote part[ies] such as the [unions] to" maintain an action. ( *Id.* at pp. 541-542.) "Denying the [u]nion[s] a remedy on the basis of [the] allegations in this case is not likely to leave a significant antitrust violation undetected or unremedied." ( *Id.* at p. 542.) "Indeed," the court explained, "if there is substance to the [u]nion[s'] claim, it is difficult to understand why these direct victims of the conspiracy have not asserted any claim in their own right." ( *Id.* at p. 542, fn. 47.)

In *Illinois Brick,* the high court applied similar principles in holding that where the defendant violates the antitrust laws by fixing prices and sells to an entity that passes the resulting overcharges on to its customers, the injuries of the customers resulting from the defendant's antitrust violation are legally too remote to support recovery. (*Illinois Brick, supra,* 431 U.S. at pp. 725-729 [97 S. Ct. at pp. 2064-2066].) The court acknowledged that this holding "denies recovery to . . . indirect purchasers who may have been actually injured by antitrust violations." ( *Id.* at p. 746 [97 S. Ct. at p. 2075].) However, "[i]n view of" the relevant policy "considerations," the court was "unwilling to carry the compensation principle to its logical extreme by [*1180] attempting to allocate damages among all 'those within the [***67] defendant's chain of distribution' [citation] . . . ." (*Ibid.*) The considerations the court cited were the defendant's "interest . . . in avoiding multiple liability for" the amount of the overcharge, "the interest of absent potential plaintiffs in protecting their right to recover for the portion of the [overcharge] allocable to them and the social interest in the efficient administration of justice and the avoidance of multiple litigation." ( *Id.* at pp. 737-738 [97 S. Ct. at p. 2071].)

The high court reaffirmed *Illinois Brick* in *Kansas v. Utilicorp United, Inc.* (1990) 497 U.S. 199 [111 L. Ed. 2d 169, 110 S. Ct. 2807]. There, the court held that

where natural gas suppliers illegally overcharged a public utility and the utility passed on the overcharge to its customers, the customers' injuries were too remote to support an antitrust action. ( *Id.* at p. 204.) The court explained that the customers "have the status of indirect purchasers" because "[i]n the distribution chain, they are not the immediate buyers from the alleged antitrust violators." ( *Id.* at p. 207.) The court next observed that its decision in *Illinois Brick* "den[ies] relief to consumers who have paid inflated prices because of their status as indirect purchasers. [Citations.]" (*Kansas, supra,* 497 U.S. at pp. 211-212 [110 S. Ct. at p. 2814].) Finally, the court refused to create an exception to "the *Illinois Brick* rule" for cases involving public utilities, "even assuming that any economic assumptions underlying [that] rule might be disproved in a specific case . . . ." (*Kansas, supra,* 497 U.S. at p. 217 [110 S. Ct. at p. 2817].)

In *Holmes v. Securities Investor Protection Corp.* (1992) 503 U.S. 258 [117 L. Ed. 2d 532, 112 S. Ct. 1311] (*Holmes*), the high court applied these same principles to a claim under the Racketeer Influenced and Corrupt Organizations Act (RICO). In *Holmes,* plaintiff Securities Investor Protection Corporation (SIPC) alleged that the defendant, in violation of RICO, illegally "conspired in a stock-manipulation scheme that disabled two broker-dealers from meeting obligations to customers," which in turn "trigger[ed] SIPC's statutory duty to advance funds to reimburse the customers." (*Holmes, supra,* 503 U.S. at p. 261 [112 S. Ct. at p. 1314].) The court held that SIPC could not maintain its claim because its injuries were too remote.

In reaching its conclusion, the *Holmes* court began by finding it "unlikel[y] that Congress meant to allow all factually injured plaintiffs to recover . . . ." (*Holmes, supra,* 503 U.S. at p. 266 [112 S. Ct. at p. 1316], fn. omitted.) The court explained that " '[i]n a philosophical sense, the consequences of an act go forward to eternity, and the causes of an event go back to the dawn of human events, and beyond. But any attempt to impose [*1181] responsibility upon such a basis would result in infinite liability for all wrongful acts, and would "set society on edge and fill the courts with endless litigation." ' [Citation.]" ( *Id.* at p. 266, fn. 10.) Relying on *Associated General,* the *Holmes* court then found that because Congress "incorporate[d] common-law principles of proximate causation" into RICO, a plaintiff's right to recover [**969] under RICO "require[s] a showing that the defendant's violation not only was a 'but for' cause of his injury, but was the proximate cause as well." (*Holmes, supra,* 503 U.S. at p. 268 [112 S. Ct. at p. 1317].) The court next explained that one aspect of proximate cause-- which is a generic label for "the judicial tools used to limit a person's responsibility for the consequences of [his or her] acts"--is "a demand for some direct relation

between the injury asserted and the injurious conduct alleged. Thus, a plaintiff who complain[s] of harm flowing merely from the misfortunes visited upon a third person by the defendant's acts [i]s generally said to stand [***68] at too remote a distance to recover. [Citation.]" ( *Id.* at pp. 268-269.)

