# EXHIBIT G

## TO THE APPENDIX OF NON-FEDERAL AND UNPUBLISHED AUTHORITIES CITED IN COUPON'S OPPOSITION TO STOTTLEMIRE'S MOTION TO DISMISS



Caution
As of: Apr 03, 2008

JORMA A. VIRTANEN, Plaintiff and Appellant, v. CHRISTOPHER P.
O'CONNELL et al., Defendants and Appellants.

G034184

COURT OF APPEAL OF CALIFORNIA, FOURTH APPELLATE DISTRICT,
DIVISION THREE

140 Cal. App. 4th 688; 44 Cal. Rptr. 3d 702; 2006 Cal. App. LEXIS 903; 2006 Cal.
Daily Op. Service 5288; 2006 Daily Journal DAR 7729

June 19, 2006, Filed

**SUBSEQUENT HISTORY:** Rehearing denied by
Virtanen v. O'Connell, 2006 Cal. App. LEXIS 1105 (Cal.
App. 4th Dist., July 12, 2006)
Time for Granting or Denying Review Extended
Virtanen (Jorma A.) v. O'Connell (Christopher P.), 2006
Cal. LEXIS 13002 (Cal., Sept. 25, 2006)
Review denied by Virtanen v. O'Connell, 2006 Cal.
LEXIS 14367 (Cal., Oct. 11, 2006)

**PRIOR HISTORY:** [***1] Superior Court of Or-
ange County, No. 01CC05781, Gregory H. Lewis, Judge.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Appellants, an attorney
and his law firm, challenged a judgment of the Superior
Court of Orange County, California, in favor of respon-
dent stock seller in his suit for negligence, breach of fi-
duciary duty, and conversion. The attorney represented
the purchaser of the stock and agreed to act as an escrow
holder for the transaction. The seller challenged the trial
court's order that denied his motion to have the punitive
damages issue tried again.

**OVERVIEW:** Although the seller decided to terminate
the sale and provided notification to the parties, the at-
torney proceeded to close the transaction and to deliver
the stock certificates to the transfer agent with instruc-
tions to effectuate the transfer of the shares. The court
held that the attorney had closed the transaction before
the conditions of the escrow instructions had been satis-

fied, before the parties had reached written agreement on
material contract terms, and after he had received a no-
tice of rescission and demand for return of documents.
The attorney not only breached a duty, as escrow holder,
to the seller, he also converted the stock when he for-
warded the certificates to the transfer agent with direc-
tions to transfer the same. Closing escrow and delivering
the stock certificates to the transfer agent was in no wise
the "functional equivalent" of filing an interpleader ac-
tion pursuant to Code Civ. Proc., § 386. The trial court
did not err in its evidentiary rulings. To the extent the
jury instructions might have been imprecise, they were
not prejudicial. The trial court erred in denying a partial
retrial under Code Civ. Proc., § 616, on punitive dam-
ages as to the attorney.

**OUTCOME:** The court affirmed the judgment. The or-
der denying a partial retrial on punitive damages was
reversed as to the attorney and affirmed as to the law
firm. On remand, the trial court was to enter an order
granting retrial of the punitive damages issue as to the
attorney only.

**CORE TERMS:** escrow holder, escrow, retrial, conver-
sion, stock, interpleader action, stock certificates, puni-
tive damages, notice, jury instruction, rescission, transfer
agent, fiduciary, partial, malice, seller, owed, escrow
instructions, discretionary, law firm, oppression, con-
verted, punitive, breached, issuer, stock certificates,
stock purchase agreement, promissory note, entry of
judgment, interplead

**LexisNexis(R) Headnotes**

*Civil Procedure > Parties > Interpleaders > Requirements*
[HN1]A party against whom double or multiple claims are made, or may be made, may bring a separate action compelling the claimants or potential claimants to interplead and litigate their claims inter se. Code Civ. Proc., § 386, subd. (b). A court may issue an order restraining parties to the action from instituting or further prosecuting any other proceedings affecting the rights and obligations as between the parties. Code Civ. Proc., § 386, subd. (f). An interpleader action is an equitable proceeding. In an interpleader action, a trial court initially determines the right of the plaintiff to interplead the funds; if that right is sustained, an interlocutory decree is entered which requires the defendants to interplead and litigate their claims to the funds. Upon an admission of liability and deposit of monies with the court, the plaintiff then may be discharged from liability and dismissed from the interpleader action. The effect of such an order is to preserve the fund, discharge the stakeholder from further liability, and to keep the fund in the court's custody until the rights of the potential claimants of the monies can be adjudicated. By implementing an interpleader action and obtaining a discharge from further liability, the stakeholder avoids tort liability.

*Business & Corporate Law > Agency Relationships > Agents Distinguished > Special Agents*
*Civil Procedure > Parties > Interpleaders > Requirements*
[HN2]By definition, closing escrow, i.e., delivering property to parties on the completion of a transaction or the satisfaction of identified conditions, is not the same thing as filing an interpleader action, i.e., depositing property into the court until the rights thereto are resolved by judicial intervention. The former device harbors obvious dangers for an aggrieved party that the latter does not. When the escrow has already closed, there is a risk that the party will not get to court in time to fully protect his or her rights - to halt the transfer of stock certificates to a bona fide purchaser for value, for example. In an interpleader action, the parties' rights remain protected while the court sorts things out. To permit a malfeasant escrow holder to dictate the nature of the litigation that follows a premature closing and to claim immunity from tort liability would be the same as permitting a converter of property to dictate to the owner thereof how his or her property must be used. Just as courts do not countenance the latter, they also do not countenance the former. The conflicted escrow holder may shield himself or herself from liability, and protect the interests of the parties to the escrow as well, by filing an interpleader action. An escrow holder who fails to do so acts at his or her own peril.

*Commercial Law (UCC) > Investment Securities (Article 8) > Transfers*
[HN3]See Cal. U. Com. Code, § 8403, subds. (a) & (b).

*Civil Procedure > Dismissals > Involuntary Dismissals > General Overview*
*Legal Ethics > Client Relations > Confidentiality of Information*
[HN4]An action against an attorney may be dismissed if the attorney cannot mount a defense without breaching the attorney-client privilege.

*Business & Corporate Law > Agency Relationships > Agents Distinguished > Special Agents*
[HN5]An escrow holder is the agent of all the parties to the escrow at all times prior to performance of the conditions of the escrow; bears a fiduciary relationship to each of them; and owes an obligation to each measured by an application of the ordinary principles of agency. The fiduciary obligations of an escrow holder, and an attorney acting as an escrow holder, are well settled.

*Business & Corporate Law > Agency Relationships > Agents Distinguished > Special Agents*
*Legal Ethics > Client Relations > Client Funds*
[HN6]It is the duty of an escrow holder to comply strictly with the instructions of his principal, and if he disposes of the property of his principal in violation of these instructions, or otherwise breaches that duty, he will be responsible for any loss occasioned thereby. The rule continues to apply when the escrow holder in question is an attorney.

*Civil Procedure > Trials > Jury Trials > Jury Instructions > General Overview*
*Civil Procedure > Appeals > Standards of Review > Harmless & Invited Errors > Prejudicial Errors*
[HN7]A judgment may not be reversed on appeal, even for error involving misdirection of the jury, unless after an examination of the entire cause, including the evidence, it appears the error caused a miscarriage of justice. Cal. Const., art. VI, § 13. When the error is one of state law only, it generally does not warrant reversal unless there is a reasonable probability that in the absence of the error, a result more favorable to the appeal-

ing party would have been reached. Instructional error in a civil case requires reversal where it seems probable that the error prejudicially affected the verdict. Factors to be evaluated in assessing the prejudicial effect of an erroneous jury instruction include: (1) the degree of conflict in the evidence on critical issues; (2) whether the respondent's argument to the jury may have contributed to the instruction's misleading effect; (3) whether the jury requested a rereading of the erroneous instruction or of related evidence; (4) the closeness of the jury's verdict; and (5) the effect of other instructions in remedying the error.

*Torts > Intentional Torts > Conversion > Elements*
[HN8]Conversion is the wrongful exercise of dominion over the property of another. Conversion is a species of strict liability in which questions of good faith, lack of knowledge, and motive are ordinarily immaterial. Furthermore, the fact that a plaintiff regained possession of the converted property does not prevent him or her from suing for damages for the conversion.

*Torts > Intentional Torts > Conversion > Remedies*
[HN9]As a general rule, the normal measure of damages for conversion is the value of the property at the time of the conversion and a fair compensation for the time and money properly expended in pursuit of the property. Civ. Code, § 3336.

*Torts > Intentional Torts > Conversion > Remedies*
[HN10]See Civ. Code, § 3336.

*Civil Procedure > Appeals > Standards of Review > Substantial Evidence > General Overview*
[HN11]Judgments and orders of the lower courts are presumed to be correct on appeal. An appellate court implies all findings necessary to support the judgment, and its review is limited to whether there is substantial evidence in the record to support these implied findings. Furthermore, the appellate court will uphold the decision of a trial court if it is correct on any ground.

*Civil Procedure > Trials > Jury Trials > Verdicts > General Overview*
[HN12]See Code Civ. Proc., § 616.

*Civil Procedure > Trials > Jury Trials > Verdicts > General Overview*

*Civil Procedure > Judgments > Entry of Judgments > General Overview*
[HN13]See Code Civ. Proc., § 630, subd. (f).

*Governments > Legislation > Interpretation*
[HN14]Statutory provisions should be construed so as to give significance to every part thereof and to avoid an interpretation that would render some parts mere surplusage.

*Civil Procedure > Judicial Officers > Judges > Discretion*
*Civil Procedure > Trials > Jury Trials > Verdicts > General Overview*
*Civil Procedure > Judgments > Entry of Judgments > General Overview*
[HN15]Code Civ. Proc., § 630, subd. (f), permits a trial court to order the entry of judgment under the circumstances described therein. Code Civ. Proc., § 616, permits the court to grant a retrial, when it has not ordered the entry of judgment under § 630, subd. (f). Construing § 616 as providing discretionary authority to grant a retrial when no entry of judgment has been ordered does not make § 630, subd. (f), meaningless, but rather gives effect to the provisions of each of the two statutes.

*Governments > Legislation > Interpretation*
[HN16]When interpreting a statute, a reviewing court must ascertain legislative intent so as to effectuate the purpose of a particular law. The court's first step in determining that intent is to scrutinize the actual words of the statute, giving them a plain and commonsense meaning.

*Civil Procedure > Judicial Officers > Judges > Discretion*
*Civil Procedure > Trials > Jury Trials > Verdicts > General Overview*
*Civil Procedure > Judgments > Entry of Judgments > General Overview*
[HN17]A plain reading of Code Civ. Proc., § 616, shows that a trial court is granted the discretionary authority to act on motions for retrial under that provision. It is not required to grant a motion for retrial, just because it also did not order entry of judgment pursuant to Code Civ. Proc., § 630, subd. (f).

*Civil Procedure > Judgments > Relief From Judgment > General Overview*

*Civil Procedure > Appeals > Standards of Review > Abuse of Discretion*

*Evidence > Procedural Considerations > Burdens of Proof > Clear & Convincing Proof*

*Torts > Damages > Punitive Damages > Availability > General Overview*

[HN18]An appellate court reviews a trial court's order on a motion for retrial under the abuse of discretion standard. In so doing, the appellate court must bear in mind the circumstances under which punitive damages may be awarded. Civ. Code, § 3294, subd. (a), provides for the recovery of punitive damages in an action for the breach of an obligation not arising from contract, where it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice. Something more than the mere commission of a tort is always required for punitive damages. There must be circumstances of aggravation or outrage, such as spite or malice, or a fraudulent or evil motive on the part of the defendant, or such a conscious and deliberate disregard of the interests of others that his conduct may be called wilful or wanton.

*Civil Procedure > Trials > Jury Trials > Verdicts > General Overview*

[HN19]Endless retrials are not required if each time a jury is hung.

*Torts > Vicarious Liability > Employers > Activities & Conditions > Intentional Torts*

[HN20]See Civ. Code, § 3294, subd. (b).

*Torts > Damages > Proof*

*Torts > Damages > Punitive Damages > Availability > Employers*

[HN21]See Civ. Code, § 3294, subd. (b).

