John A. Stottlemire
4509 Wayland Court
High Point, NC 27265
Telephone: (614) 358-4185
Email: johna@stottlemire.com
Defendant, *pro se*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | | |
|---|---|---|
| COUPONS, INC., a California corporation, | ) | Case No. 5:07-CV-03457 HRL |
| | ) | |
| Plaintiff, | ) | **DEFENDANT'S REPLY TO** |
| | ) | **PLAINTIFF'S OPPOSITION TO** |
| v. | ) | **DEFENDANT'S MOTION TO** |
| | ) | **SUMMARILY ENFORCE SETTLEMENT** |
| JOHN STOTTLEMIRE | ) | **AGREEMENT** |
| | ) | |
| Defendant | ) | Date:        February 24, 2009 |
| | ) | Time:        10:00 AM |
| | ) | Courtroom:   2, 5th Floor |
| | ) | Judge:       Hon. Howard R. Lloyd |
| | ) | |
| | ) | |

Pursuant to Civil Local Rule 7-3(c), Defendant John Stottlemire ("Stottlemire") submits this reply to Plaintiff Coupons, Inc.'s ("CI") Opposition to Defendant's Motion to Summarily Enforce Settlement Agreement ("Opposition").


Dated: February 10, 2009                    _____/s/_____
                                            John Stottlemire
                                            Defendant, *pro se*

Defendant's Reply to Plaintiff's Opposition to Defendant's Motion to Summarily Enforce Settlement Agreement
No. 5:07-CV-03457 HRL                    i

**CONTENTS**

I.     INTRODUCTION ...................................................................................1

II.    QUESTIONS PRESENTED BY THE COURT, WITH STOTTLEMIRE'S
     ANSWERS ..............................................................................................1

III.   ARGUMENT ..........................................................................................2

     1.     The Mutual Release is Enforceable ...............................................2

     2.     CI Foreclosed its Right to Rescission ...........................................3

     3.     Summarily Enforce is *not* Summary Judgment ..............................7

     4.     The Purported Breach ....................................................................7

     5.     CI's Opposition is Based Upon Hypothetical Conjecture .......................9

     6.     The Settlement was *not* Procured by Fraud or Mistake ..........................11

IV.    CONCLUSION.....................................................................................14

# TABLE OF AUTHORITIES

**CASES**

*Doi v. Halekulani Corp.*, 276 F.3d 1131 ..............................................................7

Heston v. Farmers Ins. Group (1984) 160 Cal.App.3d 402, 414-415 ...................5

*Southern California Edison Company v. The Superior Court of Los Angeles County*, 37 Cal.App.4th 839 at 851, (1995) ...............................................................6

**STATUTES**

*Cal. Civ. Proc. Code § 664.6* ..............................................................................7

**RULES**

Civ. L.R. 79-5(e) ..................................................................................................4

Federal Rules of Civil Procedure Rule 56(b) .......................................................7

**TREATISES**

3 Corbin on Contracts (1960) § 558, p. 256 .........................................................5

## I.   INTRODUCTION

First and foremost, CI cannot refuse to fulfill its contractual obligations to Stottlemire by claiming it has rescinded an agreement which precludes rescission.  Using irrelevant argument and baseless speculation, CI attempts to do just that.  For these reasons, as discussed in further detail below, the Court should reject CI's arguments, and order the Settlement Agreement to be enforced. The case should be dismissed with prejudice.

## II.   QUESTIONS PRESENTED BY THE COURT, WITH STOTTLEMIRE'S ANSWERS

1.   Does California law control enforceability of a settlement agreement?

Answer:  Yes.

2.  Is a stipulation to dismiss a material term of settlement or a consequence of settlement?

Answer:  A consequence of settlement.

3.  Would the Court allow a stipulation to dismiss to be filed under seal?

Answer:  No.

4.  Was sealing the stipulation negotiated?

Answer:  No.

5.  Was the purported breach material?

Answer:  No.  There was no breach since the parties altered the agreement to publicly disclose the lawsuit would be dismissed with prejudice.  If there was a breach, it cannot be defined as material.

6.  Can CI quantify damages caused by Stottlemire?

Answer:  No.

7.  If disparagement was an issue, why wasn't it a term of the agreement?

Answer:  CI knew that Stottlemire was blogging about his experiences with the lawsuit, but included no term restricting Stottlemire from blogging further.  If CI, a sophisticated party represented by experienced counsel, thought disparagement was an

issue, it could have included it as a term of the Settlement. CI did not. Because CI did not negotiate disparagement, it was not a term of the Settlement.

8. Could Stottlemire say he "kicked ass" before learning that "CI is fine with making the terms public"?

Answer: Yes. Stottlemire's statement was not restricted by the Settlement.

## III.  ARGUMENT

### 1.  The Mutual Release is Enforceable

CI and Stottlemire entered into an enforceable Settlement Agreement ("Settlement") on November 13, 2008. Contrary to CI's arguments, the Settlement remains enforceable.

Just one of the terms of the Settlement was an exchange of mutual general releases in standard form. The fact that CI has never signed the Mutual Release of Claims ("Release") is of no consequence. Alipo v. Secretary of the U.S. Army, 1998 U.S. Dist. LEXIS 6360 (N.D. Cal. 1998). The moment that CI and Stottlemire signed the Settlement, the minds met and CI and Stottlemire agreed to the terms of the Release. CI must now fulfill its contractual obligations as agreed to in the Release.

CI and Stottlemire agreed to exchange mutual releases in standard form, and CI knew what was in the standard form. For CI to claim they did not agree to the language in the Release is contradicted by CI's own Opposition, as a review of the facts shows.

First, CI admits it understood completely on November 13, 2008 the terms to which it was agreeing to when it signed the Settlement. CI states, the language common in releases is that the parties "each further represent, warrant and agree that the Settlement Agreement shall remain in full force, and in effect, notwithstanding the occurrence of any possible changes or differences in material fact" (Opposition 23:9-12). CI cannot claim it did not agree to this term on November 13, 2008 when it signed the Settlement. CI admits that it was standard language for "general releases in standard form". CI's signature on the Settlement equates to a signature to all terms which are standard in a general mutual release of claims.