The *Holmes* court next discussed its application of the proximate cause concept in antitrust cases. Citing *Associated General*, the court explained that "directness of relationship" between the plaintiff's injury and the defendant's conduct is one of the "central elements" of "causation" under antitrust law "for a variety of reasons. First, the less direct an injury is, the more difficult it becomes to ascertain the amount of a plaintiff's damages attributable to the violation, as distinct from other, independent, factors. [Citation.] Second, quite apart from problems of proving factual causation, recognizing claims of the indirectly injured would force courts to adopt complicated rules apportioning damages among plaintiffs removed at different levels of injury from the violative acts, to obviate the risk of multiple recoveries. [Citations.] And, finally, the need to grapple with these problems is simply unjustified by the general interest in deterring injurious conduct, since directly injured victims can generally be counted on to vindicate the law as private attorneys general, without any of the problems attendant upon suits by plaintiffs injured more remotely. [Citation.]" (*Holmes, supra,* 503 U.S. at pp. 269-270 [112 S. Ct. at pp. 1318-1319].)

Finally, applying these principles to RICO, the *Holmes* court held that SIPC could not maintain its RICO action. After noting SIPC's theory of recovery--that SIPC was "subrogated to the rights of those customers of the broker-dealers who did not purchase manipulated securities" (*Holmes, supra,* 503 U.S. at p. 271 [112 S. Ct. at p. 1319])--the court explained: "[E]ven assuming, *arguendo,* that [SIPC] may stand in the shoes of nonpurchasing customers, the link is too remote between the stock manipulation alleged and the customers' harm, being purely contingent on the harm suffered by the [*1182] broker-dealers. That is, the conspirators have allegedly injured these customers only insofar as the stock manipulation first injured the broker-dealers and left them without the wherewithal to pay customers' claims. Although the customers' claims are senior (in recourse to 'customer property') to those of the broker-dealers' general creditors, [citation], the causes of their respective injuries are the same: The broker-dealers simply cannot pay their bills, and only that intervening insolvency connects the conspirators' acts to the losses suffered by the nonpurchasing customers and general creditors. [P] As we said, however, in *Associated General Contractors,* quoting Justice Holmes, ' "The general tendency of the law, in regard to damages at least, is not

to go beyond the first step[]" ' [citation], and the reasons that supported conforming [antitrust] causation to the general tendency apply just as readily to the present facts, underscoring the obvious congressional adoption of the Clayton Act direct-injury limitation among the requirements of" RICO. (*Holmes, supra,* 503 U.S. at pp. 271-272 [112 S. Ct. at pp. 1319-1320], fns. omitted.) A contrary conclusion would "[a]llow[] suits by those injured only indirectly," thereby "open[ing] the door to 'massive and complex damages litigation' " that would " 'not only burde[n] the courts, but [would] also undermin[e] the effectiveness of treble-damages suits.' [Citation.]" ( *Id.* at p. 274.)

Lower federal courts have applied these principles to preclude recovery for remote, indirect, and derivative injury in several cases that are relevant here because they involved commission relationships, bribes, pendent state claims for interference with prospective economic advantage, and/or allegations of specific intent to harm. In *Brian Clewer, Inc. v. Pan American World Airways, Inc.* (C.D.Cal. 1986) 674 F. Supp. 782, 784-788, the court held that [***69] Clewer, a travel [**970] agency, could not maintain an antitrust action against several airlines that had allegedly conspired to destroy Laker, another airline with which Clewer had a commission arrangement. Like KSC, Clewer alleged damages in the form of lost commissions. ( *Id.* at p. 788.) Clewer also alleged that the defendants had acted " 'with the object of . . . damaging [its] business.' " ( *Id.* at p. 784.) Despite this allegation, the court, applying *Associated General,* found that Clewer could not maintain the action because "any injury to Clewer [was] only an indirect result of whatever harm may have been suffered by Laker, and thus Clewer's injury [was] derivative of . . . Laker's." (*Brian Clewer, Inc., supra,* at p. 787.) The court explained that "other potential plaintiffs"--Laker, Laker passengers, former Laker employees--"stand in a better posture to assert antitrust claims due to a more direct harm than" Clewer. (*Ibid.*) Given all of these potential plaintiffs, "if Clewer and other similarly situated travel agencies are found to have standing" to sue "for a portion of Laker's revenues, a possibility exists of duplicative recovery against the defendants." ( *Id.* at p. 788.) In concluding, the court [*1183] explained: "Clewer stands in the same position as numerous other prospective plaintiffs whose alleged losses are indirect and derivative, i.e., other travel agencies, other supplie[r]s of goods and services, food vendors, waste disposal services, and custodians. . . . Clewer's injury is too indirect to provide standing under" the antitrust laws. ( *Id.* at pp. 787-788.)

On analogous facts, another federal court reached a similar conclusion in *Fallis v. Pendleton Woolen Mills, Inc.* (6th Cir. 1989) 866 F.2d 209. There, the plaintiff, a sales representative for the defendant, filed an antitrust

action alleging that he lost commissions as a result of the defendant's alleged price-fixing scheme. ( *Id.* at pp. 210-211.) The court held that the plaintiff could not maintain his action because his alleged injury was "derivative; it [was] simply a side effect of [the defendant's] alleged antitrust violations. . . . Any injury to [the plaintiff] was merely incidental to the purposes of the alleged price-fixing arrangement," which was "aimed at disciplining retailers and raising consumer prices, not reducing the commissions earned by salespersons." (*Ibid.*) "As is generally true where the plaintiff's injury is indirect, more direct victims of the alleged conspiracy exist in the present case . . . ." ( *Id.* at p. 211.) " '[I]f the court were to allow all indirect victims standing to sue . . . , the dangers of duplicative recovery and complex apportionment of damages would become very real.' ( *Id.* at pp. 211-212.) "In light of these factors"--the indirectness of plaintiff's injury, the existence of more direct victims, the possibility of duplicative recovery--the court held that the plaintiff "lack[ed] antitrust standing." ( *Id.* at p. 212.)