## SUMMARY:

### CALIFORNIA OFFICIAL REPORTS SUMMARY

The trial court entered judgment in favor of a stock seller in his action against an attorney and his law firm for negligence, breach of fiduciary duty, and conversion. The attorney had represented the purchaser of the stock and agreed to act as an escrow holder for the transaction. The seller delivered his stock certificates to the attorney, to be held in escrow. After delays in the closing of the transaction, the seller decided to terminate the sale. He provided to both the purchaser and the attorney a written notice of rescission and demand to return documents. That notwithstanding, the attorney proceeded to close the transaction and to deliver the stock certificates to the

transfer agent with instructions to effectuate the transfer of the shares. After the jury deadlocked on the issue of punitive damages, the trial court denied the motion to have the punitive damages issue tried again. (Superior Court of Orange County, No. 01CC05781, Gregory H. Lewis, Judge.)

The Court of Appeal affirmed the judgment and reversed the order denying a partial retrial on punitive damages as to the attorney but affirmed as to the law firm, and remanded with directions. The court held that the attorney had closed the transaction before the conditions of the escrow instructions had been satisfied, before the parties had reached written agreement on material contract terms, and after he had received a notice of rescission and demand for return of documents. What the attorney did was the one thing he was not at liberty to do. He not only breached a duty, as escrow holder, to the seller, he also converted the stock when he forwarded the certificates to the transfer agent with directions to transfer the same. Closing escrow and delivering the stock certificates to the transfer agent was in no wise the "functional equivalent" of filing an interpleader action pursuant to Code Civ. Proc., § 386. The trial court did not abuse its discretion in its evidentiary rulings. To the extent that the jury instructions might have been imprecise, they were not prejudicial, inasmuch as a result more favorable to respondents would not have been probable had the instructions been more comprehensive. Although the trial court abused its discretion in denying a partial retrial under Code Civ. Proc., § 616, on punitive damages as to the attorney, it correctly denied a partial [*689] retrial with respect to the law firm. (Opinion by Moore, J., with Bedsworth, Acting P. J., and Ikola, J., concurring.)

## HEADNOTES

CALIFORNIA OFFICIAL REPORTS HEADNOTES
Classified to California Digest of Official Reports

**(1) Interpleader § 2--Proceedings--Rights to Funds.--** A party against whom double or multiple claims are made, or may be made, may bring a separate action compelling the claimants or potential claimants to interplead and litigate their claims *inter se* (Code Civ. Proc., § 386, subd. (b)). A court may issue an order restraining parties to the action from instituting or further prosecuting any other proceedings affecting the rights and obligations as between the parties (Code Civ. Proc., § 386, subd. (f)). An interpleader action is an equitable proceeding. In an interpleader action, a trial court initially determines the right of the plaintiff to interplead the funds; if that right is sustained, an interlocutory decree is entered which requires the defendants to interplead and litigate their claims to the funds. Upon an admission of liability

and deposit of monies with the court, the plaintiff then may be discharged from liability and dismissed from the interpleader action. The effect of such an order is to preserve the fund, discharge the stakeholder from further liability, and to keep the fund in the court's custody until the rights of the potential claimants of the monies can be adjudicated. By implementing an interpleader action and obtaining a discharge from further liability, the stakeholder avoids tort liability.

**(2) Escrows § 6--Pleadings and Actions--Closing Escrow--Interpleader.**--By definition, closing escrow, i.e., delivering property to parties on the completion of a transaction or the satisfaction of identified conditions, is not the same thing as filing an interpleader action, i.e., depositing property into the court until the rights thereto are resolved by judicial intervention. The former device harbors obvious dangers for an aggrieved party that the latter does not. When the escrow has already closed, there is a risk that the party will not get to court in time to fully protect his or her rights--to halt the transfer of stock certificates to a bona fide purchaser for value, for example. In an interpleader action, the parties' rights remain protected while the court sorts things out. To permit a malfeasant escrow holder to dictate the nature of the litigation that follows a premature closing and to claim immunity from tort liability would be the same as permitting a converter of property to dictate to the owner thereof how his or her property must be used. Just as courts do not countenance the latter, they also do not countenance the [*690] former. The conflicted escrow holder may shield himself or herself from liability, and protect the interests of the parties to the escrow as well, by filing an interpleader action. An escrow holder who fails to do so acts at his or her own peril.

**(3) Attorneys at Law § 20--Attorney-client Relationship--Liability of Attorneys--Dismissal of Action.**--An action against an attorney may be dismissed if the attorney cannot mount a defense without breaching the attorney-client privilege.

**(4) Escrows § 3--Competency, Duties, and Liabilities of Escrow Holder--Fiduciary Relationship.**--An escrow holder is the agent of all the parties to the escrow at all times prior to performance of the conditions of the escrow; because a fiduciary relationship to each of them; and owes an obligation to each measured by an application of the ordinary principles of agency. The fiduciary obligations of an escrow holder, and an attorney acting as an escrow holder, are well settled. It is the duty of an escrow holder to comply strictly with the instructions of his or her principal, and if he or she disposes of the property of his or her principal in violation of these instructions, or otherwise breaches that duty, he or she will be

responsible for any loss occasioned thereby. The rule continues to apply when the escrow holder in question is an attorney.

**(5) Trial § 79--Instructions to Jury--Requisites and Sufficiency--Error--Assessing Prejudicial Effect.**--Factors to be evaluated in assessing the prejudicial effect of an erroneous jury instruction include: (1) the degree of conflict in the evidence on critical issues; (2) whether the respondent's argument to the jury may have contributed to the instruction's misleading effect; (3) whether the jury requested a re-reading of the erroneous instruction or of related evidence; (4) the closeness of the jury's verdict; and (5) the effect of other instructions in remedying the error.

**(6) Conversion § 4--Actions--Strict Liability--Measure of Damages.**--Conversion is the wrongful exercise of dominion over the property of another. Conversion is a species of strict liability in which questions of good faith, lack of knowledge, and motive are ordinarily immaterial. Furthermore, the fact that a plaintiff regained possession of the converted property does not prevent him or her from suing for damages for the conversion. As a general rule, the normal measure of damages for conversion is the value of the property at the time of the conversion and a fair compensation for the time and money properly expended in pursuit of the property (Civ. Code, § 3336). [*691]

**(7) Statutes § 29--Construction--Language--Giving Significance to Every Part--Legislative Intent.**--Statutory provisions should be construed so as to give significance to every part thereof and to avoid an interpretation that would render some parts mere surplusage. When interpreting a statute, a reviewing court must ascertain legislative intent so as to effectuate the purpose of a particular law. The court's first step in determining that intent is to scrutinize the actual words of the statute, giving them a plain and commonsense meaning.

**(8) Trial § 100--Verdict and Findings of Jury--Deadlock--Authority to Grant Retrial.**--Code Civ. Proc., § 630, subd. (f), permits a trial court to order the entry of judgment under the circumstances described therein. Code Civ. Proc., § 616, permits the court to grant a retrial, when it has not ordered the entry of judgment under § 630, subd. (f). Construing § 616 as providing discretionary authority to grant a retrial when no entry of judgment has been ordered does not make § 630, subd. (f), meaningless, but rather gives effect to the provisions of each of the two statutes. A plain reading of § 616 shows that the court is granted the discretionary authority to act on motions for retrial under that provision. It is not required to grant a motion for retrial, just because it also

did not order entry of judgment pursuant to § 630, subd. (f).

**(9) Damages § 22--Exemplary or Punitive Damages-- Action for Breach of Obligation Not Arising From Contract--Burden of Proof.--**Civ. Code, § 3294, subd. (a), provides for the recovery of punitive damages in an action for the breach of an obligation not arising from contract, where it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice. Something more than the mere commission of a tort is always required for punitive damages. There must be circumstances of aggravation or outrage, such as spite or malice, or a fraudulent or evil motive on the part of the defendant, or such a conscious and deliberate disregard of the interests of others that his conduct may be called wilful or wanton.

**(10) Escrows § 3--Competency, Duties, and Liabilities of Escrow Holder--Breach of Duty--Conversion.--**An attorney, who represented a stock purchaser and acted as escrow holder for the transaction, knew full well that there was a dispute as to his authority to close the escrow, but closed it anyway, by forwarding the stock certificates to the transfer agent, which was in violation of the original instructions and despite the fact that the seller had not agreed to the extended payment dates contained in the promissory note delivered to him on close. The attorney did so in violation of the seller's notice of rescission and demand to return documents, and in complete disregard of oral and written protestations of the seller's attorney. The attorney did so while owing a duty, [*692] as escrow holder, to the seller. The attorney not only breached that duty, he also committed an act of conversion.

[6 Witkin, Summary of Cal. Law (10th ed. 2005) Torts, § 997.]

**(11) Trial § 100--Verdict and Findings of Jury-- Deadlock.--**Endless retrials are not required if, each time, a jury is hung.

**COUNSEL:** McDermott Will & Emery, Elliot Silverman and Michael R. O'Neill for Plaintiff and Appellant.

Nemecek & Cole, Frank W. Nemecek, Susan S. Baker; Greines, Martin, Stein & Richland, Robin Meadow and Cynthia E. Tobisman for Defendants and Appellants.

Reed Smith, James C. Martin and Denise M. Howell for the Los Angeles County Bar Association as Amicus Curiae.

**JUDGES:** Moore, J., with Bedsworth, Acting P. J., and Ikola, J., concurring.

**OPINION BY:** Moore

**OPINION**

[**705] **MOORE, J.**--An attorney representing the purchaser of stock agreed to act as an escrow holder for the transaction. The seller delivered his stock certificates to the attorney, to be held in escrow. After delays in the closing of the transaction, the seller decided to terminate the sale. He provided to both the purchaser and the attorney a written notice of rescission and demand to return documents. This notwithstanding, the attorney proceeded to close the transaction and to deliver the stock certificates to the transfer agent with instructions to effectuate the transfer of the shares.

In the ensuing litigation, [***2] the seller obtained a $ 1,985,000 judgment against the attorney and his law firm. The attorney and his law firm appeal. They contend that closing escrow with the expectation that the seller would sue was the "functional equivalent" of filing an interpleader action. They also argue that the court erred in precluding the introduction of evidence of privileged communications with their clients and in permitting the use of jury instructions that identified the seller as a party to whom the attorney owed a duty as an escrow holder. Furthermore, the attorney and his law firm try to convince this court that affirming the judgment would discourage attorneys everywhere from acting as escrow holders in transactions in which their clients participate. [*693]

The attorney and his law firm sought the backing of the Los Angeles County Bar Association (the Bar Association) with respect to the appeal, by asking that it file an amicus curiae brief on their behalf. The Bar Association did file a brief, albeit couched in general terms. The Bar Association contends that it is important for lawyers to be poised to act as escrow holders and that "a lawyer who carries out the escrow instructions in strict accordance [***3] with the conditions jointly agreed to by the parties should not face third party tort liability exposure simply for engaging in that conduct."

That simple proposition, however, does not resolve the case before us. Here, the attorney closed the transaction before the conditions of the escrow instructions had been satisfied, before the parties had reached written agreement on material contract terms, and after he had received a notice of rescission and demand for return of documents. What the attorney did was the one thing he was not at liberty to do. He not only breached a duty, as escrow holder, to the seller of the stock, he also con-

verted the stock when he forwarded the certificates to the transfer agent with directions to transfer the same.

Closing escrow and delivering the stock certificates to the transfer agent was in no wise the "functional equivalent" of filing an interpleader action. Furthermore, the court did not abuse its discretion in making the challenged evidentiary rulings. Finally, to the extent that the jury instructions may have been imprecise, they were not prejudicial, inasmuch as a result more favorable to the attorney and his law firm [**706] would not have been probable [***4] had the instructions been more comprehensive. We affirm the judgment.

In doing so, we do not intend to discourage attorneys from acting as escrow holders. Indeed, it is both useful and commonplace for attorneys to act as escrow holders with respect to closing documents, settlement agreements, releases, funds and other items. However, we caution that an attorney should be aware of the duties of an escrow holder before agreeing to act as one. When an attorney faces conflicting demands from his or her own client and another party to the escrow, the attorney cannot favor his or her own client and completely disregard the rights of the other party, to whom he or she owes a duty as an escrow holder. If the competing demands are not resolved, the law provides the attorney with a mechanism to avoid both the area between the rock and the hard place and tort liability, i.e., an interpleader action. However, the attorney cannot convert the escrowed property to his or her client's own use.

The seller in this matter, disappointed with the lack of a punitive damages award, also appeals from the judgment, and from the order denying his motion to have the punitive damages issue tried again. He contends [***5] that he is [*694] entitled to have a partial retrial as a matter of right under Code of Civil Procedure section 616, because the jury deadlocked on the punitive damages issue. He is in error on that point, inasmuch as a retrial is not automatic under section 616, but rather is discretionary. However, we hold that in this case the court abused its discretion in denying a partial retrial on punitive damages as to the attorney. At the same time, the court correctly denied a partial retrial with respect to the attorney's law firm. Therefore, we reverse the order denying a partial retrial on punitive damages with respect to the attorney and affirm the order denying a partial retrial with respect to the law firm.