Second, CI crafted the language of the Release and told Stottlemire that as soon as he signed it, it would file the Stipulation for Dismissal with Prejudice. CI sent the Release to Stottlemire with an attached promise, "When we receive your signature, we'll file the Stipulation for Dismissal" (Declaration of John Stottlemire in Support of Defendant's Motion to Summarily Enforce Settlement ¶ 7). CI's attached promise unequivocally admits that CI agreed to each term of the Release.

Third, discussions between CI and Stottlemire after the purported breach also make clear CI's agreement to the terms of the Release. CI explained in detail the term in the Release which requires that the Settlement remain in full force and effect, regardless of what happens in the future (Motion 6:18-27, 7:1-2). CI cannot backpedal now. It is unconscionable for CI to expect this Court to believe that CI did not agree to terms of the Release when CI interpreted their meaning and used them to support its belief that Stottlemire breached the Agreement.

Fourth, the parties did not agree to keep confidential anything other than the terms of the Settlement. CI knew that Stottlemire was blogging about the lawsuit. A sophisticated party represented by experienced counsel, CI could have included disparagement terms in the Settlement. CI did not include any additional terms. Thus, Stottlemire had the right to discuss anything other than the terms of the Agreement.

Lastly, much of Stottlemire's Motion offers arguments and authorities which establish the existence of terms to a contract even when one party refuses to sign the agreement. All of Stottlemire's arguments go unopposed by CI. This Court should accept them. CI and Stottlemire have entered into a binding contract. There can be no disputed material facts concerning the existence or terms of the Release. CI decided what the standard form of a mutual release should be, crafted the language, promised to execute the terms of settlement after Stottlemire signed and returned the Release and then attempted to use the Release to its own advantage. The terms of that Release must now be carried out and CI must be bound to its contractual obligations.

## 2. CI Foreclosed its Right to Rescission

By adding terms to the Release which preclude rescission and agreeing to those terms, CI foreclosed rescission. By foreclosing rescission, CI must release Stottlemire of all claims. This

1 Court should require CI to file the Stipulation to Dismiss with Prejudice and release Stottlemire of

2 all claims.

3 On November 23, 2008, CI fully explained its understanding of the Release (Motion 10-

4 11). Stottlemire did not oppose CI's explanation. By their actions, CI and Stottlemire have agreed

5 to settle on the terms that were specified. As discussed above, whether or not the parties can

6 control changes or differences in material fact, the Settlement is binding. Upset about the "ass-

7 kicking" comment, CI seeks to undo the Settlement, using arguments that are diametrically

8 opposed to its understanding of the Release, as conveyed to Stottlemire in its November 23, 2008

9 communication. During discussion with CI soon after the purported breach, Stottlemire stated:

> "Dennis [Cusack] promised to file the stipulation to dismiss with prejudice as soon
> as he had my signature on the accompanying document. I gave my signature on the
> document on November 19, 2008. There has been no request nor any stipulations
> provided that the stipulation be filed under seal. The stipulation would have
> become a public document for any person who has access to the PACER system,
> the Court docket or any websites which display the Court docket (i.e. justia).
>
> "While both parties have agreed that the terms of the settlement would remain
> confidential, that confidentiality obviously does not extend to a document which
> would be filed publicly by your office. You [(Neil Goteiner)] and Dennis [Cusack]
> drafted the stipulation and you were going to file it publicly. If you have forgotten
> what the stipulations say, go read it. Since I have signed the stipulation with full
> knowledge that the stipulation would be filed as soon as you have my signature on
> the [Mutual Release] and the stipulation holds no provisions to be kept under seal or
> redacted in any form, both sides have agreed to a revision on that particular term."
> (Declaration of John Stottlemire in Support of Defendant's Motion to Summarily
> Enforce Settlement Exhibit H, Page 2).

As a sophisticated party represented by experienced counsel, CI could have included a term

to file the stipulation under seal, but did not. Per the Local Rules, a motion to file under seal, and

the filing party's response if that motion is denied, is in complete control of the filing party:

> "If a request to file under seal is denied in part or in full, neither the lodged
> document nor any proposed redacted version will be filed. The Clerk will notify
> the submitting party, hold the lodged document for three days for the submitting
> party to retrieve it, and thereafter, if it is not retrieved, dispose of it. If the request is
> denied in full, the submitting party may retain the document and not make it part of
> the record in the case, or, within 3 days, re-submit the document for filing in the
> public record. If the request is denied in part and granted in part, the party may
> resubmit the document in a manner that conforms to the Court's order and this
> rule." (Civ. L.R. 79-5(e))

Here, if CI felt the confidentiality term extended to the Stipulation to Dismiss with Prejudice, CI

could have filed it with a Motion to Seal. Since only the word "with" (from the phrase "with

prejudice") is the only word not yet known by the public, CI's attempts would have been limited to that single word. CI offers no case law where only one word could be redacted. CI also offers no case law in which a Court has permitted a party to seal information that a case was dismissed with prejudice as opposed to being without prejudice. If the Court had denied the Motion to Seal (which in all likelihood, the Court would have, given the requirements of Local Rule 79-5), CI would have been given the opportunity to re-file. CI could have filed the Stipulation to Dismiss with Prejudice after conferring with Stottlemire and altering terms of the Settlement it contends existed. CI had complete control.