Another case involving analogous facts is *Eagle v. Star-Kist Foods, Inc.* (9th Cir. 1987) 812 F.2d 538. There, fishermen alleged that fish canneries had violated the antitrust laws by conspiring to set tuna prices at artificially low levels. ( *Id.* at p. 539.) The fishermen worked as crewmembers on vessels owned by others, who sold the vessels' catch to the canneries and then paid the fishermen based on a "share of the catch" or the "price per ton." (*Ibid.*) Regarding damages, the fishermen alleged that the artificially low price levels "result[ed] in a reduction of the wages" they received. (*Ibid.*) Applying *Associated General*, the court held that the fishermen could not maintain an antitrust action because their alleged injuries were "derivative of the injuries suffered by the vessel owners." ( *Eagle, supra,* at p. 541.) In [***70] reaching its conclusion, the court rejected the argument that the fishermen "were directly injured because calculation of their wages . . . was completely and inextricably intertwined with the artificially low selling prices" and because "they were joint venturers with the vessel owners . . . ." (*Ibid.*) The court explained: "[W]hat exists between the vessel owners and the crewmembers is an employer-employee relationship. . . . Once a sale has been completed, [*1184] the crewmembers are paid their wages . . . either on a 'share of the catch' or 'per-ton' basis. . . . Thus, any injury [they] suffered . . . is derived from any injury suffered by the vessel owners . . . . 'When the employer reacts to [a] loss by terminating employees, or when employees receive diminished salary *or commissions,* as a result [**971] of the employers' weakened market position, these employees suffer *derivative* injury only.' [Citation.]" ( *Id.* at pp. 541-542, first italics added.) The court also reasoned that "the vessel owners . . . [have] the requisite motivation to vindicate

the public interest" in enforcement of the antitrust laws, and that "[t]he justification for allowing the crewmembers . . . to bring the action is thereby diminished because they are more remote parties." [6] ( *Eagle, supra,* at p. 542.)

> 6   See also *Southwest Suburban Board of Realtors, Inc. v. Beverly Area Planning Assn.* (7th Cir. 1987) 830 F.2d 1374, 1378 (corporate president who may have lost commissions as a result of alleged antitrust violation may not maintain antitrust action, because "[m]erely derivative injuries sustained by employees, officers, stockholders, and creditors of an injured company do not constitute 'antitrust injury' sufficient to confer antitrust standing"); *Warnick v. Washington Education Association* (E.D.Wash. 1984) 593 F. Supp. 66, 67-69 (commissions that sales agents lost due to the defendant's attempt to restrain trade were derivative injury and could not support antitrust claim).

Still another relevant application of these remoteness principles occurred in *Hawaii Health & Welfare Trust Fund for Operating Engineers v. Philip Morris, Inc.* (D.Hawai'i 1999) 52 F. Supp. 2d 1196. There, numerous "multi-employer labor management health and welfare funds," which paid medical bills for union workers, filed a RICO action against "the major cigarette manufacturers" alleging a conspiracy to suppress information regarding the effects of smoking and claiming damage "in the form of . . . payment of unnecessary medical costs to [fund] beneficiaries." ( *Id.* at p. 1197.) Applying *Holmes*, the court held that "the 'remoteness doctrine' " barred the claim because "the Funds themselves ha[d] suffered no direct injury." (*Hawaii Health & Welfare Trust Fund for Operating Engineers, supra,* 52 F. Supp.2d at p. 1198.) The court explained that the remoteness doctrine, "[w]hether analyzed in terms of proximate cause or standing, . . . generally bars indirect claims where other more directly-injured parties are the proper plaintiffs. [Citation.]" (*Ibid.*) The court found the doctrine applicable because the alleged injuries were "derivative, " not "direct," in that they were " 'entirely dependent upon injuries sustained by [fund] participants and beneficiaries, making [the plaintiffs] at least one step removed from the challenged harmful conduct.' [Citation.]" ( *Id.* at pp. 1199-1200.) Thus, the plaintiffs were "seek[ing] recovery for the same injuries to victims represented, or able to be represented, in other direct suits." ( *Id.* at p. 1199.) The court's conclusion is especially relevant to the case now before us because, in applying the remoteness doctrine, the court expressly rejected the plaintiffs' argument that "the[ir] injury was allegedly intentional and directed [*1185] specifically to the trust funds because the [d]efendants knew their fraudulent

scheme would cause the trust funds to expend [***71] additional money on health related costs." (*Ibid.*)

*Carter v. Berger* (7th Cir. 1985) 777 F.2d 1173 is relevant here because it applied these remoteness principles in a case involving alleged bribes. The plaintiffs in *Carter* filed a RICO action claiming that the defendant used illegal bribes to obtain lower property tax assessments, which resulted in higher taxes for everyone else. ( *Id.* at p. 1174.) The court held that the plaintiffs were "not the right parties to bring th[e] suit" because their "injury derive[d] from the County's . . . ." (*Ibid.*) After describing *Illinois Brick's* remoteness analysis, the court explained: "The same approach prevails throughout the law. . . . '[T]he general tendency of the law, in regard to damages at least, is not to go beyond the first step.' [Citations.]" (*Carter, supra,* at p. 1175.) Thus, "the indirectly injured party may not sue . . . . If a wrong committed against a firm causes it to become bankrupt and discharge its employees or discontinue its purchases, the injured employees and suppliers may not sue." (*Ibid.*) "[A]n indirectly injured party should look to the recovery of the directly injured party, not to the wrongdoer, for relief." ( *Id.* at p. 1176; see also *National Enterprises, Inc. v. Mellon Financial Services Corp. Number 7* (5th Cir. 1988) 847 F.2d 251, 252-255 [unpaid creditor of bankrupt corporation could not pursue RICO action against defendant that required kickbacks from corporation as a loan condition].)