I

FACTS

Jorma A. Virtanen (Virtanen) was the chief scientist and a vice-president of Burstein Technologies, Inc. (BTI). He was also a founder, director and shareholder of BTI. BTI was engaged in the development and marketing of bio-compact discs for clinical diagnostics.

Virtanen engaged in negotiations to sell his BTI stock to Richard Burstein (Burstein), president, chief executive officer and chairman of the board of BTI. In order to effectuate the [***6] contemplated purchase, Burstein got together with Gerald Goldstein (Goldstein), also a director of BTI, to form Burstein-Goldstein Investors LLC (B-G) to serve as the purchaser.

On April 24, 2001, Virtanen executed a stock purchase agreement for the sale of 1,400,000 shares of his BTI stock to B-G at a price of $ 1.25 per share, or $ 1,750,000. The purchase price was to be paid in installments. An initial $ 70,000 was to be paid at closing, with a remainder of $ 1,680,000 to be paid pursuant to a promissory note. The stock purchase agreement granted B-G a right of first refusal to acquire an additional 420,000 shares from Virtanen.

Under cover letter dated April 24, 2001, Attorney Steven J. Dunning (Dunning), on behalf of Virtanen, delivered the stock purchase agreement executed by Virtanen, the original stock certificates together with stock assignments executed in blank, and related closing documents, to Attorney Christopher P. O'Connell (O'Connell) of Parker, Milliken, Clark, O'Hara & Samuelian (Parker Milliken). The cover letter stated that O'Connell was to hold each of [**707] the items until three conditions had been fulfilled: (1) O'Connell was in possession of fully executed closing [***7] documents and was authorized to deliver originals of the same to Dunning; (2) Virtanen had confirmed to O'Connell that he had received the $ 70,000; and (3) the stock certificates and stock assignments had been delivered to Guzik & Associates to be held under the terms of an escrow agreement regarding the payment of the secured [*695] promissory note over time. After Dunning sent the package to O'Connell, he left town for a Florida vacation, returning to his office on May 2, 2001. Before leaving, Dunning informed O'Connell that he was going on vacation.

According to Goldstein, on April 24, 2001, he received an execution copy of the stock purchase agreement. However, he was just about to leave the state on a trip and did not have time to review it. Goldstein says that he told Virtanen, in an April 24, 2001 telephone conversation, that he would be returning from his trip on April 30, 2001, and would like until May 1, 2001, to review the stock purchase agreement and related documentation.

On April 30, 2001, Virtanen sent a notice of rescission of the transaction to Burstein, by both facsimile and hand delivery. In that notice, he demanded that B-G and all its agents return to him the stock [***8] certificates

and other documents previously delivered by him in connection with the transaction. The following morning, May 1, 2001, Attorney J. Russell Tyler, Jr. (Tyler), then representing Virtanen, sent O'Connell, by facsimile, a copy of an April 30, 2001 letter from Virtanen, in which Virtanen notified O'Connell of the rescission of the transaction. In that letter, Virtanen also requested that O'Connell return to him all documents that Dunning had previously delivered to O'Connell in connection with the transaction. According to Virtanen, he had not, by that date, received a copy of the stock purchase agreement or any related documents as signed by B-G.

O'Connell sent out two letters dated May 1, 2001. One was a letter addressed to both B-G and Virtanen, requesting that they agree to a closing date of May 1, 2001, and to a change in a variety of dates in the stock purchase agreement and related documents, and that they demonstrate their agreement by signing and returning their copies of his letter. According to Virtanen, he never signed this extension request. The other May 1, 2001 letter was addressed to Virtanen. In that letter O'Connell stated that the transaction was closed [***9] and that he was sending the stock certificates to BTI's transfer agent for transfer.

Tyler and O'Connell spoke by telephone on May 2, 2001. Tyler demanded that O'Connell refrain from forwarding the stock certificates to the transfer agent. O'Connell insisted on doing so.

On May 2, 2001, O'Connell, understanding that BTI acted as its own transfer agent, forwarded to BTI Virtanen's two stock certificates, in the denominations of 1,800,000 shares and 20,000 shares, respectively. In his May 2, 2001 written instructions, O'Connell directed BTI to register the transfer of 1,400,000 of Virtanen's shares to B-G and to reissue, in the name of B-G and in various denominations, stock certificates representing those [*696] shares. He also directed that the remaining 420,000 shares be reissued as one certificate in the name of Virtanen. In addition, O'Connell instructed BTI to deliver directly to Burstein one of the reissued certificates, in the name of B-G and in the denomination of 56,000 shares, and to deliver all of the other reissued certificates to Guzik & Associates. [**708]

On May 3, 2001, Virtanen filed suit against Burstein, B-G, O'Connell and Parker Milliken. The following day, he filed an ex parte application [***10] for a temporary restraining order to prevent the transfer of his shares of stock in BTI. The court granted the application and subsequently issued a preliminary injunction as well. B-G filed a cross-complaint against Virtanen, seeking declaratory relief, specific performance and enforcement of the terms of the stock purchase agreement through the doctrine of promissory estoppel.

By agreement dated December 20, 2002, Virtanen settled with Burstein and B-G. The matter proceeded to trial by jury against O'Connell and Parker Milliken, on Virtanen's fifth amended complaint, which asserted causes of action for negligence, breach of fiduciary duty and conversion.

The jury returned a special verdict in which it found that O'Connell and Parker Milliken were liable to Virtanen, whose total compensatory damages were $2,275,000. The jury deadlocked on the issue of whether Virtanen had proved by clear and convincing evidence that O'Connell and Parker Milliken had acted with malice, fraud or oppression, so as to entitle Virtanen to punitive damages. The court offset the amount of the settlement with Burstein and B-G, $290,000, against the special verdict amount, for a resulting judgment amount [***11] of $1,985,000, plus costs.

Virtanen filed a motion for a partial new trial [1] with respect to the punitive damages issue. O'Connell and Parker Milliken moved for a judgment notwithstanding the verdict. The court denied both motions. Each party appeals. [2]

1    While Virtanen filed a motion styled as one for a partial "new trial," as a technical point the motion is properly characterized as one for a partial retrial under Code of Civil Procedure section 616. (*Sullivan v. Delta Air Lines, Inc.* (1997) 15 Cal.4th 288, 307, fn. 11 [63 Cal. Rptr. 2d 74, 935 P.2d 781].) Consequently, we will describe the motion as having been for a partial retrial.

2    Although O'Connell and Parker Milliken filed a notice of appeal from both the judgment and the order denying their motion for judgment notwithstanding the verdict, they have failed in their briefing to address the order. Consequently, we deem their appeal from the order denying their motion for judgment notwithstanding the verdict to have been abandoned. (*Tanner v. Tanner* (1997) 57 Cal.App.4th 419, 422, fn. 2 [67 Cal. Rptr. 2d 204].)

[***12] [*697]

II

DISCUSSION

A. *Breach of Duty as Escrow Holder:*

O'Connell [3] contends that the jury impliedly found that he was acting as an escrow holder and further that, as escrow holder, he had a duty to return Virtanen's shares when requested to do so. O'Connell does not challenge the implied finding that he was an escrow holder.

(See *Wasmann v. Seidenberg* (1988) 202 Cal. App. 3d 752, 755-756 [248 Cal. Rptr. 744] [attorney who accepts documents from opposing party under conditional authority to use them is escrow holder].) However, O'Connell contends that he had no duty to return the shares. In support of this assertion, he cites authority for the proposition that an escrow holder must follow joint escrow instructions [4] and that, when faced with [**709] competing demands, he or she must either hold the property or interplead it. (See *Diaz v. United California Bank* (1977) 71 Cal. App. 3d 161 [139 Cal. Rptr. 314].)

[***13]

The problem is that O'Connell neither held the property nor interpleaded it. His remarkable choice was to close escrow and forward the stock certificates to the transfer agent with instructions to register the transfer and reissue the shares. O'Connell does not explain how this action was in compliance with his duties as an escrow holder who had received competing demands. It could not be more clear that in taking this action, rather than continuing to hold the shares or interpleading them, he breached his duties as an escrow holder. (See *Diaz v. United California Bank, supra,* 71 Cal. App. 3d at p. 171.) [***14] O'Connell simply "did not have a right to ignore these options and blindly close the escrow ... ." (*Ibid.*)

O'Connell says that forwarding the shares to BTI, with the expectation that Virtanen would promptly sue to halt the transfer, was the "functional equivalent" of filing an interpleader action. We can hardly agree.

[HN1](1) "A party against whom double or multiple claims *are made, or may be made,* may bring a separate action compelling the claimants or potential [*698]

claimants to interplead and litigate their claims *inter se.* (Code Civ. Proc., § 386, subd. (b).) A court may issue an order restraining parties to the action from instituting or further prosecuting any other proceedings affecting the rights and obligations as between the parties. (Code Civ. Proc., § 386, subd. (f).)" ( *Cantu v. Resolution Trust Corp.* (1992) 4 Cal.App.4th 857, 874 [6 Cal. Rptr. 2d 151], fn. omitted.)

"An interpleader action is an equitable proceeding. [Citations.] In an interpleader action, the court initially determines the right of the plaintiff to interplead the funds; if that right is sustained, an interlocutory decree is entered which requires [***15] the defendants to interplead and litigate their claims to the funds. Upon an admission of liability and deposit of monies with the court, the plaintiff then may be discharged from liability and dismissed from the interpleader action. [Citations.] The effect of such an order is to preserve the fund, discharge the stakeholder from further liability, and to keep the fund in the court's custody until the rights of the potential claimants of the monies can be adjudicated. [Citations.]" ( *Dial 800 v. Fesbinder* (2004) 118 Cal.App.4th 32, 42-43 [12 Cal. Rptr. 3d 711].) By implementing an interpleader action and obtaining a discharge from further liability, the stakeholder avoids tort liability. ( *Cantu v. Resolution Trust Corp., supra,* 4 Cal.App.4th at pp. 873-874.)

(2) Not surprisingly, O'Connell cites no authority to the effect that closing an escrow is the "functional equivalent" of filing an interpleader action just because the closing results in a lawsuit. [HN2]By definition, closing escrow, i.e., delivering property to parties on the completion of a transaction or the satisfaction of identified conditions, is not the same thing as filing an interpleader action, i.e., depositing [***16] property into the court until the rights thereto are resolved by judicial intervention. (See, e.g., *Paul v. Schoellkopf* (2005) 128 Cal.App.4th 147, 154 [**710] [26 Cal. Rptr. 3d 766] [escrowed items delivered to parties on happening of specified event or performance of prescribed condition]; *Dial 800 v. Fesbinder, supra,* 118 Cal.App.4th at p. 43 [interpleaded property retained in court custody until rights resolved].) The former device harbors obvious dangers for an aggrieved party that the latter does not.

O'Connell simply has not convinced us that putting the burden on a party to an escrow to commence immediate litigation following a premature closing is the same as the escrow holder's filing of an interpleader action before any closing takes place. When the escrow has already closed, there is a risk that the party will not get to court in time to fully protect his or her rights--to halt the transfer of stock certificates to a bona fide purchaser for value, for example. In an interpleader action, the parties' rights remain protected while the court sorts things out. (

---

3    O'Connell and Parker Milliken filed joint briefs on appeal and, for the most part, their arguments are the same. For the sake of simplicity, we will refer to the joint arguments of O'Connell and Parker Milliken simply as those of O'Connell, except where the context specifically requires a separate reference to the distinct arguments of Parker Milliken.

4    Virtanen, in contrast, argues that because Dunning delivered the documents under unilateral escrow instructions, O'Connell was obligated to follow Virtanen's unilateral instructions demanding the return of the documents. This is a matter we need not decide. Even assuming, as O'Connell asserts, that joint escrow instructions would have been required for him to return the documents to Virtanen, O'Connell, as we shall show, still breached his obligations as escrow holder by closing escrow under the circumstances.