With full knowledge of the control it possessed, CI argued the Release provided that the Settlement remained in full force, and in effect regardless of what happens in the future. CI made this analysis on November 23, 2008 (Motion 10:23-28, 11: 1-7) when it suited CI's purpose. Now, CI is backpedaling, and is attempting to renege on its contractual obligations. In opposition to Stottlemire's Motion, CI argues the term of the Release it previously analyzed has binding effect only if the changes or differences in material effect are outside the parties' control (Opposition 23: 9-16). CI cannot claim to have it both ways when it chooses. If CI had meant to limit the binding effect of the Settlement only when changes or differences in material effect were outside of the parties' control, it could have added those words to the Release. Instead, the Release says "notwithstanding the occurrence of *any* possible changes or differences in material fact" (Motion Exhibit D) and CI interpreted this statement to mean "regardless of what happens in the future" (Motion Exhibit H, Page 1). The Release therefore requires, just as CI stated on November 23, 2008, the Settlement remain in full force and effect regardless of what happens in the future. CI foreclosed its right to rescission when it agreed to these terms. CI cannot escape its own practical interpretation of the contract:

> "As stated in Corbin on Contracts, "The practical interpretation of the contract by one party, evidenced by his words or acts, can be used against him on behalf of the other party, even though that other party had no knowledge of those words or acts when they occurred and did not concur in them. In the litigation that has ensued, one who is maintaining the same interpretation that is evidenced by the other party's earlier words, and acts, can introduce them to support his contention." (3 Corbin on Contracts (1960) § 558, p. 256, fn. omitted; and see, e.g., Heston v. Farmers Ins. Group (1984) 160 Cal.App.3d 402, 414-415 [ 206 Cal.Rptr. 585].)" (*Southern*

*California Edison Company v. The Superior Court of Los Angeles County*, 37 Cal.App.4th 839 at 851, (1995)).

CI further opposes Stottlemire's Motion and argues the Release does not immunize a party from remedies for a breach or fraudulent inducement (Opposition 23:13-14). Setting aside that there was no fraudulent inducement, CI cannot pretend that its only remedy is rescission of the Settlement nor does Stottlemire's Motion even remotely pretend to rob either party of all of the remedies it may be entitled to if a material breach of the terms actually occur. Stottlemire's Motion argues that rescission of the Settlement is precluded. The parties obviously have other remedies available. Stottlemire is using one remedy – specific performance – to force CI to dismiss the case with prejudice, as CI promised to do.

Next, not only is rescission of the Settlement precluded by the Release, both CI and Stottlemire acknowledged "other facts upon which Coupons and Stottlemire may be relying in entering into the Settlement Agreement may later turn out to be other than, or different from, those now known, suspected or believed to be true" (Motion Attachment D, Page 3). CI claims and Stottlemire adamantly denies the facts it relied upon to settle this dispute are other than or different from those now known, suspected or believed to be true. Specifically, that Stottlemire procured CI's agreement to settle by misrepresenting Stottlemire's intentions. CI's opposition is again diametrically opposite to the plain language of the Release the parties agreed to. CI drafted the Release and specifically agreed to assume that risk. CI and Stottlemire "have expressly agreed to assume the risk of such possible unknown damages, claims, demands, actions, or cause of action, or such possible changes or differences in material fact." (Id. Pg 2-3). Even if CI agreed to the terms of the Settlement under facts which later turned out to be other than or different from those CI knew, suspected to know or believed to be true, the Release precludes rescission on these grounds. None of the case law that CI relies upon in its 25-page Opposition included language like that in the Release.

In conclusion, CI and Stottlemire agreed to a mutual general release in standard terms on November 13, 2008. With its agreement to standard terms, CI carefully crafted the language of the Release. Stottlemire never disagreed to those standard terms and only sought to add to them. On November 13, 2008, CI and Stottlemire agreed to the Release. The minds had fully met. By CI's

own analysis the Release precludes rescission of the Settlement. CI cannot refuse to fulfill its contractual obligations to Stottlemire by claiming it has rescinded an agreement which precludes rescission. In an agreement which it drafted, CI foreclosed rescission. This Court should require CI to sign and file the Stipulation to Dismiss with prejudice.

### 3. Motion to Summarily Enforce is *not* Summary Judgment

Stottlemire's Motion to Summarily Enforce the Settlement Agreement is not a motion for summary judgment, since Stottlemire is not seeking judgment in his favor on any of CI's claims. Pursuant to the Courts inherent authority and the authority conferred by California law, Stottlemire moved the Court to Summarily Enforce Settlement Agreement. (*See Doi v. Halekulani Corp.*, 276 F.3d 1131 at 1135 (9th Cir. 2002) "Once a settlement has been reached in a pending action, any party to the agreement may bring a motion to enforce it." *See also Cal. Civ. Proc. Code § 664.6* "If parties to pending litigation stipulate, in a writing signed by the parties outside the presence of the court or orally before the court, for settlement of the case, or part thereof, the court, upon motion, may enter judgment pursuant to the terms of the settlement.") At no time does Stottlemire seek relief pursuant to Federal Rules of Civil Procedure Rule 56 and it is unclear why CI devotes so much of its Opposition claiming that Rule 56 is controlling.

Federal Rules of Civil Procedure Rule 56(b) states that "[a defending] party against whom relief is sought may move at any time, with or without supporting affidavits, for summary judgment *on all or part of the claim*" (emphasis added). In this immediate action, CI's claims are brought under 17 U.S.C. § 1201(a), 17 U.S.C. § 1201(b) and related state law claims. Stottlemire's Motion does not move the Court for judgment on all or part of CI's claim. Stottlemire's Motion moves the Court to enforce the Settlement the parties entered into on November 13, 2008. Therefore, CI's summary judgment argument is irrelevant.

### 4. The Purported Breach

Contrary to CI's claims, Stottlemire did not breach the Settlement by revealing confidential information. Stottlemire disclosed only that which CI had disclosed to the Court and was readily ascertainable by the public. CI also errs in attributing to Stottlemire, statements that obviously were made by a third party and not Stottlemire, and also errs in misrepresenting an exchange

between a third party and Stottlemire. CI has no grounds to rescind the Settlement. This Court should grant Stottlemire's Motion to Summarily Enforce the Settlement Agreement.

CI opposes by claiming "the natural *sin qua non* of any settlement agreement" is the dismissal of the complaint. On November 14, 2008, CI filed a letter on the court docket which stated that CI and Stottlemire had settled (Document 110). CI was under no requirement of law to file this letter. By filing this letter, CI effectively admitted that it would dismiss the lawsuit against Stottlemire, the natural *sin qua non* of any settlement agreement. Further, CI made no attempt to conceal that it was dropping the lawsuit it had filed against Stottlemire from the public. The letter was voluntarily filed by CI within 24 hours of the settlement between Stottlemire and CI and made publicly available on the Court's docket. CI cannot now claim Stottlemire's mirroring of CI's letter on his blog along with a statement which explained the natural *sin qua non* of any settlement agreement is a material breach of the Settlement. Likewise, any additional postings or comments made by Stottlemire limited to CI dismissing the lawsuit would not be a material breach of the Settlement because these comments were not barred by the terms of the Settlement.