[**972] Finally, among the federal cases, *Newton v. Tyson Foods, Inc.* (8th Cir. 2000) 207 F.3d 444 is particularly noteworthy here because it involved bribes and it applied these remoteness principles to claims for a RICO violation *and* a pendent state law claim for intentional interference with prospective economic advantage. In *Newton*, cattle producers sued a poultry producer, alleging that it "was able to exempt the poultry industry from strict regulations by providing illegal payments to" government officials. ( *Id.* at p. 445.) They alleged that this exemption resulted in lower costs, which enabled poultry producers to lower poultry prices, which increased demand for poultry and lowered the demand for beef, which reduced beef sales by packers, which reduced the plaintiffs' sales to packers and lowered the price of cattle sold. ( *Id.* at p. 446.) The court first held that the plaintiffs could not maintain their RICO claim because their alleged injuries were "far distant along the chain of causation from [the defendant's] alleged wrongs and [were] too attenuated and removed from those wrongs to provide a basis for standing under RICO. [Citation.]" ( *Id.* at p. 447.) Noting that "proximate cause" was also "an element" of the plaintiffs' claim for "intentional interference with prospective economic advantage," the court next held that the plaintiffs' "common-law tort claim fail[ed] as a matter of law for the same

[*1186] reasons that the [plaintiffs] lack[ed] standing to pursue their RICO claim. [Citation.]" ( *Id.* at p. 448; see also *Laborers Local 17 Health and Benefit Fund v. Philip Morris, Inc.* (2d Cir. 1999) 191 F.3d 229, 242-243 [applying RICO remoteness/proximate cause analysis to dismiss common law claims for fraud and breach of special duty].)

Given the overlap between antitrust law and the tort of intentional interference with prospective economic advantage, we should follow these federal decisions and decline to recognize a tort cause of action for plaintiffs, like KSC, that allege only remote, indirect, and derivative injury. Liability for both the tort and an antitrust violation requires an independently wrongful act. Moreover, the purpose of the tort is similar to the purpose of the antitrust laws: to "provid[e] a remedy for predatory economic behavior" while "keeping [***72] legitimate business competition outside litigative bounds." (*Della Penna, supra,* 11 Cal. 4th at p. 378.) Notably, the Restatement Second expressly recognizes the "interplay between [antitrust] law and the law of tortious interference with prospective contractual relations." (Rest.2d, § 768, com. c, p. 43.) It explains that because a claim for this tort is often based on an antitrust violation, antitrust legislation "and the very extensive case law that has developed as a gloss upon it are pertinent to a great number of the [tort] cases . . . ."[7] ( *Id.* at pp. 42-43; see also *id.*, § 767, com. c, p. 31 ["conduct that is in violation of antitrust provisions or is in restraint of trade" may make interference "improper"].) Finally, as I have already explained, the federal courts have based their proximate causation analysis on common law principles, which are no less applicable in defining the scope of the common law tort. Given this overlap, we should follow the extensive antitrust case law and decline to extend tort liability to plaintiffs, like KSC, that allege only remote, indirect, and derivative injury.

> 7   The significance of the Restatement Second's discussion is not, as the majority incorrectly suggests (maj. opn., *ante*, at pp. 1163-1164, fn. 13), diminished by the Restatement Second's further observation that complete discussion of antitrust law is "outside the scope of the Restatement of Torts." (Rest.2d, § 768, com. f, p. 43.)

Moreover, a claim for intentional interference with prospective economic advantage by a plaintiff with only remote, indirect, and derivative injuries implicates the same factors the federal courts have cited in precluding antitrust recovery for such injuries. Allowing recovery under these circumstances creates a risk of duplicative recovery. Here, for example, the lost commission KSC seeks to recover represents a percentage of the contract price MacDonald would have paid to KSC had Mac-

Donald obtained the contract. There are, no doubt, others who also stood to gain from the award of the contract to MacDonald and who would have claims to other portions of the contract price. There is "no principled way to cut off a myriad of other [*1187] indirect claimants" who can each [**973] "claim that their business was somehow impacted or adversely affected by" MacDonald's loss of the contract. ( *Sharp v. United Airlines, Inc.* (10th Cir. 1992) 967 F.2d 404, 409 [dismissing antitrust and prospective economic advantage claims of employees alleging that the defendant's illegal conduct destroyed their employer].) Of course, MacDonald may also sue for the *entire* contract price. Moreover, MacDonald, which is absent from this action, has an interest in protecting its right to recover. Finally, given MacDonald's much more direct connection to Lockheed's alleged interference, denying KSC a remedy for its alleged remote, indirect, and derivative injury is not likely to leave tortious conduct undetected or unremedied. Thus, "the social interest in the efficient administration of justice and the avoidance of multiple litigation" supports a rule precluding a plaintiff like KSC from maintaining a claim for intentional interference with prospective economic advantage where the plaintiff's injury only remotely and indirectly follows from a defendant's alleged interference with the prospective economic advantage of some third party. (*Illinois Brick, supra,* 431 U.S. at p. 738 [97 S. Ct. at pp. 2070-2071].) There is simply insufficient reason for the law to "shoulder[] these difficulties" when "those directly injured" can "be counted on to bring suit for the law's vindication." (*Holmes, supra,* 503 U.S at p. 273 [112 S. Ct. at p. 1320].) "The existence of an identifiable [***73] class of persons whose self-interest would normally motivate them to" sue "diminishes the justification for allowing . . . more remote part[ies]," such as KSC, to maintain an action. (*Associated General, supra,* 459 U.S. at p. 542 [103 S. Ct. at pp. 910-911].)