*Dial 800 v. Fesbinder, supra,* 118 Cal.App.4th at pp. 42-43.) [*699]

To permit a malfeasant escrow [***17] holder to dictate the nature of the litigation that follows a premature closing and to claim immunity from tort liability, would be the same as permitting a converter of property to dictate to the owner thereof how his or her property must be used. Just as we do not countenance the latter ( *Dakota Gardens Apartment Investors "B" v. Pudwill* (1977) 75 Cal. App. 3d 346, 353 [142 Cal. Rptr. 126]), we also do not countenance the former. The conflicted escrow holder may shield himself or herself from liability, and protect the interests of the parties to the escrow as well, by filing an interpleader action. ( *Dial 800 v. Fesbinder, supra,* 118 Cal.App.4th 32; *Cantu v. Resolution Trust Corp., supra,* 4 Cal.App.4th 857.) An escrow holder who fails to do so acts at his or her own peril. (See *Cantu v. Resolution Trust Corp., supra,* 4 Cal.App.4th at pp. 873-874; cf. *Burlesci v. Petersen* (1998) 68 Cal.App.4th 1062, 1066-1067 [80 Cal. Rptr. 2d 704].)

O'Connell further insists that his actions were the functional equivalent of filing an interpleader action in light of the fact that an aggrieved shareholder can employ the procedures of Commercial Code section 8403 [***18] [5] in order to protect his or her position. He characterizes section 8403 as a vehicle whereby a shareholder can take steps to block the transfer of shares, thereby transforming the issuer of stock into a neutral stakeholder. He complains that due to the trial court's erroneous ruling on Virtanen's motion in limine No. 7, [**711] he was precluded from making his functional equivalency argument.

5 Subdivisions (a) and (b) of Commercial Code section 8403 provide: "(a) [HN3]A person who is an appropriate person to make an endorsement or originate an instruction may demand that the issuer not register transfer of a security by communicating to the issuer a notification that identifies the registered owner and the issue of which the security is a part and provides an address for communications directed to the person making the demand. ... [¶] (b) If a certificated security in registered form is presented to an issuer with a request to register transfer or an instruction is presented to an issuer with a request to register transfer of an uncertificated security after a demand that the issuer not register transfer has become effective, the issuer shall promptly communicate to (A) the person who initiated the demand ... and (B) the person who presented the security for registration of transfer or initiated the instruction requesting registration of transfer a notifica-

tion stating all of the following: [¶] (1) The certificated security has been presented for registration of transfer or the instruction for registration of transfer of the uncertificated security has been received. [¶] (2) A demand that the issuer not register transfer had previously been received. [¶] (3) The issuer will withhold registration of transfer for a period of time stated in the notification in order to provide the person who initiated the demand an opportunity to obtain legal process or an indemnity bond."

[***19] In his motion in limine No. 7, Virtanen requested that the court preclude O'Connell from making any argument or presenting any evidence pertaining to Commercial Code section 8403, on the grounds that the provision could not provide O'Connell with a defense to his actions and that making reference to it would confuse the jury. We find his arguments persuasive and conclude the court did not abuse its discretion in excluding evidence and [*700] argument pertaining to section 8403. ( *Tudor Ranches, Inc. v. State Comp. Ins. Fund* (1998) 65 Cal.App.4th 1422, 1431-1432 [77 Cal. Rptr. 2d 574] [court has discretion in ruling on motions in limine].) In any event, O'Connell cites no authority for the proposition that an escrow holder, when faced with competing demands, may properly close escrow on the assumption that one of the parties will timely employ a statutory mechanism for blocking the transfer of shares—to try to undo the effects of the already closed escrow.

B. *Duty to Client:*

O'Connell argues that to affirm the judgment would be to enunciate a rule that an attorney who acts as an escrow holder cannot provide his or her client with legal advice pertaining to the [***20] transaction. His argument in support of this position is strained.

O'Connell points out that Virtanen's expert, Anthony Pierno (Pierno), testified that with competing demands, O'Connell would have been justified in interpleading the stock. Pierno qualified that no interpleader would have been proper, however, if one of the competing demands were "spurious," that is to say, based on a recommendation by O'Connell that the demand be made. O'Connell uses this testimony to spin a fantastical defense to his actions. He implies that in order to find in favor of Virtanen, the jury must have determined that O'Connell advised his clients to make a spurious, competing demand. Then, per Pierno's viewpoint, interpleader would have been improper, and, even more importantly, O'Connell's self-proclaimed "functional equivalent" of interpleader would have been improper as well. O'Connell claims that if this is why he was held liable, no attorney anywhere would ever agree to act as an escrow holder, because to do so would be to give up the right, and obligation, to

render legal advice to the client during the course of the escrow.

O'Connell is unduly alarmed. There are no express or implied findings [***21] here to the effect that O'Connell either advised his clients to make a spurious demand or erred in continuing to provide advice to his clients during the course of the escrow. What O'Connell did is close escrow when the conditions to close had not been met, the parties had not reached written agreement on material contract terms, and one party to the escrow had delivered a notice of rescission and demanded the return of his documents. O'Connell's action gave rise to liability irrespective of what advice he provided to his clients or whether his clients' competing demand was spurious.

As an offshoot of his argument, O'Connell contends the court erred in granting Virtanen's motion in limine No. 2, which precluded him from introducing any evidence or making any arguments pertaining to the duties an [*701] attorney owes to his or her own client. In making the motion, Virtanen argued that the attorney-client duties were irrelevant to the case and would confuse the jury. In opposing the motion, O'Connell argued that any duty he owed to Virtanen conflicted with his undivided duty of loyalty to his own clients and that he could not have satisfied both of those conflicting duties. O'Connell concluded [***22] [**712] that his duties to his clients were extremely relevant to the case and implied that when faced with conflicting duties, his only permissible course of action was to satisfy the demands of his clients over the demands of Virtanen.

The court did not abuse its discretion in excluding evidence and argument pertaining to an attorney's duties to his or her client. [6] ( *Tudor Ranches, Inc. v. State Comp. Ins. Fund, supra,* 65 Cal.App.4th at pp. 1431-1432 [abuse of discretion standard]. [7]) We will accept O'Connell's word that he had competing instructions from his clients. (See *Frazier v. Superior Court (2002)* 97 Cal.App.4th 23, 36 [118 Cal. Rptr. 2d 129].) However, the question is not what his duty to his clients may have been given those competing instructions, but whether O'Connell violated a duty owed to Virtanen by closing escrow when none of the conditions to close had been met, the parties had not reached written agreement on material contract terms, and Virtanen had delivered a notice of rescission and request for return of documents. The fact that O'Connell owed duties to his clients does not excuse him for violating his duty to Virtanen and converting the stock certificates. [***23] As we have already discussed, if O'Connell believed that no joint resolution of the conflicting demands was forthcoming, he could have filed an interpleader action. He had a statutorily sanctioned method for dealing with conflicting demands, even [*702] when one of those demands

came from his own clients. He just chose not to take advantage of that method.

[6] This ruling notwithstanding, O'Connell's expert Stanley Lamport (Lamport) did testify as to the relationship between an attorney and his or her client. He also testified as to an attorney's duties when he or she receives conflicting demands from a client and from a nonclient, and his or her options for resolving the situation. Lamport also expressed his disagreement with certain of Pierno's viewpoints, including the notion that any advice O'Connell gave to B-G could have given rise to a spurious demand. Furthermore, O'Connell's counsel, in his summation, made reference to the testimony of Lamport. In his reply brief, O'Connell says that Lamport's testimony was minimal. O'Connell also contends he was deprived of the opportunity to argue that he was obligated to advise his clients concerning the transaction, and the mere fact that he fulfilled that obligation could not justify holding him liable to Virtanen. However, the argument he wanted to make was directed to the spurious demand issue, which, as we have said, has no bearing on our analysis.

[***24]

[7] We are unpersuaded by O'Connell's assertion that the court is deemed to have abused its discretion either because it failed to exercise discretion at all or because its ruling excluded an entire legal theory that O'Connell would have raised. True enough, the court took into consideration the fact that Burstein was unwilling to waive the attorney-client privilege. But this did not mean that the court did not exercise discretion in making its ruling. The reporter's transcript reflects that there was a lengthy argument on the motion, and there is no indication that the court failed to weigh each party's arguments. As far as the effect of precluding O'Connell from raising his arguments about his client obligations as a defense, we again see no error.

(3) Similarly, O'Connell is off base in arguing that the case should have been dismissed because, without a waiver of the attorney-client privilege and the ability to inform the court as to his confidential attorney-client communications, he was unable to put on a defense in the litigation. It is true that [HN4]an action against an attorney may be dismissed [***25] if the attorney cannot mount a defense without breaching the attorney-client privilege. ( *Solin v. O'Melveny & Myers* (2001) 89 Cal.App.4th 451, 467 [107 Cal. Rptr. 2d 456]; see also *McDermott, Will & Emery v. Superior Court* (2000) 83 Cal.App.4th 378, 385 [99 Cal. Rptr. 2d 622].) However,

in this case, no disclosure of privileged communications is [**713] required for O'Connell to address whether he owed a duty to Virtanen, whether he breached that duty, whether he converted Virtanen's stock certificates, and whether Virtanen suffered damages. As we have said, the communications O'Connell had with his clients were irrelevant to those issues.

### C. Jury Instructions:

O'Connell requested the following jury instruction: "An attorney owes his client an undivided duty of loyalty and diligence." Virtanen, in turn, requested a lengthy instruction about the fiduciary duty an attorney owes to a nonclient when he or she accepts property from that nonclient in order to facilitate a transaction. The court rejected each of the proposed instructions.

O'Connell now claims the court erred in failing to give his desired instruction. O'Connell failed to preserve his objection in the trial court. When arguing the [***26] two proposed jury instructions before the judge, O'Connell's counsel stated: "If they're both out, your Honor, just let me comment that in my final analysis, they're probably more confusing than helpful to the jury." That's it. He conceded that the instructions were more confusing than helpful, and he did not argue that the court would err in excluding them. End of story.

Next, O'Connell complains that the court erred in giving two jury instructions on the definition of, and the duties of, an escrow holder. The first of the two instructions provided in part: "An escrow holder owes a fiduciary duty to the person whose property they are holding. If you find that defendants are escrow holders, you must find that they owed a fiduciary duty to Dr. Virtanen." The second of the two instructions read: "It is the duty of an escrow holder to strictly obey the instructions of the person whose property he is holding."

**(4)** O'Connell asserts that these instructions are neither legally correct nor supported by the evidence. Yet it is hard to imagine how one can [*703] seriously dispute that an escrow holder owes a fiduciary duty to the parties to the escrow, including the party who has deposited property [***27] into the escrow. [HN5]" 'An escrow holder is the agent of all the parties to the escrow at all times prior to performance of the conditions of the escrow [citations]; bears a fiduciary relationship to each of them [citation]; and owes an obligation to each measured by an application of the ordinary principles of agency. [Citation.]' " (_Diaz v. United California Bank, supra,_ 71 Cal. App. 3d at p. 168.) "Although [O'Connell] owed [Virtanen] no professional duty, his acceptance of [Virtanen's stock certificates gave] rise to a duty of care. The wellspring of this duty is the fiduciary role of an escrow holder. [Citations.]" (_Wasmann v. Seidenberg, supra,_

202 Cal. App. 3d at pp. 755-756.) The fiduciary obligations of an escrow holder, and an attorney acting as an escrow holder, are well settled.

Also, we disagree with O'Connell's assertion that the jury instructions are not supported by the evidence. (See _People v. Marshall_ (1997) 15 Cal.4th 1, 39-40 [61 Cal. Rptr. 2d 84, 931 P.2d 262] [only theories supported by substantial evidence should be presented to jury].) It is undisputed that Dunning delivered Virtanen's documents to O'Connell together with a cover letter [***28] specifying the conditions under which those documents could be used. "If [O'Connell] did not want to be responsible for the [documents], he should have promptly returned [them] to [Virtanen]. We hold a trier of fact could find any failure to do so was an acceptance of [Virtanen's] entrustment." (_Wasmann v._ [**714] _Seidenberg, supra,_ 202 Cal. App. 3d at p. 756.) Moreover, "[h]aving accepted the [documents] from [Virtanen], [O'Connell] was bound to comply strictly with the escrow instructions. [Citations.]" (_Ibid._) The jury instructions are supported by the evidence.

Still, O'Connell contends that the first of the two jury instructions essentially told the jury that O'Connell was the fiduciary of Virtanen only, to the exclusion of O'Connell's clients. We disagree with this construction. The issue was whether O'Connell owed a duty to Virtanen and whether he breached any such duty. The instruction was properly framed to help the jury assess whether O'Connell owed a duty to Virtanen.