CI's only other articulated ground for rescission is Stottlemire's purported statement that CI did not receive any remedy for its claims against Stottlemire, specifically that Stottlemire was not required to stop publishing his "circumvention" instructions (Opposition 8:14-15). Stottlemire has never made or inferred this statement to anyone. CI bases its opposition on two separate postings. The first posting was authored by David Kravets, a Wired.com reporter. The second posting was authored by Stottlemire; however CI misrepresented what was said.

David Kravets reported: "Terms of the settlement were not made public. They do not require Stottlemire to remove the workaround, which is still published here" (Opposition 8:11-12). This statement, which CI claims Stottlemire disclosed, is obviously an assumption by David Kravets, based on publicly available – and therefore, not confidential -- information. The last word in the statement, the word "here", is a hyperlink. If a computer user reading this statement clicked on the word "here" it would load a webpage in their web browser. That webpage is not, as reported, the "circumvention instructions" claimed by David Kravets. The page linked to by David Kravets is instructions to completely remove CI's coupon printer software from a computer.

1  The uninstall instructions have never had an impact on the ability to print multiple coupons from

2  CI's website.  The "circumvention instructions" CI has complained about since filing this action in

3  July 2007 do not exist on Stottlemire's blog, nor do they exist anywhere.  Had CI made a

4  reasonable inquiry under the circumstances, CI would have known of David Kravets' mistake.

5          Finally, CI has once again misrepresented in its filings with this Court what Stottlemire

6  said.  CI's opposition states:  "Another user then asked whether Stottlemire would be allowed to

7  continue to blog about his circumvention methods, and Stottlemire said, "The blog will remain

8  intact and updated as needed" (Opposition 7:15-17).  CI references Post #13 of Steven Boal's

9  Declaration Exhibit D.  For the Court's convenience, a more legible copy of Post #13 has been

10 attached to this Reply (Stottlemire Declaration ¶ 2).  As can clearly be seen, the user did not ask

11 Stottlemire about circumvention methods.  The user's question is:  "So, are you allowed to post

12 anymore blogs about how to remove this damn software from our machines without formatting the

13 entire PC?"  Removal of CI's software is not a method of circumvention. CI is well aware of this

14 fact.  CI is also aware that Stottlemire quit posting any instructions when CI began reading pseudo-

15 anonymous information from consumer's computers in order to limit distribution of its coupons.

16 Other than to advance its argument against Stottlemire, it is unclear why CI would misrepresent

17 these statements in its opposition.  The user clearly enquired as to the status of Stottlemire's blog

18 page which provides detailed instructions on how to completely remove CI's software.  Yet, CI

19 claims the user enquired about circumvention methods.

20         Once again, CI has attached no evidence to its pleading to support a claim of material

21 breach.  CI cannot claim a breach to the Settlement without proper grounds.  CI must fulfill its

22 contractual obligations to Stottlemire.  This Court should require CI to sign and file the Stipulation

23 to Dismiss with Prejudice.

24     **5.  CI's Opposition is Based Upon Hypothetical Conjecture**

25         To divert the Court's attention from the issues, CI repeats previous claims that by

26 Stottlemire's silence he is in effect admitting to CI's allegations.  Apparently, CI hasn't been

27 listening.  In virtually every communication with CI and this Court since CI first claimed

28 Stottlemire breached, Stottlemire has denied that a breach occurred.  In addition, to deny each of

CI's purported grounds for rescinding the Settlement would have been impossible because Stottlemire cannot predict, and then deny, CI's latest grounds before CI had articulated them.

CI's bases for rescission are like the shifting sands. Since November 21, 2008, CI has recast its purported grounds authorizing rescission not less than three times. On November 21, 2008, CI claimed Stottlemire breached the agreement by disclosing the dismissal with prejudice and that he "kicked ass" (Motion Exhibit G). On January 6, 2009, CI claimed Stottlemire breached the agreement by disclosing "a dismissal with prejudice in return for no money" (Coupons' Opposition to Defendant's Motion to Stay Discover (Document 129) 1:8-9). Finally, in its Opposition to this Motion CI claims Stottlemire breached the agreement by disclosing a dismissal with prejudice and that he was not required to stop publishing his circumvention instructions (Opposition 8-13:15). Stottlemire could not predict the new bases that CI would offer to support its arguments. It would have been impossible to deny any of CI's purported grounds prior to CI articulating them.

To be certain, there has been no requirement to admit or deny any of CI's purported grounds even had Stottlemire been able to do so. To discolor the then pending motions with an apparent excess of adversarial animation would have been a waste of time for both Stottlemire and the Court. As previously argued, the time to address CI's allegations was not ripe. Stottlemire responded to each motion without deviating from the issues raised.

CI also opposes by claiming it knows exactly what Stottlemire was thinking and his intentions after CI read Stottlemire's Motion. As an example, CI claims Stottlemire admits he never intended to keep his promise of confidentiality. CI bases this claim on Stottlemire's purported admission that he went into the ENE session with the mindset that the case would not settle if Stottlemire was required to make any promises to CI. CI's analysis is in error and CI purposely mischaracterizes Stottlemire's Motion. Prior to Settlement, CI repeatedly demanded Stottlemire agree to an injunction, a promise not to circumvent CI's technology in the future. With this Settlement, CI dropped that demand and the parties settled. Obviously, there are other promises Stottlemire made which make clear CI's mischaracterization of Stottlemire's Motion. Stottlemire promised to stipulate to the dismissal. Stottlemire promised to bear his own costs.

Stottlemire promised to release CI from any and all claims related to this action. And Stottlemire promised to keep confidential the terms of the agreement. CI's 25-page filing lacks any evidence that Stottlemire did not intend to keep these promises. Indeed, in filing this motion to summarily enforce the settlement agreement, Stottlemire is demonstrating his intent to keep his promises.