Indeed, courts applying New York law have reached precisely this conclusion and have held that parties with indirect and remote injuries may not recover for intentional interference with prospective economic advantage. Like California, New York precludes recovery for intentional interference with prospective economic advantage "unless the means employed by [the defendant] were wrongful." ( *NBT Bancorp Inc. v. Fleet/Norstar Financial Group, Inc.* (1996) 87 N.Y.2d 614 [641 N.Y.S.2d 581, 585, 664 N.E.2d 492].) *In addition,* "under New York law, in order for a party to make out a claim . . . , the defendant must interfere with the business relationship directly; that is, the defendant must direct some activities towards the third party and convince the third party not to enter into a business relationship with the plaintiff. [Citation.]" ( *Fonar Corp. v. Magnetic Resonance Plus, Inc.* (S.D.N.Y. 1997) 957 F. Supp. 477, 482.) Applying this rule, in *G.K.A. Beverage Corp. v. Honick-*

*man* (2d Cir. 1995) 55 F.3d 762, 768, the court held that soft drink distributors could not state a claim for intentional interference with prospective economic advantage by alleging that the defendants' acts to drive out of business a bottling company with which the distributors had contracted "interfered with their relationships with retailers and other final [*1188] purchasers of soft drinks." THE COURT EXPLAINED: "[The defendants'] alleged goal was to obtain a monopoly in bottling, and the distributors' relationship with their retail customers is irrelevant to that goal. The distributors thus make no allegations that [the defendants] had any contact with the distributors' customers or that [the defendants] tried to convince the customers to make contracts with them rather than the distributors. It is axiomatic that, in order to prevail on this claim, the distributors would have to show that the [defendants] intentionally caused the retailers not to enter into a contractual relationship with them. [Citations.] The distributors cannot allege such intentional interference, and their claim therefore fails." (*Ibid.*) [8]

8 For similar reasons, the court also held that the distributors' antitrust claim failed as a matter of law. The court explained that the distributors' injury was "derivative of" the bottling company's injury, and that "a party in a business relationship with an entity that failed as a result of an antitrust violation" does "not have standing to bring an antitrust claim." ( *G.K.A. Beverage Corp. v. Honickman, supra,* 55 F.3d at pp. 766-767.) This rule, the court explained, "follows naturally" from the rule that " '[m]erely derivative injuries sustained by employees, officers, stockholders, and creditors of an injured company do not . . . confer antitrust standing.' [Citation.]" ( *Id.* at p. 766.)

In *Piccoli A/S v. Calvin Klein Jeanswear Co.* (S.D.N.Y. 1998) 19 F. Supp. 2d 157, 167-168, [**974] the court applied similar principles in dismissing a claim for tortious interference with business relations. The plaintiff alleged that the defendant exported "surplus Calvin Klein jeans to 'lower-end stores' in Scandinavia and that the presence of these jeans in lower-end stores caused [the plaintiffs] exclusively upper-end clients to cease doing business with it." ( *Id.* at p. 167, fn. omitted.) The court held "that such an indirect relationship cannot form the basis of a tortious interference claim. [P] . . . '[U]nder New York law, . . . the defendant must interfere with the business relationship directly; that is, the defendant must direct some activities towards the third party and convince the third party not to enter into a business relationship with the plaintiff.' [P] Here, [ [***74] the plaintiff's claim fails because] the defendants' alleged conduct concededly was not directed towards any third party with whom [the plaintiff] had an existing or pro-

spective business relationship." ( *Id.* at pp. 167-168, fn. omitted.) [9]

> 9   Apparently, under New York law, instead of showing wrongful means, a plaintiff may alternatively show that the defendant "acted for the sole purpose of inflicting intentional harm on plaintiffs." ( *NBT Bancorp Inc. v. Fleet/Norstar Financial Group Inc. (1995) 215 A.D.2d 990 [628 N.Y.S.2d 408, 410].)* This fact does not undermine my conclusion that we should follow New York law regarding remoteness. On the contrary, it reinforces my conclusion, because a defendant who acts solely to harm the plaintiff is at least as blameworthy as a defendant who uses wrongful means and is only substantially certain that the plaintiff will be harmed.

In summary, regarding the fundamental policy question of proximate cause, we should adopt the approach of the courts applying federal and New York law and hold that parties who allege only remote, indirect, and [*1189] derivative injury may not recover for intentional interference with prospective economic advantage. Applying this principle here, KSC's claim fails because Lockheed's alleged acts were not directed towards MacDonald or any other third party with which KSC had a prospective economic advantage; they were directed solely towards the Republic of Korea.