Where the second of the two jury instructions is concerned, it is well settled that " '[i]t [HN6]is the duty of an [escrow] holder to comply strictly with the instructions of [***29] his principal [citations], and if he disposes of the property of his principal in violation of these instructions, or otherwise breaches that duty, he will be responsible for any loss occasioned thereby. [Citations.]' " (_Diaz v. United California Bank, supra,_ 71 Cal. App. 3d at p. 168.) The rule continues to apply when the escrow holder in question is an attorney. (_Wasmann v. Seidenberg, supra,_ 202 Cal. App. 3d at p. 756.) [*704]

Even so, O'Connell says that the second of the two jury instructions was erroneous because it could be interpreted to mean that he was obligated to follow Virtanen's unilateral instructions. As stated previously, we need not resolve the issue of whether O'Connell was indeed obligated to follow Virtanen's unilateral instructions. Were we to agree with O'Connell that joint escrow instructions were required and that the second jury instruction could be interpreted to mean, contrarily, that O'Connell was obliged to follow Virtanen's unilateral instructions, we still would not find reversible error. [HN7]"A judgment may not be reversed on appeal, even for error involving 'misdirection of the jury,' unless 'after an examination of

the entire [***30] cause, including the evidence,' it appears the error caused a 'miscarriage of justice.' (Cal. Const., art. VI, § 13.) When the error is one of state law only, it generally does not warrant reversal unless there is a reasonable probability that in the absence of the error, a result more favorable to the appealing party would have been reached. [Citation.]" ( *Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 574 [34 Cal. Rptr. 2d 607, 882 P.2d 298].) Put another way, instructional error in a civil case requires reversal " 'where it seems probable' that the error 'prejudicially affected the verdict.' [Citations.]" ( *Id.* at p. 580.)

(5) In the case before us, it does not appear probable that a result more favorable to O'Connell would have been reached had the instruction stated that O'Connell was required to strictly comply with joint escrow instructions agreed to by each party to the escrow. "Factors to be evaluated in assessing the prejudicial effect of an erroneous instruction ... include: ' "(1) the degree of conflict in the evidence on critical issues [citations]; (2) whether respondent's argument to the jury may have contributed to the instruction's misleading effect [citation]; [***31] (3) whether the jury requested a rereading of the erroneous instruction [citation] or of related evidence [citation]; (4) the closeness of the jury's verdict [citation]; and (5) the effect of other instructions in remedying the error [citations]." ' [Citations.]" ( *Ortega v. Pajaro Valley Unified School Dist.* (1998) 64 Cal.App.4th 1023, 1050 [75 Cal. Rptr. 2d 777].)

O'Connell addresses only two of these factors--the second and the fourth. [**715] Where the second factor is concerned, O'Connell cites several passages of the argument Virtanen's counsel made to the jury. The lawyer told the jury that experts had testified that O'Connell owed Virtanen a duty. He further said that, even though O'Connell owed Virtanen a duty and had received Virtanen's demand, "what did he do? He didn't return the stock. Instead, he did everything he could to just ram that stock transaction through." The lawyer also stated: "The bottom line is this: When it came to the stock, the defendants had a duty, a duty to follow Dr. Virtanen's instructions; they didn't follow those instructions. They did just the opposite. Dr. Virtanen said, 'Give me back the stock.' What did they do? They sent it off. They didn't send [***32] it to him." [*705]

These arguments can be read two ways. First, they can be read to mean that O'Connell violated his duty to Virtanen by closing the escrow. Second, they can be read to mean that O'Connell violated his duty to Virtanen by failing to return the stock certificates to him. It is the latter possibility that O'Connell complains about, because it supports an interpretation of the jury instructions to the effect that O'Connell was required to comply with Virtanen's unilateral demand, not with joint escrow instruc-

tions. Even though the comments of Virtanen's attorney can be interpreted to bolster that interpretation of the jury instructions, that is only one factor to be considered in assessing whether the jury instructions had a prejudicial effect. As we shall show, this one factor is not determinative in this case.

Where the fourth factor is concerned, O'Connell says that the closeness of the jury's vote demonstrates the seriousness of the error. The jury found by a 10-to-2 vote that O'Connell and Parker Milliken were liable to Virtanen. We do not consider this to be a close split. Rather, the vote, although not unanimous, was weighted heavily in favor of Virtanen. This is not surprising, [***33] considering the substantial evidence that O'Connell violated his duty to Virtanen and converted his stock.

This brings us to the first factor, which is the most striking in this particular case. With respect to that factor, there is no conflict in the evidence on the critical issues. O'Connell closed escrow when none of the conditions to close had been met.

First, at the time of close, he was not prepared to deliver to Dunning fully executed copies of the April 24, 2001 documents--the documents that Virtanen had approved and signed. Rather, on April 26, 2001, O'Connell sent Virtanen a written request to approve changes to certain dates contained in the contract documents, including delayed payment dates under the promissory note. Virtanen declined to sign the extension request. This notwithstanding, on close, O'Connell delivered to Virtanen a promissory note containing changed but unapproved dates. One of those dates, pertaining to a $ 350,000 payment, was pushed from one calendar year into another, an event that Virtanen testified would have adverse tax consequences for him.

Second, O'Connell closed escrow without Virtanen having confirmed to him that the $ 70,000 had been received. [***34] Third, the stock certificates were not delivered to Guzik & Associates to be held under the terms of a written escrow agreement pertaining to the payment of the secured promissory note over time. Instead, they were sent to BTI, with instructions to register the transfer of 1,400,000 shares to B-G and to deliver directly to Burstein a reissued certificate in the name of B-G and in the denomination of 56,000 shares. [*706]

In addition to the fact that the conditions to close had not been satisfied, the parties had not agreed in writing to material [**716] contract terms, and Virtanen had delivered a notice of rescission and request for return of documents. Without question, O'Connell breached his duty to Virtanen. Given this, we cannot conclude that there is a reasonable probability that the jury would have reached a verdict more favorable to O'Connell had the jury instructions been more complete or more precise on

the duties of an escrow holder to each party to the escrow.

### D. *Request for Reversal with Directions:*

O'Connell is so certain he did nothing wrong that he requests that this court reverse the judgment with directions to enter judgment in his favor. He insists that a judgment in [***35] his favor is the only possible result. He explains that there is no theory under which he could possibly be held liable and further that Virtanen cannot prove damages.

#### (1) *Conversion*

Among other things, O'Connell argues that Virtanen has not presented a viable conversion cause of action. He states that Virtanen impliedly ratified any taking of his stock when he sought an injunction to stop the transfer agent from reissuing the shares, instead of seeking an injunction to compel the return of the shares, and cites *Farrington v. A. Teichert & Son* (1943) 59 Cal. App. 2d 468 [139 P.2d 80] in support of this assertion. We reject this argument out of hand.

First off, we note that Virtanen, in his declaration in support of his application for a temporary restraining order, did in fact request that the court issue orders not only preventing the transfer of his shares, but also requiring the return of the shares to him. Second, we can hardly construe the commencement of litigation, due to the closing of escrow and the delivery of the stock certificates to the transfer agent, as a ratification of those acts. Third, *Farrington v. A. Teichert & Son, supra,* 59 Cal. App. 2d 468 [***36] is clearly distinguishable from the case before us.

In *Farrington v. A. Teichert & Son, supra,* 59 Cal. App. 2d 468, the plaintiff landowner observed that the defendant contracting firm was removing rock, sand and gravel from city property that bordered upon his own property. He visited the site a number of times and ultimately became concerned that some of the materials were being removed from his property, not city property. The plaintiff approached the city and the contracting firm about the matter. He did not want to halt the excavation, but rather was content to have the materials removed from his property, for a reasonable price. The parties had difficulty, however, in agreeing as to what price was reasonable. (*Id.* at pp. 471-472.) [*707]

The plaintiff ultimately brought a conversion action. The trial court held that the plaintiff did not have a viable cause of action for conversion because he had consented to the removal of the material from his property. However, the court awarded him what it determined to be the reasonable value of the material, based on quantum meruit. (*Farrington v. A. Teichert & Son, supra,* 59 Cal.

App. 2d at p. 470.) [***37] The plaintiff appealed, seeking a higher damages award based on conversion. (*Id.* at pp. 474-475.) The appellate court affirmed. (*Id.* at p. 476.)

The *Farrington* court stated: "At no time did [the plaintiff] ever do anything to avoid the consequences or minimize [the defendant's] taking; instead he encouraged and abetted that taking. Thus it would seem that not only was there implied consent and acquiescence to [the defendant's] acts but express ratification and approval thereof; and the law is well settled [**717] that there can be no conversion where an owner either expressly or impliedly assents to or ratifies the taking, use or disposition of his property. [Citations.]" (*Farrington v. A. Teichert & Son, supra,* 59 Cal. App. 2d at p. 474.)

It is true that Dunning, on Virtanen's behalf, delivered the stock certificates to O'Connell to be held pending close of escrow and to be transferred under the conditions specified. However, Virtanen certainly did not consent to O'Connell's transfer of the certificates to BTI under the circumstances that occurred. Not one of the conditions to close that Dunning had set forth in his cover letter [***38] was met, as detailed above.

Furthermore, the parties had not reached written agreement on material contract terms, i.e., payment dates. In addition, Virtanen had delivered a notice of rescission and request to return documents to Burstein and Tyler had sent a notice of rescission directly to O'Connell. Tyler also had placed telephone calls to O'Connell and had sent him an explicit demand letter insisting that he refrain from forwarding the stock certificates to BTI. It could not be more clear that Virtanen did not consent to the delivery of the stock certificates to BTI. Rather, he objected vigorously to O'Connell's intended placement of the stock certificates in the hands of another and even threatened a lawsuit for conversion.

(6) " [HN8]'Conversion is the wrongful exercise of dominion over the property of another.' [Citation.] 'Conversion is a species of strict liability in which questions of good faith, lack of knowledge and motive are ordinarily immaterial.' [Citation.]" (*Irving Nelkin & Co. v. South Beverly Hills Wilshire Jewelry & Loan* (2005) 129 Cal.App.4th 692, 699 [28 Cal. Rptr. 3d 815].) Furthermore, " 'the fact that [a] plaintiff regained possession of the converted property does [***39] not prevent him from suing for damages for the conversion.' [Citation.]" (*Id.* at pp. 699-700.) Clearly, O'Connell converted Virtanen's stock certificates [*708] when he handed them over to the transfer agent even though none of Virtanen's conditions to close had been met, the parties had not reached written agreement on material contract terms, Virtanen had delivered a notice of rescission and demand to return documents, and Tyler had expressly warned

O'Connell against exercising dominion and control over the stock certificates. (See *Trask v. Garza* (1921) 51 Cal.App. 739 [197 P. 807].)

O'Connell asserts that even if the record supported a cause of action for conversion, Virtanen suffered no damages. Wrong again.

[HN9]As a general rule, "the normal measure of damages for conversion is '[t]he value of the property at the time of the conversion' and '[a] fair compensation for the time and money properly expended in pursuit of the property' (Civ. Code, § 3336) ... ." [*] (*Spates v. Dameron Hospital Assn.* (2003) 114 Cal.App.4th 208, 221 [7 Cal. Rptr. 3d 597]; see also *Lueter v. State of California* (2002) 94 Cal.App.4th 1285, 1302 [115 Cal. Rptr. 2d 68].) O'Connell [***40] does not discuss this general rule, or whether the amount of damages [**718] specified in the special verdict constitutes the value of the stock certificates at the time of conversion. Instead, he cites *Myers v. Stephens* (1965) 233 Cal. App. 2d 104 [43 Cal. Rptr. 420], which notes that an alternate measure of damages, such as lost profits, may be available when necessary to indemnify the injured party for damages proximately caused. (*Id.* at pp. 116-120.) O'Connell has cited no case persuading us that the alternate measure of damages should have been applied in this instance, assuming for the purpose of discussion that it was not.

> 8   Civil Code section 3336 provides that "[t]he [HN10]detriment caused by the wrongful conversion of personal property is presumed to be: [¶] First--The value of the property at the time of the conversion, with the interest from that time, or, an amount sufficient to indemnify the party injured for the loss which is the natural, reasonable and proximate result of the wrongful act complained of and which a proper degree of prudence on his part would not have averted; and [¶] Second--A fair compensation for the time and money properly expended in pursuit of the property."

[***41] The record contains substantial evidence supporting the jury award, as demonstrated by the testimony of investor Harvey Vechery. Vechery's family trust had purchased 150,000 shares of BTI stock for $ 525,000, or $ 3.50 per share, in 1999. In April 2001, Vechery was in discussions with Virtanen to purchase additional BTI stock at $ 1.75 per share. In April or July 2001, Vechery or his family trust purchased an additional 99,000 shares at that price. Of those shares, 9,000 belonged to Virtanen and 90,000 belonged to Virtanen's children. Vechery testified that he would have purchased all of Virtanen's shares at that time, for $ 1.75 per share, had they been available.