Equally disturbing is CI's conclusion that Stottlemire would not have settled if the parties did not agree to the confidentiality term. CI bases its conclusion on its speculation that Stottlemire had to protect a reputation he had established with hackers and interested media (Opposition 4-16:26). CI errs. If Stottlemire's goal was to protect a reputation he had established with hackers and interested media, a term of confidentiality would defeat that purpose. Stottlemire's motivation to settle this dispute came because of his then pending relocation to North Carolina and the resources it would require should Stottlemire continue litigation in the state of California while living in North Carolina. Stottlemire foresaw correctly that the cost, both financially and personally would be great. Just one example was Stottlemire's requirement to leave his wife and four day old daughter just two days after they were released from the hospital so that Stottlemire could attend the hearing held on Stottlemire's Motion to Stay Discovery. Due to costs, Stottlemire would have settled this dispute with or without a term of confidentiality. Confidentiality was not material to Stottlemire.

CI submitted a 25-page opposition, littered with speculation and various defeats that distract from the real issue: was there a meeting of the minds such that a contract was formed? The answer to that question – and the only relevant question – is "Yes". Therefore, a settlement agreement is in place, which the Court should enforce.

**6. The Settlement was *not* Procured by Fraud or Mistake**

CI disregards Stottlemire's surrounding conduct which unmistakably proves there has been no intent to fraud. Further, CI errs in concluding Stottlemire had reason to believe CI disclosed terms of the Settlement by mistake. CI's conclusion, that rescission is warranted based upon fraud or mistake, is in error. CI has no grounds to rescind the Settlement and this Court should enforce the Settlement.

CI's Opposition correctly establishes that "fraud may be established by the circumstances surrounding the transaction" (Opposition 13:18-19). Yet, CI fails to consider *all* of the surrounding circumstances to establish fraudulent intent. CI is fully aware but precludes those circumstances which eliminate fraudulent intent. First, Stottlemire made clear, and Wired.com published, that the Court did not vindicate Stottlemire. With this comment, Stottlemire emphasized he did not win the lawsuit. (Motion 5:7). Second, Stottlemire made clear, and Wired.com published, that CI upgraded their software in December 2007 and the instructions central to the litigation were moot. (Motion 5:7-9). Third, Stottlemire made clear to CI he had no desire to disclose material terms of the Settlement (Motion to Stay Discovery, Exhibit F). Stottlemire stated:

> "I am trying to avoid [a Motion to Summarily Enforce Settlement Agreement] to PROTECT CI from publically disclosing terms of the settlement. I can only imagine what the press will say should it discover that to settle this action all Stottlemire had to do was AGREE not to file action against CI for Malicious Prosecution and that CI did not even attempt to recover any of its legal fees" (emphasis in original).

In response, CI stated it "is fine with making everything public regarding the settlement" (Motion to Stay Discovery, Exhibit F).

Lastly, and most disturbing, is CI's mischaracterization of Stottlemire's statement he released to Wired.com. In his Motion to Stay Discovery, Stottlemire fully explained his statement: "in [his] opinion, kicked [the attorneys] ass" (Motion to Stay Discovery 8:9). Without any factual underpinning, CI changed Stottlemire's statement to suit its desired purpose, an assertion of fraud. CI states Stottlemire said: "that he "kicked their [Coupons'] ass" (Opposition 7:23-24). However, CI is also aware that Stottlemire discussed this statement in a "chat" (Opposition 9:6-7). During the entire course of litigation, the first time a third party claims to have spoken with Stottlemire in a chatroom, CI adds it to its brief. It is more than obvious that CI discovered that Stottlemire was discussing the Wired.com blog entry through chat. The only way CI would have learned of Stottlemire's chat was through comments made by third parties at Digg.com. A hyperlink to the Digg.com comments is prominently displayed at the bottom of the Wired.com web page. In the first comment in the Digg.com posting made by third parties proclaiming to have chatted with

Stottlemire is a transcript of that chat. The transcript is dated November 22, 2008 and includes the following statement made by Stottlemire: "the jury is still out if I actually kicked their ass (since no one knows the terms of the settlement) but, I fought for 16 months against large lawfirms and survived… so I kicked the attorney's ass" (ellipses and parentheses in original) (Stottlemire Declaration ¶ 3).

To assert fraud, CI must evaluate all of Stottlemire's surrounding conduct. Not simply those it cherry picks. Stottlemire's chatroom conversation makes clear Stottlemire did not execute the "victory dance" against CI as CI claims. CI employed two separate law firms to bring this action against Stottlemire. All of CI's attorneys have been well educated and have vast experience. Although neither party can claim an outright victory, a *pro se* litigant with no litigation experience and no formal education, who has prevailed each attempt of CI's attorneys to bully him, can certainly claim he kicked their ass.

CI also errs in concluding "Stottlemire knew Coupons' consent was given by mistake" (Opposition 14:18 – 16:19). The purported mistakes are keeping confidential "with" in "dismiss with prejudice" and not including terms prohibiting disparagement. Assuming these were mistakes, Stottlemire did not induce these mistakes. Stottlemire had no reason to believe that experienced attorneys could make a mistake as trivial as the mistake CI claims it made. Absent Stottlemire's knowledge that CI made a mistake, CI cannot claim the mistake provides grounds for rescission of the Settlement. The Settlement is a valid contract and cannot be rescinded. Accordingly, this Court should enforce the Settlement.

During the course of litigation, CI often times has argued before the Court and to Stottlemire that Stottlemire does not understand the law. Stottlemire readily admits, as a *pro se* litigant many areas of the law are foreign to him and must rely on the experience and knowledge of other attorneys by reading and studying briefs filed by them in various state and federal courts. Stottlemire must also listen with great care to things said to him by CI's attorneys and does so patiently. Given the experience and education of CI's attorneys, there is never a reason to believe they made a mistake. The most recent example of Stottlemire's faith in CI's attorneys was his first reaction to CI's filing on the eve of the hearing for Stottlemire's Motion to Stay Discovery.