The majority's explanation for disregarding these decisions is demonstrably incorrect. The majority asserts that because the federal antitrust decisions "analy[ze] . . . the statutory language of the Clayton Act, as well as its relevant legislative history and objectives," they are "inapplicable" in determining "standing to bring a claim" for intentional interference with prospective economic advantage, which is governed by the "common law." (Maj. opn., *ante,* at pp. 1163-1164, fn. 13.) However, the high court's decisions in both *Blue Shield* and *Associated General* conclusively refute the majority's assertion. In *Blue Shield,* the court explained that "neither the statutory language nor the legislative history of [the Clayton Act] offers any focused guidance on the question of which injuries are too remote" to support recovery. (*Blue Shield, supra,* 457 U.S. at p. 477 [102 S. Ct. at p. 2547].) "[I]ndeed," the court observed, the Clayton Act's "unrestrictive language" and "the avowed breadth of the congressional purpose, cautions [sic] us not to cabin [the Clayton Act] in ways that will defeat its broad remedial objective." (*Ibid.*) Finding no "direct guidance from Congress" for determining whether "a particular injury is too remote . . . to warrant . . . standing" under the Clayton Act, the court turned to the "analysis . . . employed traditionally by courts *at common law* with respect to the matter of 'proximate cause.' [Citations.]" (*Ibid.,* italics

added, fn. omitted.) Similarly, in *Associated General,* the high court explained that despite the breadth of the Clayton Act's statutory language and its legislative history, "common-law rules" and "constraints" govern remoteness questions in "antitrust damages litigation." (*Associated General, supra,* 459 U.S. at p. 533.) Thus, in addressing remoteness issues under the Clayton Act, the high court has expressly looked *to the common law,* not, as the majority asserts, to the Clayton Act's statutory language or legislative history. The majority's rationale for disregarding the federal cases is, therefore, erroneous. We should follow the federal antitrust cases *precisely because* [***75] they apply common law remoteness principles. [10]

> 10   Notably, in the Court of Appeal, even KSC agreed that federal cases addressing "standing under the antitrust laws provide useful guidance . . . in determining the reach of the tort of intentional interference with prospective economic advantage." Similarly, the law review article on which the majority relies (maj. opn., *ante,* at p. 1163) states that "[i]n a business competition setting, antitrust laws . . . may serve as a yardstick for liability," and it argues for "[i]ncorporating the fluid doctrines of antitrust into an unlawful means test for tortious interference . . . ." (Perlman, *Interference with Contract and Other Economic Expectancies: A Clash of Tort and Contract Doctrine, supra,* 49 U.Chi. L.Rev. at p. 98, fn. omitted.)

[*1190]   [**975]   III. THE MAJORITY'S SUBSTANTIAL CERTAINTY STANDARD IS INCORRECT UNDER PRIOR CALIFORNIA DECISIONS.

The majority holds that to state a claim for intentional interference with prospective economic advantage, a plaintiff need not "plead that the defendant acted with the specific intent, or purpose, of disrupting the plaintiff's prospective economic advantage." (Maj. opn., *ante,* at p. 1153.) "Instead," the majority states, "to satisfy the intent requirement for this tort, it is sufficient to plead that the defendant knew that the interference was certain or substantially certain to occur as a result of its action." (*Ibid.*)

The majority's conclusion is incorrect under existing California law. In *Seaman's Direct Buying Service, Inc. v. Standard Oil Co. (1984) 36 Cal.3d 752, 758 [206 Cal. Rptr. 354, 686 P.2d 1158] (Seaman's),* we expressly considered whether " 'intent' [is] an element of a cause of action for intentional interference with contractual relations." We answered this question affirmatively, holding: "[I]n an action for inducing breach of contract it is essential that plaintiff plead and prove that the defendant '*intended* to induce a breach thereof . . . .' [Citations.] Simi-

larly, to prevail on a cause of action for intentional interference with prospective economic advantage, plaintiff must plead and prove 'intentional acts on the part of the defendant *designed* to disrupt the relationship.' [Citations.]" ( *Id.* at p. 766.) Thus, we rejected the plaintiff's argument "that [the defendant's] 'intent' to interfere with the contract is not a necessary prerequisite to liability." ( *Id.* at pp. 766-767, fn. omitted.) Notably, in defining the intent requirement, we also expressly rejected the plaintiff's argument that to establish intent, it is necessarily sufficient to show that the defendant "knew that interference with the contract was 'substantially certain' to result from its conduct." ( *Id.* at p. 765.) We explained: "Intent, of course, may be established by inference as well as by direct proof. Thus, the trial court could properly have instructed the jury that it *might* infer culpable intent from conduct 'substantially certain' to interfere with the contract. Here, though, the jury was instructed that culpable intent was 'deemed' to exist if [the defendant] knew that its conduct would interfere with the contract. Under the principles outlined above, this instruction was clearly error." ( *Id.* at p. 767.) Thus, *Seaman's* rejects the very standard the majority here adopts. Our Courts of Appeal have followed *Seaman's* in this regard. (E.g. *Kasparian v. County of Los Angeles* (1995) 38 Cal.App.4th 242, 270-271 [45 Cal. Rptr. 2d 90]; *Savage v. Pacific Gas & Electric Co.* (1993) 21 Cal.App.4th 434, 449 [26 Cal. Rptr. 2d 305].)