In March 2002, Vechery or his family trust purchased an additional 420,000 shares of BTI stock from Virtanen for $ 1.50 a share, or $ 630,000, [*709] even though Virtanen was unable to deliver physical possession of the stock certificates representing those shares. Vechery was then unwilling to pay more than $ 1.50 per share because of the condition of the company at the time. By December 2002, when Burstein offered to sell Vechery more BTI stock, Vechery declined, because by then he figured the stock was worthless. Pursuant [***42] to the settlement with Burstein and B-G, B-G purchased 184,000 of Virtanen's shares, and the remainder of his shares were freed up in July 2003. Virtanen then delivered to Vechery the stock certificates representing the 420,000 shares purchased in March 2002, and also offered to sell Vechery more stock. Vechery again declined, stating that the stock was worthless. As this testimony shows, Vechery was an existing BTI stockholder who was ready and willing to purchase all of Virtanen's shares in 2001 at $ 1.75 per share, but was no longer interested in the purchase by the time Virtanen's remaining shares became available for sale in July 2003.

The jury determined that the date of Virtanen's loss for the purpose of calculating damages was May 1, 2001, i.e., the date O'Connell informed Virtanen that the transaction had closed. Following the closing, O'Connell delivered 1,820,000 of Virtanen's shares to the transfer agent, thereby converting those shares. If the shares were valued at $ 1.75 apiece, the amount that Vechery was willing to pay in 2001, the total value of the shares at the time of conversion would have been $ 3,185,000. If one offset against this amount the $ 630,000 Virtanen [***43] received for the sale of 420,000 shares in March 2002, total damages would be $ 2,555,000--more than the jury's $ 2,275,000 compensatory damages award.

The jury award fit within the parameters of the standard award for conversion, i.e., the fair market value of the converted property at the time of conversion. (*Spates v. Dameron Hospital Assn., supra,* 114 Cal.App.4th at p. 221; *Lueter v. State of California, supra,* 94 Cal.App.4th at p. 1302.) The court offset against the damages award the $ 290,000 recovery from Burstein and B-G under the settlement agreement, so there is no double recovery on account of the settlement proceeds. There is also no double recovery in the sense that Virtanen [**719] ultimately recovered the bulk of his stock which, one might presume, he could then sell. Vechery's testimony reflects that the stock may have been worthless at the time it was finally released to Vechery. At any rate, the opportunity to sell all of the stock to Vechery had been lost.

[HN11]"Judgments and orders of the lower courts are presumed to be correct on appeal. [Citation.]" (*In re Marriage of Cohn* (1998) 65 Cal.App.4th 923, 928 [76 Cal. Rptr. 2d 866].) "We imply all [***44] findings nec-

essary to support the judgment, and our review is limited to whether there is substantial evidence in the record to support these implied findings. [Citations.]" (*Ibid.*; see also *People v. Francis (2002) 98 Cal.App.4th 873, 878 [120 Cal. Rptr. 2d 90].*) [*710] Furthermore, "[w]e will uphold the decision of the trial court if it is correct on any ground. [Citation.]" (*Schubert v. Reynolds (2002) 95 Cal.App.4th 100, 110 [115 Cal. Rptr. 2d 285].*) The record supports an implied finding that O'Connell converted Virtanen's stock certificates. Moreover, substantial evidence supports the jury's award of $ 2,275,000 in compensatory damages as representing the fair market value of the converted stock minus the amount Virtanen recovered for the March 2002 sale to Vechery. O'Connell has not met his burden to show error, either in terms of liability, or in terms of the measure of damages. (*Del Real v. City of Riverside (2002) 95 Cal.App.4th 761, 766 [115 Cal. Rptr. 2d 705]* [appellant's burden to demonstrate reversible error].)

## (2) Breach of duty

With respect to the breach of fiduciary duty and negligence causes of action, O'Connell insists he could not have violated a duty because he was [***45] not required to return the stock to Virtanen. Yet at the same time, O'Connell states that "[r]egardless of its genesis and timing, B-G's conflicting demand triggered [his] obligation to hold or interplead the stock." The breach of that duty gave rise to liability, as we have already discussed.

As far as O'Connell is concerned, whether he breached a duty to Virtanen or not, Virtanen could not have suffered any damages. From his perspective, the shares were going to be tied up in litigation one way or another, so Virtanen could not have been harmed by his lack of possession of the shares during the litigation period.

This argument presupposes two things. First, it assumes that there could have been no negotiated resolution of the matter, i.e., no joint escrow instructions forthcoming, had O'Connell simply held onto the shares for a while to see how things played out. Second, it assumes that the litigation that ensued once escrow had closed and Virtanen was in the position of trying to undo it was essentially the same, or at least of the same duration, as the litigation that would have ensued had an interpleader action been filed instead. We are not prepared to accept either assumption.

[***46] When the parties are still in escrow they tend to be predisposed to resolution. Once an escrow has been closed in such a manner as to make one party feel victimized and to force that party to hire a litigator to assert his or her rights, the chances of a speedy resolution

diminish. There may even be a difference in the tenor of the litigation in that instance and in the instance in which a conflicted escrow holder has been the one to file an interpleader action. Indeed, O'Connell himself notes at least one difference, stating that B-G "vigorously opposed Virtanen's injunction, which required considerably more effort than responding to an interpleader action." [*711]

Those points aside, we need not resolve whether the harm Virtanen suffered due to [**720] the close of escrow and the resultant litigation was identical to the harm he would have suffered had an interpleader action been filed instead, so as to determine what damages might have been available under either a breach of fiduciary duty theory or a negligence theory. As we have shown, the record supports the damages award under a conversion theory. We decline O'Connell's request to direct the entry of a judgment in his favor.

## E. *Punitive* [***47] *Damages:*

### (1) *Introduction*

The jurors were deadlocked on the question: "Do you find by the standard of clear and convincing evidence that Dr. Virtanen has proved that Christopher P. O'Connell and Parker, Milliken, Clark, O'Hara & Samuelian acted with malice, fraud or oppression, [so that] Dr. Virtanen is entitled to punitive damages[?]" The jurors voted seven to five in favor of punitive damages against O'Connell and seven to five in favor of punitive damages against Parker Milliken.

Virtanen contends that he was entitled to have the punitive damages issue tried again as a matter of right, under Code of Civil Procedure section 616, and that the court erred in denying his request for a retrial. Code of Civil Procedure section 616 provides: [HN12]"In all cases where the jury are discharged without having rendered a verdict, or are prevented from giving a verdict, by reason of accident or other cause, during the progress of the trial, or after the cause is submitted to them, except as provided in Section 630, the action may be again tried immediately, or at a future time, as the court may direct." According to Virtanen, this means that [***48] a retrial is mandatory unless the court, pursuant to Code of Civil Procedure section 630, subdivision (f), directs a new verdict.

Code of Civil Procedure section 630, subdivision (f) provides: [HN13]"When the jury for any reason has been discharged without having rendered a verdict, the court on its own motion or upon motion of a party, notice of which was given within 10 days after discharge of the jury, may order judgment to be entered in favor of a party whenever a motion for directed verdict for that

party should have been granted had a previous motion been made. Except as otherwise provided in Section 12a, the power of the court to act under the provisions of this section shall expire 30 days after the day upon which the jury was discharged, and if judgment has not been ordered within that time the effect shall be the denial of any motion for judgment without further order of the court."

(7) Virtanen reasons that if Code of Civil Procedure section 616 were interpreted to give the court the discretionary authority to grant or deny a [*712] retrial as it deemed proper, then the provisions of Code of Civil Procedure section 630, [***49] subdivision (f) would be rendered superfluous. And, as he points out, [HN14]statutory provisions should be construed so as to give significance to every part thereof and to avoid an interpretation that would render some parts mere surplusage. (_Elsenheimer v. Elsenheimer (2004) 124 Cal.App.4th 1532, 1537 [22 Cal. Rptr. 3d 447]._) However, we disagree that to interpret section 616 as giving the court discretionary authority would be to render section 630, subdivision (f) superfluous. [HN15](8) Section 630, subdivision (f) permits the court to order the entry of judgment under the circumstances described therein. Section 616 permits the court to grant a retrial, when it has not ordered the entry of judgment under section 630, subdivision (f). Construing section 616 as providing discretionary authority to grant a retrial when no entry of judgment has been ordered does not make section 630, subdivision (f) meaningless, but rather gives effect to the provisions of [**721] each of the two statutes. (_Elsenheimer v. Elsenheimer, supra,_ 124 Cal.App.4th at p. 1537 [statutory provisions are to be harmonized when possible].)

[HN16]" 'When interpreting a statute, we must ascertain legislative intent so as to effectuate [***50] the purpose of a particular law. Of course our first step in determining that intent is to scrutinize the actual words of the statute, giving them a plain and commonsense meaning. [Citation.]' " (_Woolls v. Superior Court (2005) 127 Cal.App.4th 197, 208 [25 Cal. Rptr. 3d 426]._) Here, we note that Code of Civil Procedure section 616 uses the word "may." That word is permissive. (_Woolls v. Superior Court, supra,_ 127 Cal.App.4th at p. 208.) [HN17]A plain reading of the statute shows that the court is granted the discretionary authority to act on motions for retrial under that provision. It is not required to grant a motion for retrial, just because it also did not order entry of judgment pursuant to Code of Civil Procedure section 630, subdivision (f).

(9) Accordingly, [HN18]we review the trial court's order on a motion for retrial under the abuse of discretion standard. (Cf. _Plancarte v. Guardsmark (2004) 118 Cal.App.4th 640, 645 [13 Cal. Rptr. 3d 315]._) In so do-

ing, we must bear in mind the circumstances under which punitive damages may be awarded. Civil Code section 3294, subdivision (a) provides for the recovery of punitive damages "[i]n an action for the breach of an obligation [***51] not arising from contract, where it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice ... ." As the Supreme Court in _Taylor v. Superior Court (1979) 24 Cal.3d 890 [157 Cal. Rptr. 693, 598 P.2d 854]_ explained: " 'Something more than the mere commission of a tort is always required for punitive damages. There must be circumstances of aggravation or outrage, such as spite or "malice," or a fraudulent or evil motive on the part of the defendant, _or such a conscious and deliberate disregard of the interests of others that his conduct may be called wilful or wanton._' [Citation.]" (_Id. at pp. 894-895._) [*713]

Given this requirement, O'Connell and Parker Milliken state that there simply is insufficient evidence to warrant a retrial with respect to punitive damages. More particularly, they contend the evidence would not enable a reasonable trier of fact to conclude that Virtanen presented clear and convincing proof of oppression, fraud or malice. They insist that the evidence shows "nothing more than aggressive representation." We certainly disagree, at least with respect to O'Connell.

(2) _Potential liability of O'Connell_

[***52] The record contains some very telling, undisputed evidence. Dunning delivered Virtanen's documents to O'Connell under a cover letter authorizing O'Connell to make use of the documents on the express conditions identified therein. Dunning, having sent the documents, then left town, after informing O'Connell of his impending departure.

On April 30, 2001, Virtanen delivered to Burstein a notice of rescission and demand for return of his documents. Burstein informed O'Connell of the notice on April 30, 2001, late in the day. O'Connell admits that he knew Dunning was out of town at the time and that he made no effort to contact Dunning after learning of the notice.

On the morning of May 1, 2001, Tyler sent a separate notice of rescission and request for return of documents directly to O'Connell. O'Connell admits that he received the facsimile transmission of the same at 9:52 a.m. on the morning of May 1, 2001, but made no effort to contact Tyler. [**722] O'Connell also admits that, when he received the notice from Tyler, he was aware that B-G had not paid the $ 70,000.

In addition, O'Connell concedes that, even though he was aware of the notice of rescission and demand for return of documents, [***53] he had several conversa-

tions with Goldstein on May 1, 2001, about depositing the $ 70,000 into Virtanen's account. Despite the fact that the money had not then been deposited, O'Connell on May 1, 2001 at 3:41 p.m., faxed Dunning a letter, addressed to Virtanen, stating that the transaction had closed. It was not until 4:39 p.m. that day, that Goldstein deposited $ 70,000 into Virtanen's bank account.