1 Stottlemire's first reaction was "how do I counter this?" It was not until much later that

2 Stottlemire became aware that CI's filing violated the Civil Local Rules of this Court since it had

3 not requested leave to file the pleading.

4       Here, less than 24 hours after the parties settled, CI's attorneys told the Court and public

5 that it was dropping its lawsuit against Stottlemire. Stottlemire had no reason to believe that CI's

6 attorneys made the information readily available to the public through mistake. Even though CI

7 immediately disclosed that term of the Settlement, Stottlemire patiently waited to see if CI planned

8 to file a redacted Stipulation to Dismiss with Prejudice. When it became clear CI had no intention

9 to file a redacted stipulation and that the stipulation would be readily ascertainable by the public,

10 Stottlemire posted CI's November 14, 2008 letter to the Court on his personal blog. Stottlemire

11 further stated that the lawsuit would be dismissed with prejudice.

12       Stottlemire waited seven days so that he could be certain of CI's interpretation of the

13 Settlement. Stottlemire had no reason to question if CI's experienced attorneys were making a

14 mistake. Stottlemire is a *pro se* litigant without the aid of experience or education. If CI's

15 attorneys interpreted the terms of the Settlement and decided it could disclose the lawsuit would be

16 dismissed with prejudice, Stottlemire had no basis to question them.

17       CI cannot claim to have rescinded the Settlement based upon fraud or mistake. Fraudulent

18 intent must be established by all of the circumstances surrounding the transaction. Not just CI's

19 cherry picked incidents. Mistake need not be mutual, but rescission for unilateral mistake requires

20 Stottlemire must have believed CI made a mistake and then did nothing to correct it. The

21 Settlement is an enforceable agreement entered into by CI and Stottlemire on November 13, 2008

22 and this Court should enforce it.

23 **IV.**   **CONCLUSION**

24       CI and Stottlemire entered into a fully enforceable settlement agreement on November 13,

25 2008. Less than 24 hours later, CI disclosed to the public that it was dropping its lawsuit against

26 Stottlemire. The confidentiality term of the Settlement Agreement obviously did not apply to this

27 term of the agreement. Shortly after Stottlemire echoed CI's disclosure on his own blog, CI

28 informed Stottlemire that it had rescinded the Settlement Agreement and refused to file the

Stipulation to Dismiss with the Court unless Stottlemire agree to new terms to settle the litigation. When Stottlemire refused, CI began an avalanche of discovery requests and willfully violated the Federal Rules of Civil Procedure and Civil Local Rules of this Court. CI's purpose of the avalanche is clear; overwhelm Stottlemire in an attempt to coerce him into accepting the newly offered terms in a manner calculated to delay the case and increase the costs incurred by Stottlemire. Stottlemire and CI have already agreed to settlement terms. Their signature on the Settlement Agreement is evidence of this.

One of the terms of the settlement agreement required CI and Stottlemire to exchange mutual general releases in standard form. CI then authored the Mutual Release as it understood the term "standard form" when it signed the Settlement Agreement on November 13, 2008. The minds had fully met on November 13, 2008. The mutual release agreed to by CI and Stottlemire preclude rescission of the agreement no matter what happens in the future. CI made this clear in its email to Stottlemire. CI cannot claim that "no matter what happens in the future" only applies when it fits squarely into CI's purpose. It equally applies to Stottlemire.

Stottlemire therefore respectfully requests that the Court summarily enforce the settlement agreement. CI must fulfill its contractual obligations to Stottlemire by signing the Release and delivering a signed stipulation of dismissal with prejudice to the Court.

John A. Stottlemire
4509 Wayland Court
High Point, NC 27265
Telephone: (614) 358-4185
Email: johna@stottlemire.com
Defendant, *pro se*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| COUPONS, INC., a California corporation, | Case No. 5:07-CV-03457 HRL |
| Plaintiff, | **DECLARATION OF JOHN STOTTLEMIRE IN SUPPORT OF DEFENDANT'S REPLY TO PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO SUMMARILY ENFORCE SETTLEMENT AGREEMENT** |
| v. | |
| JOHN STOTTLEMIRE | |
| Defendant | |
| | Date: February 24, 2009 |
| | Time: 10:00 AM |
| | Courtroom: 2, 5th Floor |
| | Judge: Hon. Howard R. Lloyd |

I, John Stottlemire, hereby declare:

1.      I am the Defendant in this action.  I state all facts herein of my own firsthand knowledge, and if called as a witness, I could and would competently testify thereto.

2.      On February 8, 2009, I visited the website address which isolated Exhibit D Post 13 to the Declaration of Steven Boal in Opposition to Defendant's Motion to Summarily Enforce Settlement Agreement.  I was able to isolate Post 13 by clicking on the number 13 in the upper right hand corner of that post.  A true and exact copy of Post 13 is attached to this Declaration as Exhibit A.

3.      On February 10, 2009, I visited the website address an ordinary internet user would visit by clicking on the "digg it" hyperlink located at the bottom of Exhibit E to the Declaration of Steven Boal in Opposition to Defendant's Motion to Summarily Enforce Settlement Agreement.  Clicking on that hyperlink caused a page to be loaded in my web browser entitled "Coupon Hacker

Defeats DMCA Suit".  A true and exact copy of that webpage is attached to this Declaration as Exhibit B.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed this 10th day of February 2009 at High Point, North Carolina.

Dated:  February 10, 2009                    _____/s/_____
                                             John Stottlemire
                                             Defendant, *pro se*

# EXHIBIT A



View Single Post                                    Thread: Coupons, Inc. v. Stottlemire

11-20-2008, 01:58 PM                                                              #13

**virtually_john**

L1: Learner

Date Joined:        Sep 2007
Location:        High Point, NC
Posts:                     17
Reputation:                17

> **Quote from MarkBett :**
> looks like op created multiple accounts to try to get coupons
> for free stuff and other coupons and violated the dmca and
> also "sold" coupons as well as circumvented the software to
> allow multiple copies of copons

Actually, the case has nothing to do with creating multiple accounts. The
fact that I offered coupons in exchange for a handling fee had no bearing
other than to allege I was in competition with Coupons, Inc. Circumventing
to allow multiple copies and violating the DMCA are the exact same thing,
neither of which have been proved. Only alleged.