[*1191]  In reaching its conclusion, the majority virtually ignores our *holding* in *Seaman's* [***76] and relies instead on *dictum* in *Quelimane Co. v. Stewart Title Guaranty Co.* (1998) 19 Cal.4th 26 [77 Cal. Rptr. 2d 709, 960 P.2d 513] (*Quelimane*). (Maj. opn., *ante*, at pp. 1155-1157.) In *Quelimane*, the only issue the defendant raised in challenging the adequacy of the plaintiff's claim for intentional interference with contract was the plaintiff's failure to allege that the defendant's conduct was "wrong." (*Quelimane, supra,* 19 Cal. 4th at p. 55.) We disagreed, holding that "[w]rongfulness independent of the inducement to breach the contract is not an element of the tort of intentional interference with *existing* contractual relations . . . ." (*Ibid.*) In dictum, we went on to state: "Moreover, the tort of intentional interference with performance of [**976] a contract does not require that the actor's primary purpose be disruption of the contract. As explained in comment j to section 766 of the Restatement Second . . .: 'The rule stated in this Section is applicable if the actor acts for the primary purpose of interfering with the performance of the contract, and also if he desires to interfere, even though he acts for some other purpose in addition. The rule is broader, however, in its application than to cases in which the defendant has acted with this purpose or desire. It applies also to intentional interference, as that term is defined in § 8A, in which the actor does not act for the purpose of interfer-

ing with the contract or desire it but knows that the interference is certain or substantially certain to occur as a result of his action. The rule applies, in other words, to an interference that is incidental to the actor's independent purpose and desire but known to him to be a necessary consequence of his action. [P] 'The fact that this interference with the other's contract was not desired and was purely incidental in character is, however, a factor to be considered in determining whether the interference is improper.' " (*Quelimane, supra,* 19 Cal. 4th at p. 56, fn. omitted.)

For several reasons, *Quelimane* is insufficient authority to support the majority's holding. First, as already noted, *Quelimane's* discussion of the intent requirement is dictum because the defendant did not raise this issue. It is dictum for another reason as well; the complaint in *Quelimane* "allege[d] that 'defendants . . . ha[d] deliberately, willfully, and intentionally interfered with the [plaintiff's] contractual relations . . . .' " (*Quelimane, supra,* 19 Cal. 4th at p. 57.) Thus, we had no need in *Quelimane* to consider whether an allegation of substantial certainty is enough to state a claim. [11] Second, *Quelimane's* dictum addressed the intent requirement for interference with contract, not intentional interference with prospective economic advantage. [*1192] ( *Id.* at p. 56.) As *Quelimane* also explained, because existing contracts "receive[] greater solicitude" than merely prospective economic advantages, the elements of interference with contract and intentional interference with prospective economic advantage are not identical. ( *Id.* at pp. 55-56.) We made the same point earlier in *Della Penna*, explaining that "[e]conomic relationships short of contractual"--i.e., prospective economic relationships--"should stand on a different legal footing as far as the potential for tort liability is [***77] reckoned." (*Della Penna, supra,* 11 Cal. 4th at p. 392.) Logically, because prospective economic advantages receive less protection than existing contracts, the intent requirement for intentional interference with prospective economic advantage should be heightened. Third, *Quelimane* did not involve a plaintiff, like KSC, whose alleged injuries were only an indirect and remote consequence of the defendant's conduct; the complaint in *Quelimane* alleged that the defendants directly interfered with the plaintiffs' existing land sales contracts by refusing to issue title insurance. (*Quelimane, supra,* 19 Cal. 4th at pp. 55-57.) Because remoteness was not a factor in *Quelimane*, its dictum regarding the intent required to recover for direct injuries carries even less weight in the case now before us. Finally, *Quelimane* did not consider or even cite *Seaman's*, which directly considered the intent question and held that proof of substantial certainty permits an inference of intent, but that substantial certainty is not a substitute for or an alternative articulation of intent to interfere.

11  The same is true in the case now before us, because KSC's complaint alleges that Lockheed "intentionally induc[ed]" the Republic of Korea to award the contract to Lockheed "[i]n order to disrupt" KSC's relationship with MacDonald. Thus, it is unnecessary to decide whether a complaint alleging only substantial certainty adequately states a claim.

The majority gives only slightly more consideration to *Seaman's* than did *Quelimane*; its discussion is as incorrect as it is brief. Relegating *Seaman's* to a mere footnote, the majority states that in *Della Penna*, "we expressly disapproved of" *Seaman's* "to the extent that it was inconsistent with *Della Penna*." (Maj. opn., *ante*, at p. 1155, fn. 7.) The majority's statement, though accurate (see [**977] *Della Penna, supra,* 11 Cal. 4th at p. 393, fn. 5), is completely irrelevant because *with regard to the intent requirement, Seaman's* is not in any way inconsistent with *Della Penna*. *Della Penna* never discussed the intent requirement and, as the majority concedes, did not affect the elements of the tort other than to add the wrongfulness requirement. (Maj. opn., *ante*, at pp. 1153-1154.) Consistent with its concession, the majority cites nothing in *Della Penna* to support its (its majority's)) suggestion that *Seaman's* is somehow inconsistent with *Della Penna* with regard to the intent requirement. The majority also stresses *Della Penna's* observation that *Seaman's* " 'rel[ied] on the *first* Restatement [of Torts] . . . without reviewing or even mentioning intervening revaluations of the tort by the Restatement Second, other state high courts and our own Court of Appeal.' [Citation.]" (Maj. opn., *ante*, at p. 1155, fn. 7.) However, in *Seaman's*, we based our *holding* regarding the intent requirement *on prior decisions of both this court and our Courts of Appeal*, and mentioned the first Restatement of Torts only briefly. [*1193] (*Seaman's, supra,* 36 Cal. 3d at pp. 765-767.) Notably, the majority fails to cite a single decision from our Courts of Appeal--or from the courts of other states--that *Seaman's* should have, but failed to, consider. Nor did *Quelimane* cite a case from either California or from some other jurisdiction to support its dictum regarding the intent requirement; as I have already explained and as the majority acknowledges (maj. opn., *ante*, at p. 1155, fn. 7), *Quelimane* completely ignored *Seaman's* (and the cases following it) and relied instead exclusively on the Restatement Second. Unlike the majority, I consider a prior *holding* of this court to be more binding--and "a better representation" of California law (maj. opn., *ante*, at p. 1155, fn. 7)--than the Restatement Second, or dictum that relied exclusively on the Restatement Second.