Six minutes later, at 4:45 p.m., Virtanen received a hand-delivered package from O'Connell. The package contained a promissory note, together with the letter, a copy of which O'Connell had already faxed to Dunning, stating that the transaction had closed. The promissory note contained payment dates that differed from those Virtanen had agreed to under the April 24, 2001 documents. [*714]

On May 2, 2001, Tyler faxed to O'Connell a letter concerning Virtanen's notice of rescission and demand for return of documents. The letter stated in part: "Despite my two voice mail messages to you, I have yet to hear back from you with regard to this transaction. We are frankly quite astonished that any attempt would be made to exercise dominion and control over Mr. Virtanen's stock certificates in light [***54] of his rescission of the stock purchase agreement and cancellation of the transaction. Please take notice that, if you do not immediately return Mr. Virtanen's stock certificates and related documents, you and your law firm will face significant personal liability for the tort of conversion, having exercised dominion and control over the stock certificates, and that Mr. Virtanen will take all legal action necessary to prevent the improper attempt to close the transaction." O'Connell concedes that he still had possession of the stock certificates when he received this letter.

O'Connell admits that he spoke to Tyler on the telephone on May 2, 2001. He concedes that, during that conversation, Tyler told him that he represented Virtanen, and that Virtanen had rescinded the transaction and demanded his shares back. In addition, Tyler directed O'Connell to refrain from doing anything with the shares. O'Connell states that, in response, he told Tyler that the shares had been paid for and B-G considered the transaction to be closed. O'Connell says that the conversation concluded unpleasantly, with Tyler stating that he intended to file suit to block the transfer of the shares to B-G. O'Connell [***55] further admits that he told Tyler that he intended to forward the shares to the transfer agent, and that Virtanen could either agree that the transaction had closed or file a lawsuit.

(10) In short, knowing full well that there was a dispute as to his authority to close the escrow, O'Connell closed it anyway, by forwarding the stock certificates to the transfer agent. He did so in violation of the original instructions provided by Dunning and despite the fact

that Virtanen had not agreed to the extended payment dates contained in the promissory note delivered to him on close. He did so in violation of the notice of rescission and demand to return documents, and in complete disregard of the oral and written protestations of Tyler. He did so while owing a duty, as escrow holder, to Virtanen. O'Connell not only breached that duty, he also committed an act of conversion.

There is sufficient evidence for a reasonable trier of fact to conclude Virtanen showed by clear and convincing proof that O'Connell acted in such a conscious and deliberate disregard for the rights of Virtanen [**723] that his conduct could be characterized as wilful or wanton, giving rise to a punitive damages award under Civil Code section 3294, [***56] subdivision (a). (Cf. Hoch v. Allied-Signal, Inc. (1994) 24 Cal.App.4th 48, 59-61 [29 Cal. Rptr. 2d 615].) [*715] The court nonetheless denied Virtanen a partial retrial. In open court, the judge remarked to Virtanen: "I think that you simply failed to carry your burden and your burden was to get nine out of twelve votes ... ." He also indicated that he took into consideration O'Connell's testimony and the notion that punitive damages are generally disfavored.

(11) The court was well intentioned. However, considering the strength of the evidence Virtanen presented, the fact that the majority of jurors who heard the evidence were persuaded that O'Connell had acted with malice, fraud or oppression, and the fact that there had been only one trial on the issue, the court abused its discretion in denying a retrial with respect to the issue of punitive damages against O'Connell. While it is true that Virtanen did not get nine votes on the first attempt, it is also true that he is entitled to a resolution of the matter if one can be had. It would be different if there already had been one retrial on the issue of punitive damages. [HN19]Endless retrials are not required if each time the jury is hung. However, [***57] under the particular circumstances of this case, the court abused its discretion in denying one retrial to see if the jurors could reach a conclusion on the point.

### (3) Potential liability of Parker Milliken

Parker Milliken maintains that even if there were enough evidence of malice to take to a jury with respect to O'Connell, there is not sufficient evidence of malice to take to a jury with respect to itself--the law firm for which O'Connell works. As Parker Milliken notes, Civil Code section 3294, subdivision (b) provides: [HN20]"An employer shall not be liable for damages pursuant to subdivision (a), based upon acts of an employee of the employer, unless the employer had advance knowledge of the unfitness of the employee and employed him or her with a conscious disregard of the rights or safety of others or authorized or ratified the wrongful conduct for

which the damages are awarded or was personally guilty of oppression, fraud, or malice. With respect to a corporate employer, the advance knowledge and conscious disregard, authorization, ratification or act of oppression, fraud, or malice must be on the part of an officer, director, or managing agent [***58] of the corporation." Parker Milliken says that Virtanen failed to demonstrate any ground for imposing punitive damages on it pursuant to section 3294, subdivision (b). Parker Milliken is correct, as we shall show.

At trial, O'Connell testified that Parker Milliken was a professional corporation and that he was a shareholder of that corporation. Both O'Connell and Parker Milliken stipulated that they represented Burstein and [*716] B-G in connection with the transaction at issue. They further stipulated that for the purposes of the transaction, O'Connell was an agent of Parker Milliken. In his trial testimony, O'Connell reiterated that he and Parker Milliken represented both Burstein and B-G and that all the work he did in connection with the transaction was as an agent of Parker Milliken. We have found no other evidence in the record of the relationship between O'Connell and Parker Milliken, and Virtanen does not address the argument or the evidence at all.

We agree with Parker Milliken that the aforementioned evidence is insufficient as a matter of law to impose punitive damages on Parker Milliken for the acts of O'Connell. There is no evidence that Parker [**724] Milliken had advance knowledge [***59] of any unfitness of O'Connell, authorized or ratified his wrongful conduct, or had itself committed fraud or acted with oppression or malice. Moreover, there was no evidence that O'Connell was an officer, director or managing agent of Parker Milliken.

Although O'Connell said that he was an "agent" of Parker Milliken with respect to the representation of Burstein and B-G, there is no evidence to show that he was a "managing agent" of Parker Milliken within the meaning of Civil Code section 3294, subdivision (b). Under that subdivision, [HN21]"principal liability for punitive damages [does] not depend on employees' managerial level, but on the extent to which they exercise substantial discretionary authority over decisions that ultimately determine corporate policy. ... In order to demonstrate that an employee is a true managing agent under section 3294, subdivision (b), a plaintiff seeking punitive damages would have to show that the employee exercised substantial discretionary authority over significant aspects of a corporation's business." ( White v. Ultramar, Inc. (1999) 21 Cal.4th 563, 576-577 [88 Cal. Rptr. 2d 19, 981 P.2d 944].) In this case, Virtanen presented no evidence whatsoever [***60] to show that O'Connell exercised substantial discretionary authority over significant aspects of Parker Milliken's business.

Inasmuch as Virtanen cites no evidence that would support a punitive damages award against Parker Milliken, we must conclude that the trial court did not abuse its discretion in denying a partial retrial as to punitive damages against that firm. Thus, we affirm the order denying a partial retrial as to Parker Milliken. [*717]

III

DISPOSITION

The judgment is affirmed. The order denying a partial retrial on punitive damages is reversed as to O'Connell and affirmed as to Parker Milliken. On remand, the trial court shall enter an order granting retrial of the punitive damages issue as to O'Connell only. Virtanen shall recover his costs on appeal.

Bedsworth, Acting P. J., and Ikola, J., concurred.

A petition for a rehearing was denied July 12, 2006, and the petition of defendants and appellants for review by the Supreme Court was denied October 11, 2006, S145426.

# EXHIBIT H

TO THE APPENDIX OF NON-FEDERAL
AND UNPUBLISHED AUTHORITIES CITED
IN COUPON'S OPPOSITION TO
STOTTLEMIRE'S MOTION TO DISMISS

LEXSTAT CAL. BUS. & PROF. CODE 17200

DEERING'S CALIFORNIA CODES ANNOTATED
Copyright (c) 2008 by Matthew Bender & Company, Inc.
a member of the LexisNexis Group.
All rights reserved.

\*\*\* THIS DOCUMENT REFLECTS ALL URGENCY LEGISLATION ENACTED \*\*\*
THROUGH 2007-2008 THIRD EXTRAORDINARY SESSION CH.6 AND
CH.3 OF THE 2008 REGULAR SESSION APPROVED 3/26/08

BUSINESS & PROFESSIONS CODE
Division 7. General Business Regulations
Part 2. Preservation and Regulation of Competition
Chapter 5. Enforcement

**GO TO CALIFORNIA CODES ARCHIVE DIRECTORY**

Cal Bus & Prof Code § 17200 (2008)

### § 17200. Definition

As used in this chapter, unfair competition shall mean and include any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by Chapter 1 (commencing with Section 17500) of Part 3 of Division 7 of the Business and Professions Code.

**HISTORY:**

Added Stats 1977 ch 299 § 1. Amended Stats 1992 ch 430 § 2 (SB 1586).

# EXHIBIT I

TO THE APPENDIX OF NON-FEDERAL
AND UNPUBLISHED AUTHORITIES CITED
IN COUPON'S OPPOSITION TO
STOTTLEMIRE'S MOTION TO DISMISS

# FEDERAL PRACTICE

## AND

# PROCEDURE®

By

### The Late CHARLES ALAN WRIGHT
Charles Alan Wright Chair in Federal Courts
The University of Texas

and

### ARTHUR R. MILLER
Bruce Bromley Professor of Law, Harvard University

## Federal Rules of Civil Procedure
### Rule 12

—

### Sections 1341 to 1357

## Volume 5B

[Date First Edition Volume published:  1969]
[Date Second Edition Volume published: 1990]
[Date Third Edition Volume published: 2004]



THOMSON
★
WEST ™

Mat #40191416

merits is a matter properly determined on the basis of proof, which means on a summary judgment motion or at trial by the judge or a jury, and not merely on the face of the pleadings.[53] The district

**See also**

Martin v. Mears, S.Ct.Alaska 1979, 602 P.2d 421, 429 n. 21, **citing Wright & Miller.**

Senay v. Meehan, 1977, 364 N.E.2d 1085, 5 Mass.App. 854, **citing Wright & Miller.**

**53. Case determined on proof**

Burstein v. Retirement Account Plan for Employees of Allegheny Health Educ. & Research Foundation, C.A.3d, 2003, 334 F.3d 365.

Desiano v. Warner–Lambert Co., C.A.2d, 2003, 326 F.3d 339.

Garbini v. Protection One, Inc., C.A.9th, 2002, 49 Fed.Appx. 169 (not selected for publication in Federal Reporter; not to be cited per Ninth Circuit Rule 36–3).

Bonham v. District of Columbia Library Admin., C.A.1993, 989 F.2d 1242, 300 U.S.App.D.C. 370.

Rule 12(b)(6) is not a tool for testing the truth of allegations or for determining whether a plaintiff has evidence to back up those allegations. ACLU Foundation of Southern California v. Barr, C.A.1991, 952 F.2d 457, 293 U.S.App.D.C. 101.

Miller v. Glanz, C.A.10th, 1991, 948 F.2d 1562, appeal after remand C.A.10th, 1993, 989 F.2d 507 (court's role is not to examine evidence, but rather to determine whether complaint alone is legally sufficient to state claim for relief).

The office of a motion to dismiss is merely to assess the legal feasibility of the complaint, and not to assay the weight of the evidence that might be offered in support. Geisler v. Petrocelli, C.A.2d, 1980, 616 F.2d 636.

Lipsky v. Commonwealth United Corp., C.A.2d, 1976, 551 F.2d 887.

Wooten v. Shook, C.A.4th, 1975, 527 F.2d 976.

Carter v. Barry, C.A.2d, 1972, 468 F.2d 821.

Sass v. District of Columbia, C.A.1963, 316 F.2d 366, 114 U.S.App.D.C. 365.

Arthur H. Richland Co. v. Harper, C.A.5th, 1962, 302 F.2d 324, 326.

Carss v. Outboard Marine Corp., C.A.5th, 1958, 252 F.2d 690.

Stanaland v. Atlantic Coast Line R.R. Co., C.A.5th, 1951, 192 F.2d 432.

Spencer v. Town of Chapel Hill, D.C.N.C.2003, 290 F.Supp.2d 655.

Gottesman v. J.H. Batten, Inc., D.C.N.C. 2003, 286 F.Supp.2d 604.

Jones v. Nassau County Sheriff Dep't, D.C.N.Y.2003, 285 F.Supp.2d 322.

Copeland v. Home & Community Health Servs., D.C.Conn.2003, 285 F.Supp.2d 144.

Longmoor v. Nilsen, D.C.Conn.2003, 285 F.Supp.2d 132.

Nuss v. Central Iowa Binding Corp., D.C.Iowa 2003, 284 F.Supp.2d 1187.