> **Quote from playa07 :**
> Right On!!!
>
> So, are you allowed to post anymore blogs about how to
> remove this damn software from our machines without
> formatting the entire PC?

The blog will remain intact and updated as needed.

> **Quote from Pig :**
> So...you were exploiting their coupon policy?

Coupons, Inc. has no "coupon policy" on their website. The Licensing
Agreement now in their software installation was nonexistant in May 2007
and only first appeared after I filed a motion to dismiss because there were
no terms and conditions to prevent removal of files and registry keys on my
computer. A motion I ultimately won because of the lack of the Licensing
Agreement.

-john

Mod Alert        Edit        Reply

Close this window

# EXHIBIT B

**709** diggs

dugg!

## Coupon Hacker Defeats DMCA Suit

blog.wired.com — A California online coupon generating company is dropping its Digital Millennium Copyright Act lawsuit against a man sued for posting commands allowing users to print an unlimited number of valid coupons.

↪ Share  ☆ Favorite?  made popular **80 days ago**

submitted by
**DigSomeMore**
81 days ago
⊕ FRIEND

---

## People Who Dugg This Also Dugg BETA

**531** [Cell jammers still illegal, but may come to state prisons](#)
Made popular 76 days ago  ▤ 96  arstechnica.com

**726** [GOP governor slams party](#)
Made popular 80 days ago  ▤ 115  www.politico.com

**486** [Ultra-wideband radio rides a beam of light](#)
Made popular 81 days ago  ▤ 34  www.physorg.com

How are these stories? **Let us know!**

---

| 53 Comments | Who Dugg It? |

expand all | only mine (1) | only friends' | oldest first ▼          hide profanity   settings

**Louis11**
on 11/21/2008

"Without being represented by an attorney, I defended myself in federal court against a company who solicited the services of two separate law firms," Stottlemire said. "And in my opinion, I kicked their ass."     +102 diggs 🔴 ⬜

▶ 1 Reply — best has 3 diggs                                                              Reply

**aolshove**
on 11/21/2008

Well, maybe it's because all coupons contain the phrase, "This coupon has no monetary value".     +57 diggs 🔴 🟢
It's hard to prosecute somebody for stealing something that you, yourself admits has no value.
Or, maybe they just realized that the more people that redeem the coupons are BUYING MORE OF YOUR
PRODUCT.

▶ 2 Replies — best has 7 diggs                                                            Reply

**Top in Security**

**646** [Hackers Using Fake Parking Tickets to Infect Computers](#)

Maximize

**therealBEANS**
on 11/21/2008

If you go to his blog you can chat with him. He seems like a down to Earth guy and not in it for the money, looking out for the consumers and mentions he wants the world to know a normal people like us can go up against huge corporations and win.

http://www.tenbucks.net/

▶ 3 Replies — best has 3 diggs

+23 diggs

Reply

---

**Gonasadude**
on 11/22/2008

Conversation I had with him detailing how he did it:

+25 diggs

Visitor
Man, congrats on wooping their asses.

John Stottlemire
Thank you

Visitor
I'm sure that you're aware that an article about you is on digg.com.

John Stottlemire
Yes, its all over the internet actually.
I'll be famous. ha ha ha. not quite what I wanted to be famous for "a coupon hacker" lol

Visitor
The script thing kind of sounds like things that I did while in school for various websites.

John Stottlemire
it wasn't even a script. it was a batch file that used "erase" and "reg delete" commands

Visitor
Did it just delete the cookies or something? The article I read was pretty vague.

John Stottlemire
deleted 5 registry keys and two hidden files in the windows directory

Visitor
=) Nice.

John Stottlemire
the registry keys and files were very deceptively named

Visitor
Oh I bet.

John Stottlemire
like "autotrayhistoryenable"


Maximize your refund online for FREE.

Free. Easy.
Online tax prep.

⊖ FILE FOR FREE

$

H&R BLOCK®

**Visitor**
Haha, wow

**John Stottlemire**
and windows.shell.manifest.old

**Visitor**
How did you find it? did you do a diff of your registry after getting a coupon?

**John Stottlemire**
used regmon to see where it was writing in the registry and filemon to see what files it accessed
just in case it was appending data

**Visitor**
Ah, cool

**John Stottlemire**
nothing too hard, but I got sued for it. lol

**Visitor**
Yea, but you kicked their ass, and they wasted lots of money on lawyers.

**John Stottlemire**
the jury is still out if I actually kicked their ass (since no one knows the terms of the settlement)
but, I fought for 16 months against large lawfirms and survived... so I kicked the attorney's asses

**Visitor**
Props to you man. I'm out though. Thanks =)

**Visitor**
Man, congrats on wooping their asses.

**John Stottlemire**
Thank you

**Visitor**
I'm sure that you're aware that an article about you is on digg.com.

**John Stottlemire**
Yes, its all over the internet actually.
I'll be famous. ha ha ha. not quite what I wanted to be famous for "a coupon hacker" lol

**Visitor**
The script thing kind of sounds like things that I did while in school for various websites.

**John Stottlemire**
it wasn't even a script. it was a batch file that used "erase" and "reg delete" commands

**Visitor**
Did it just delete the cookies or something? The article I read was pretty vague.

**John Stottlemire**
deleted 5 registry keys and two hidden files in the windows directory

**Visitor**
=) Nice.

**John Stottlemire**
the registry keys and files were very deceptively named

**Visitor**
Oh I bet.

**John Stottlemire**
like "autotrayhistoryenable"

**Visitor**
Haha, wow

**John Stottlemire**
and windows.shell.manifest.old

**Visitor**
How did you find it? did you do a diff of your registry after getting a coupon?

**John Stottlemire**
used regmon to see where it was writing in the registry and filemon to see what files it accessed
just in case it was appending data