[***78]  The other basis for the majority's conclusion--that specific intent to interfere is unnecessary in light of *Della Penna's* wrongful act requirement for in-

tentional interference with prospective economic advantage (maj. opn., *ante*, at pp. 1159-1162)--is both questionable and ironic. It is questionable because, as I have explained and as the majority acknowledges (maj. opn., *ante*, at pp. 1153-1154), *Della Penna* never discussed the intent requirement or considered whether the wrongful act requirement would affect the intent requirement. The majority's analysis is ironic because, as I have also already explained, our purpose in *Della Penna* in adopting the wrongful act requirement was to *restrict* the scope of the tort of intentional interference with prospective economic advantage. The majority again turns *Della Penna* on its head by citing its wrongful act requirement as justification for relaxing the intent requirement and greatly *expanding* the tort's scope. Thus, the majority's conclusion that a plaintiff may state a claim by pleading "that the defendant knew that the interference was certain or substantially certain to occur," and need not "plead that the defendant acted with the specific intent . . . of disrupting the plaintiff's prospective economic advantage" (maj. opn., *ante*, at p. 1153), is inconsistent with California case law. Under *Seaman's* and the cases following it, a plaintiff who alleges injury that only remotely and indirectly follows from a defendant's intentional interference with the prospective economic advantage of some third party should be allowed to recover, if at all, only upon pleading and proving that the defendant specifically intended to interfere with the plaintiff's prospective economic advantage.

Finally, I disagree with the majority's assertion that its substantial certainty requirement "is an appropriate limitation on both the potential number of plaintiffs that may bring a claim under this tort and the remoteness of these plaintiffs to a defendant's wrongful conduct." (Maj. opn., *ante*, at p. 1165.) [*1194] As explained in the law review article on which the majority relies, "[e]conomic relationships are intertwined so intimately that disruption [**978] of one may have far-reaching consequences. Furthermore, the chain reaction of economic harm flows from one person to another without the intervention of other forces. Courts facing a case of pure economic loss thus confront the potential for liability of enormous scope, with no easily marked intermediate points and no ready recourse to traditional liability-limiting devices such as intervening cause." (Perlman, *Interference with Contract and Other Economic Expectancies: A Clash of Tort and Contract Doctrine, supra,* 49 U.Chi. L.Rev. at p. 72, fns. omitted.) However, "if a plaintiff suffering economic loss is required to show that [the defendant] knew of [the plaintiff's] contract or expectancy and *purposely disrupted it*, the number of successful plaintiffs and the extent of liability are considerably smaller." (*Id.* at p. 77, italics added.) Thus, "requiring the plaintiff to show intent by the defendant to interfere with a particular contract" or expectancy would help "distinguish[] the

plaintiff's loss from injuries resulting more indirectly from the defendant's act." (*Id.* at p. 76, fn. omitted.) By contrast, the majority's relaxed substantial certainty requirement does little to narrow the enormous scope of potential liability for harm to economic relationships and offers "no principled way to cut off a myriad of other indirect claimants" who can each "claim that their business was somehow impacted or adversely affected by" MacDonald's loss of the contract. [12] [***79] ( *Sharp v. United Airlines, Inc., supra,* 967 F.2d at p. 409.)

[12]    For example, although the majority states that a defendant's interference "becomes less certain as . . . the identity of potential victims becomes more vague" (maj. opn., *ante,* at p. 1165), at least one California court has held that recovery is available as long as the plaintiff was " 'identified [to the defendant] in some manner,' " even if the defendant did not know "of the injured party's specific identity or name." ( *Ramona Manor Convalescent Hospital v. Care Enter-*

*prises* (1986) 177 Cal. App. 3d 1120, 1133 [225 Cal. Rptr. 120].)

## IV. CONCLUSION.

In "[a]llowing suits by those injured only indirectly," the majority "open[s] the door to" greatly expanded liability for intentional interference with prospective economic advantage. (*Holmes, supra,* 503 U.S. at p. 274 [112 S. Ct. at p. 1321].) Ironically, in doing so, it relies principally on a requirement--the defendant's commission of an independently wrongful act--that we established specifically to *restrict* liability. Based on the relevant policy considerations and case law, I would hold that a plaintiff whose alleged injury only indirectly and remotely follows from the defendant's interference with the prospective economic advantage of some third party may not maintain an action for intentional interference with prospective [*1195] economic advantage. Therefore, I would affirm the trial court's dismissal of KSC's claim.

Brown, J., concurred.