Margiotta v. Kaye, D.C.N.Y.2003, 283 F.Supp.2d 857.

Feigl v. Ecolab, Inc., D.C.Ill.2003, 280 F.Supp.2d 846.

Averbach v. Vnescheconombank, D.C.Cal.2003, 280 F.Supp.2d 945.

Bair v. Shippensburg Univ., D.C.Pa. 2003, 280 F.Supp.2d 357.

Fedders Corp. v. Elite Classics, D.C.Ill. 2003, 279 F.Supp.2d 965.

Financial Trust Co., Inc. v. Citibank N.A., D.C.Virgin Islands 2003, 268 F.Supp.2d 561.

Foley v. Marquez, D.C.Cal.2003, 2003 WL 22288160.

Highground, Inc. v. Cetacean Networks, Inc., D.C.N.H.2003, 2003 WL 21228459.

Hall v. New England Bus. Servs., Inc., D.C.N.H.2003, 2003 WL 2004375.

Kato v. Ishihara, D.C.N.Y.2002, 239 F.Supp.2d 359, affirmed C.A.2d, 2004, 360 F.3d 106.

FDIC v. Pelletreau & Pelletreau, D.C.N.Y.1997, 965 F.Supp. 381.

Hili v. Sciarotta, D.C.N.Y.1997, 955 F.Supp. 177, affirmed C.A.2d, 1998, 140 F.3d 210.

Quinones v. Howard, D.C.N.Y.1996, 948 F.Supp. 251.

ABC Home Furnishings, Inc. v. Town of East Hampton, D.C.N.Y.1996, 947 F.Supp. 635.

Fry v. McCall, D.C.N.Y.1996, 945 F.Supp. 655.

Wallace v. Conroy, D.C.N.Y.1996, 945 F.Supp. 628.

Turner & Boisseau, Inc. v. Nationwide Mut. Ins. Co., D.C.Kan.1996, 944 F.Supp. 842 (proper question is whether plaintiff is entitled to offer proof).

Zigman v. Giacobbe, D.C.N.Y.1996, 944 F.Supp. 147.

Hernandez v. Cunningham, D.C.N.Y. 1996, 914 F.Supp. 72.

Cohen v. Litt, D.C.N.Y.1995, 906 F.Supp. 957.

Nowosad v. English, D.C.N.Y.1995, 903 F.Supp. 377.

In re Corestates Trust Fee Litigation, D.C.Pa.1993, 837 F.Supp. 104, affirmed C.A.3d, 1994, 39 F.3d 61 (court need not determine whether plaintiff will prevail, but whether plaintiff can prove facts that will allow it to pre-vail).

City of Heath, Ohio v. Ashland Oil, Inc., D.C.Ohio 1993, 834 F.Supp. 971.

Robotic Vision Sys., Inc. v. Cybo Sys., Inc., D.C.N.Y.1993, 833 F.Supp. 189.

Thomas v. New York City, D.C.N.Y. 1993, 814 F.Supp. 1139, citing Wright & Miller.

Lindsey v. Admiral Ins. Co., D.C.Cal. 1992, 804 F.Supp. 47.

The strength of the complaint's allegations is not a factor for the court to consider when ruling on a motion to dismiss for failure to state a claim, but rather, the office of a motion to dismiss for failure to state a claim is solely to determine the legal feasibility of the complaint. Lasky v. American Broadcasting Cos., D.C.N.Y.1985, 606 F.Supp. 934.

J. Baranello & Sons v. Hausmann Indus., Inc., D.C.N.Y.1980, 86 F.R.D. 151.

Eye Encounter, Inc. v. Contour Art, Ltd., D.C.N.Y.1979, 81 F.R.D. 683.

No matter how unlikely it seems that the plaintiff will prove entitlement to relief, federal policy favors disposition on the proof rather than on the pleadings. Sixth Camden Corp. v. Township of Evesham, County of Burlington, D.C.N.J.1976, 420 F.Supp. 709, 720, citing Wright & Miller.

U.S. Steel Corp. v. Multistate Tax Comm'n, D.C.N.Y.1973, 367 F.Supp. 107.

Asher v. Reliance Ins. Co., D.C.Cal.1970, 308 F.Supp. 847.

Pointer v. American Oil Co., D.C.Ind. 1968, 295 F.Supp. 573.

Goldstein v. North Jersey Trust Co., D.C.N.Y.1966, 39 F.R.D. 363.

U.S. for Use & Benefit of Moran Towing Corp. v. Hartford Acc. & Indem. Co., D.C.R.I.1962, 204 F.Supp. 353.

R.I.T.A. Chemical Corp. v. Malmstrom Chem. Corp., D.C.Ill.1962, 200 F.Supp. 954.

See also

McBryde v. Amoco Oil Co., Ct.App.D.C. 1979, 404 A.2d 200, 203, citing Wright & Miller.

Compare

Cochran v. Quest Software, Inc., C.A.1st, 2003, 328 F.3d 1 (standards

court should be especially reluctant to dismiss on the basis of the pleadings when the asserted theory of liability is novel or even "extreme," since it is important that new legal theories be explored and assayed in the light of actual facts rather than a pleader's suppositions.[54] A significant number of federal courts have adopted

applicable at summary judgment stage are far more demanding than standards at Rule 12(b)(6) stage).

**But see**

Dismissal of the action is appropriate when the allegations contained in the plaintiff's complaint are beyond credulity. Dickinson v. French, D.C.Ala. 1976, 416 F.Supp. 429.

**54.   Novel or "extreme" theory**

Baker v. Cuomo, C.A.2d, 1995, 58 F.3d 814, **citing Wright & Miller.**

Electrical Constr. & Maintenance Co. v. Maeda Pac. Corp., C.A.9th, 1985, 764 F.2d 619, 623, **quoting Wright & Miller.**

"It is perhaps ironic that the more extreme or even far-fetched is the asserted theory of liability, the more important it is that the conceptual legal theories be explored and assayed in the light of actual facts, not a pleader's supposition." Shull v. Pilot Life Ins. Co., C.A.5th, 1963, 313 F.2d 445, 447 (Brown, J.).

Greenier v. Pace, Local No. 1188, D.C.Me.2002, 201 F.Supp.2d 172, **quoting Wright & Miller** (claim for deliberate acquiescence to discrimination under Title VII or ADA).

Sentara Virginia Beach Gen. Hosp. v. LeBeau, D.C.Va.2002, 182 F.Supp.2d 518, **quoting Wright & Miller.**

Varney v. R.J. Reynolds Tobacco Co., D.C.Mass.2000, 118 F.Supp.2d 63, **quoting Wright & Miller.**

Wajda v. R.J. Reynolds Tobacco Co., D.C.Mass.2000, 103 F.Supp.2d 29, **quoting Wright & Miller.**

Jackson v. Nicoletti, D.C.Pa.1994, 875 F.Supp. 1107, **quoting Wright & Miller.**

Otterbacher v. Northwestern Univ., D.C.Ill.1993, 838 F.Supp. 1256.

Thomas v. New York City, D.C.N.Y. 1993, 814 F.Supp. 1139, **citing Wright & Miller.**

Morgan v. American Family Life Assur. Co., D.C.Va.1983, 559 F.Supp. 477, 483, **citing Wright & Miller.**

Sherman v. St. Barnabas Hosp., D.C.N.Y.1982, 535 F.Supp. 564, 572, **citing Wright & Miller.**

Dart Drug Corp. v. Corning Glass Works, D.C.Md.1979, 480 F.Supp. 1091, 1099 n. 10, **citing Wright & Miller.**

**See also**

Atkins v. Industrial Telecommunications Ass'n, Inc., D.C.App.1995, 660 A.2d 885, **citing Wright & Miller.**

Roberts v. Meeks, S.Ct.Ala.1981, 397 So.2d 111, 114, **citing Wright & Miller.**

Lavoie v. Aetna Life & Cas. Co., S.Ct. Ala.1979, 374 So.2d 310, 311, **citing Wright & Miller.**

Capazzoli v. Holzwasser, 1986, 490 N.E.2d 420, 425, 397 Mass. 158, **citing Wright & Miller.**

Bell v. Mazza, 1985, 474 N.E.2d 1111, 1115, 394 Mass. 176, **citing Wright & Miller.**

M. Aschheim Co. v. Turkanis, 1983, 458 N.E.2d 743, 744, 17 Mass.App.Ct. 968, **citing Wright & Miller.**

Jenkins v. Jenkins, 1983, 444 N.E.2d 1301, 1302, 15 Mass.App.Ct. 934, **citing Wright & Miller.**

Hobrla v. Glass, 1985, 372 N.W.2d 630, 637, 143 Mich.App. 616, **quoting Wright & Miller.**

As a practical matter, a dismissal under Rule 12(b)(6) is likely to be granted by the district court only in the relatively unusual case in which the plaintiff includes allegations that show on the face of the complaint that there is some insuperable bar to securing relief; the cases in the note below illustrate that proposition.[58] In

mary judgment motions to define disputes and to dispose of unmeritorious claims).

See vol. 10A, §§ 2711–2729 and vol. 10B, §§ 2730–2742 for further discussion of summary judgment.

**See also**

McKenna v. City of Homewood, 1975, 324 So.2d 770, 772, 295 Ala. 128, **quoting Wright & Miller.**

Trabits v. First Nat. Bank of Mobile, 1975, 323 So.2d 353, 358, 295 Ala. 85, **quoting Wright & Miller.**

**But see**

Gray v. Petoseed Co., D.C.S.C.1996, 985 F.Supp. 625, affirmed C.A.4th, 1997, 129 F.3d 1259.

**58. Insuperable bar to relief**

Thompson v. Illinois Dep't of Professional Regulation, C.A.7th, 2002, 300 F.3d 750.

Thomas v. Publishers Clearing House, Inc., C.A.6th, 2002, 29 Fed.Appx. 319, **quoting Wright & Miller.**

Schmedding v. Tnemec Co., C.A.8th, 1999, 187 F.3d 862.

Doe v. Hartz, C.A.8th, 1998, 134 F.3d 1339.

Duffy v. Landberg, C.A.8th, 1998, 133 F.3d 1120, certiorari denied 119 S.Ct. 62, 525 U.S. 821, 142 L.Ed.2d 49.

Frey v. City of Herculaneum, Missouri, C.A.8th, 1994, 37 F.3d 1290, vacated on other grounds and superseded on denial of rehearing C.A.8th, 1995, 44 F.3d 667.

Sidney S. Arst Co. v. Pipefitters Welfare Educ. Fund, C.A.7th, 1994, 25 F.3d 417.

Alexander v. Peffer, C.A.8th, 1993, 993 F.2d 1348.

Ring v. First Interstate Mortgage, Inc., C.A.8th, 1993, 984 F.2d 924.

Lister v. Stark, C.A.7th, 1989, 890 F.2d 941 (preemption is bar).

Aldahonda–Rivera v. Parke Davis & Co., C.A.1st, 1989, 882 F.2d 590.

Palmer v. Tracor, Inc., C.A.8th, 1988, 856 F.2d 1131.

Baxley–DeLamar Monuments, Inc. v. American Cemetery Ass'n, C.A.8th, 1988, 843 F.2d 1154, appeal after remand C.A.8th, 1991, 938 F.2d 846.

U.S. v. Uvalde Consol. Independent School Dist., C.A.5th, 1980, 625 F.2d 547, 549 n. 1, **citing Wright & Miller,** certiorari denied 101 S.Ct. 2341, 451 U.S. 1002, 68 L.Ed.2d 858.

Thomas W. Garland, Inc. v. City of St. Louis, C.A.8th, 1979, 596 F.2d 784, certiorari denied 100 S.Ct. 208, 444 U.S. 899, 62 L.Ed.2d 135.

Battle v. Liberty Nat. Life Ins. Co., C.A.5th, 1974, 493 F.2d 39, certiorari denied 95 S.Ct. 784, 419 U.S. 1110, 42 L.Ed.2d 807.

TV Signal Co. of Aberdeen v. American Tel. & Tel. Co., C.A.8th, 1972, 462 F.2d 1256.

Harman v. Valley Nat. Bank, C.A.9th, 1964, 339 F.2d 564.

Corsican Productions v. Pitchess, C.A.9th, 1964, 338 F.2d 441.

VanHorn v. Nebraska State Racing Comm'n, D.C.Neb.2004, 304 F.Supp.2d 1151, **citing Wright & Miller.**

Graves v. Tubb, D.C.Miss.2003, 281 F.Supp.2d 886.

Davis v. DCB Financial Corp., D.C.Ohio 2003, 259 F.Supp.2d 664.