**Visitor**
Ah, cool

**John Stottlemire**
nothing too hard, but I got sued for it. lol

**Visitor**
Yea, but you kicked their ass, and they wasted lots of money on lawyers.

**John Stottlemire**
the jury is still out if I actually kicked their ass (since no one knows the terms of the settlement)
but, I fought for 16 months against large lawfirms and survived... so I kicked the attorney's asses

**Visitor**
Props to you man. I'm out though. Thanks =)

▶ 9 Replies — best has 48 diggs                                    Reply

**kangy3213**
on 11/22/2008

I like turtles                                                    -6 diggs    Reply
▶ 2 Replies — best has 3 diggs

**jeffkee**
on 11/22/2008

I'm hungry.                                                       +2 diggs
                                                                              Reply

**john214**
on 11/22/2008

Those damn toothpaste thiefs!                                     -1 diggs
                                                                              Reply

**maleficdog**
on 11/22/2008

He defeated the attorneys, and we destroyed his website.          +16 diggs

Karma.
                                                                              Reply

**infinitejones**
on 11/22/2008

Is it just me or is the site down at the moment? All I get is a blank page - not even a server or dns   0 diggs
error. Going through translate.google.com seems to work fine but I don't know whether that's a
translation of the live site or a Google snapshot...
                                                                              Reply

**punkcat**
on 11/22/2008

Fucking pirates getting 50 cents off butterball turkeys. FU.      +20 diggs

                                                                              Reply

**oMeSSiaHo**
on 11/22/2008

If the services can be exploited companies will be hesitant to post coupons online. Whats to stop   +2 diggs
a few greedy people from ruining it for everyone?
▶ 3 Replies — best has 5 diggs                                                Reply

**bobbknight**
on 11/22/2008

No defeat, just a pull out.                                       +1 digg
▶ 1 Reply — best has 1 digg                                                   Reply

**Khast**
on 11/22/2008

Wait, so now you can be sued for removing data off my own computer? I delete registry keys all   +10 diggs
the time, not for hacking purposes, but to keep it streamlined and free from orphans.

But, I guess I had better watch out, that 47KB I shaved out of my registry last time I did maintenance might land me
in court. :O Oh noez!!!
                                                                              Reply

**jflaker**
on 11/22/2008

THEY place data on the end user computer to prevent multiple coupons   +11 diggs
USER removes data, which they have EVERY right to do
THEY sue user for removing data because it broke their program

NEVER EVER EVER EVER EVER rely on data on an end user system for your system to work right.....Bad
programming will always nip you in the ass sooner or later.
                                                                              Reply

**PurgueFlantar**
on 11/22/2008

John Stottlemeir, the "hacker" has a chat app embedded on his website, this is the transcript of   +1 digg
my bried conversation with him:

**Visitor**
Heya John, just read the Digg article about you, great stuff.

**John Stottlemire**
Thank You!

**Visitor**
Did you see the Digg posting? Do you follow that site?
http://digg.com/security/Coupon_Hacker_Defeats_DMC ...

**John Stottlemire**
yeah, pretty cool
and its generating tons of traffic
I like this one too:
http://arstechnica.com/news.ars/post/20081121-coup ...

**Visitor**
Cool beans John, hang tough.

**John Stottlemire**
thanks! I appreciate it!

Reply



**johnstottlemire**
on 11/22/2008

Ya'll quit posting my chats. LOL.

+4 diggs

Reply

**opticwind**
on 11/22/2008

I don't know why we are supporting him. Even if it brought business to the company that's not his decision to make. I mean...just because he is a hacker, it doesn't mean he's doing something good.

+1 digg

▶ 1 Reply — best has 2 diggs

Reply

**AyaJulia**
on 11/22/2008

Lulz, that's my father. -.-

+3 diggs

...no, seriously. Might be nice if I saw a penny of that money for all the time my mom had to work multiple jobs while he didn't pay child support. Fucking deadbeat. I could use it, immigration and education are expensive. But whatever, grats and shit or something.

▶ 2 Replies — best has 1 digg

Reply

**johnnyCA**
on 11/25/2008

Summary: Coupons Inc. gets coupwned

0 diggs

Reply

**coupon888**
on 01/21/2009

Thanks for your sharing and I would like to share with you the latest coupon codes from
http://www.couponsmarter.com,

try it out and you will find you could save a big dollar with couponsmarter.com

Reply

**Zengetsu**
on 01/28/2009

http://animecorruption.com/

+1 digg

Reply

**Add a Comment** — No HTML please. Comments are editable for 5 min.

Enter the text you see in the image.

🕐 Please allow up to 60 sec for your comment to be saved.

3 G 3 a n

Save Comment

## Related by Keyword BETA

| 67 | Hackers claim zero-day flaw in Firefox |
| | Made popular 2 years 131 days ago 💬 5 news.com.com |

| 561 | Hackers exploit Bhutto assassination |
| | Made popular 1 year 44 days ago 💬 61 www.computerworld.com |

| 1201 | Hacker's Hall of Fame |
| | Made popular 3 years 39 days ago 💬 31 tlc.discovery.com |

How are these related stories? **Tell us!**

### Site Links

HOME

TAKE A TOUR

SEARCH DIGG

DIGG MOBILE

RSS FEEDS

POPULAR ARCHIVE

TERMS OF USE, PRIVACY

### All About Digg

ABOUT US

CONTACT US

THE DIGG BLOG

DIGG TOWNHALLS & MEETUPS

JOBS AT DIGG

ADVERTISE ON DIGG

DIGGNATION PODCAST

### Digg Tools & API

ALL DIGG TOOLS

FIREFOX TOOLBAR New

ADD DIGG TO GOOGLE

FLOCK WEB BROWSER

MYSPACE WIDGET

NETVIBES WIDGET

INTEGRATE DIGG BUTTONS

### Digg Dialogg!

DIGG DIALOGG lets you choose the questions.

### Digg Labs

Get a real-time view beneath the surface of Digg.

DIGG LABS HOME

ARC, SWARM, STACK, BIGSPY, PICS

### Digg Mobile

Browsing Digg on your phone just got easier with our enhancements to the DIGG MOBILE SITE. If your phone doesn't support the full web browsing experience, check out the original DIGG RIVER mobile site instead.

